UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Civil No. 13-3029-JRT-JSM

| | | |
|---|---|---|
| LEONARD J. RICHARDS, | ) | |
| | ) | |
| Plaintiff, | ) | **FIRST AMENDED** |
| | ) | **COMPLAINT** |
| vs. | ) | |
| | ) | |
| ERIC H. HOLDER, JR., U.S. Attorney General | ) | |
| ([inactive]: *see* ¶ 4(b)(1), *infra*); | ) | |
| DONALD MARK RITCHIE (a/k/a/ MARK RITCHIE), | ) | Jury trial demanded |
| Minnesota Secretary of State (the "Secretary"), in his | ) | (*see* NOTICE and ¶ 1, *infra*). |
| individual and official capacities; | ) | |
| BRAD ANDERSON, Election Administrator of the | ) | |
| Secretary, in his individual and official capacities; | ) | |
| BERT BLACK, Data Practices Compliance Officer of the | ) | |
| Secretary, in his individual and official capacities; | ) | |
| STATE OF MINNESOTA, by Lori R. Swanson, its | ) | |
| Attorney General; | ) | |
| THOMAS A. ROY (a/k/a TOM ROY), Minnesota | ) | |
| Commissioner of Corrections, in his individual and | ) | |
| official capacities; | ) | |
| MARK BRANDT DAYTON (a/k/a MARK DAYTON), | ) | |
| Governor of the State of Minnesota, in his individual | ) | |
| and official capacities; | ) | |
| THOMAS EDWARD NELSON, in his individual | ) | |
| capacity as Plaintiff's co-candidate for Governor or | ) | |
| Lieutenant Governor of the State of Minnesota | ) | |
| in election year 2014; and | ) | |
| all persons in concert with any of the defendants or | ) | |
| on their behalf, | ) | |
| Defendants. | ) | |

Plaintiff, for his complaint against the defendants, states and alleges as follows:

---

**NOTICE**

The filing period for the offices of Governor and Lieutenant Governor

begins on May 20, 2014, and ends on June 3, 2014. *See also* ¶ 1, *infra*.

---

SCANNED

APR 1 1 2014

U.S. DISTRICT COURT ST. PAUL

## JURY DEMAND

1.　　　Plaintiff requests trial by jury as to all factual issues EXCEPT FOR TIME-SENSITIVE ELECTION MATTERS.

## JURISDICTION

2.　　　This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, and 1988; 28 U.S.C. §§ 1331 and 1343; 28 U.S.C. § 1367; 28 U.S.C. §§ 2201 and 2202; 42 U.S.C. § 12101 *et seq.*, being the Americans with Disabilities Act; 29 U.S.C. § 794, being Section 504 of the Rehabilitation Act; AMENDMENTS I, IV, V, VIII, and XIV of the United States Constitution; and ARTICLE V, § 2, sentence two, of the Minnesota Constitution.

## CONSTRUCTION OF Pro se PLEADINGS

3.　　　In addressing any *pro se* litigant's pleadings, a court must construe the pleadings liberally. *Haines v. Kerner*, 404 U.S. 519, 521; *Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 922 n.1 (8th Cir. 2010) ("[A] pro se complaint must be liberally construed.")

## PARTIES

4.　　　(a)　　PLAINTIFF:　**Leonard J. RICHARDS**

Leonard J. Richards is the sole plaintiff (hereinafter "Plaintiff") in this action. He is currently incarcerated at the Minnesota Correctional Facility-Stillwater (which is actually in Bayport) by defendant STATE OF MINNESOTA. Plaintiff's prisoner number is 149837. His current postal address is as follows:

> Leonard J. Richards
> 970 Pickett Street North 149837
> Bayport, MN 55003-1490

Plaintiff is NOT a telephone, email, or Website subscriber. Plaintiff IS a candidate for all public

2

offices in every election (whether by write-in or by on-ballot candidacy), including—of immediate relevance to this complaint—the office of Governor or Lieutenant Governor of the State of Minnesota in election year 2014.  In addition to his numerous write-in candidacies, Plaintiff has previously been an on-ballot candidate in the state of Minnesota for the Federal offices of U.S. Representative in Congress (8th District), in 1974 and in 1992, and U.S. Senator in Congress, in 1978 and in 1994; in 1978, Plaintiff was the **endorsed** candidate of The Libertarian Party for the six-year U.S. Senate seat (*both* U.S. Senate seats were up for election due to Hubert H. Humphrey, Jr.'s death).  In 1974 and in 1978, Plaintiff was NOT convicted (or, more accurately in the context of the sham court proceedings burdening Plaintiff, "convicted") of any crime.  In 1992 and in 1994, Plaintiff was a prisoner at the Minnesota Correctional Facility-Oak Park Heights.  In 1990, Plaintiff was an on-ballot candidate for State Treasurer, running as a D-F-L candidate.  Plaintiff was freed of any criminal conviction ("conviction") by the Minnesota Supreme Court on June 1, 1990, and of course voted for himself for State Treasurer while confined as a pretrial detainee at the Hennepin County Jail.  In **retaliation** for seeking the elective public office of State Treasurer (an office later abolished by constitutional amendment), Plaintiff was assaulted and battered in the Hennepin County Jail by Lt. Vernon Roger Anderson and guards—including Sgt. France—under the command of the said Lt. Anderson.  (Anderson died on November 16, 2011, aged 70, of lung cancer.  At least he won't be mistreating any more prisoners.)

        (b)   <u>DEFENDANTS</u>:

           (1)   **Eric H. HOLDER, Jr.**

Eric H. HOLDER, Jr., is the Attorney General of the United States.  He was dismissed, *without* prejudice, as a party to this action by U.S. District Judge John R. Tunheim on January 6, 2014

(*see* Document 18).

(2)    **Donald Mark RITCHIE (also known as Mark RITCHIE)**

Donald Mark RITCHIE (a/k/a Mark RITCHIE) is the Secretary of State of the State of

Minnesota. He is sued in his individual and official capacities. His office address is as follows:

Donald Mark Ritchie
(a/k/a Mark Ritchie)
Secretary of State
180 State Office Building
100 King Boulevard
Saint Paul, MN 55155-1299

(3)    **Brad ANDERSON**

Brad ANDERSON is the Election Administrator of the Minnesota Secretary of State. He is sued

in his individual and official capacities. His office address is as follows:

Brad Anderson
Election Administrator
Secretary of State
180 State Office Building
100 King Boulevard
Saint Paul, MN 55155-1299

(4)    **Bert BLACK**

Bert BLACK is the Data Practices Compliance Officer of the Minnesota Secretary of State. He

is sued in his individual and official capacities. His office address is as follows:

Bert Black
Data Practices Compliance Officer
Secretary of State
180 State Office Building
100 King Boulevard
Saint Paul, MN 55155-1299

(5)    **STATE OF MINNESOTA**

STATE OF MINNESOTA, by its Attorney General, Lori R. Swanson, is sued for prospective

injunctive relief against certain of its officials for continuing violation of Federal law. The

4

officials of the STATE OF MINNESOTA named in this complaint are defendants RITCHIE,

ANDERSON, BLACK, ROY, and DAYTON.  Attorney General Swanson's office address is

as follows:

Lori R. Swanson
Attorney General
102 State Capitol Building
75 King Boulevard
Saint Paul, MN 55155-1609

(6)     **Thomas A. ROY (also known as Tom ROY)**

Thomas A. Roy (a/k/a Tom Roy) is the Commissioner of Corrections of the State of Minnesota;

he was appointed to that official office by defendant Mark Brandt DAYTON (also known as

Mark DAYTON).  Defendant ROY is sued in his individual and official capacities.  His office

address is as follows:

Thomas A. Roy
(a/k/a Tom Roy)
Commissioner of Corrections
Suite 200
1450 Energy Park Drive
Saint Paul, MN 55108-5219

(7)     **Mark Brandt DAYTON (also known as Mark DAYTON)**

Mark Brandt DAYTON (a/k/a Mark DAYTON) is the Governor of the State of Minnesota.  He

is sued in his individual and official capacities.  His office address is as follows:

Mark Brandt Dayton
(a/k/a Mark Dayton)
Governor
130 State Capitol Building
75 King Boulevard
Saint Paul, MN 55155

(8)     **Thomas Edward NELSON**

Thomas Edward NELSON is Plaintiff's co-candidate for Governor or Lieutenant Governor of

the State of Minnesota in election year 2014.  His last

legal residence address in Plaintiff's records is as follows:

Thomas Edward Nelson
970 Pickett Street North 103194
Bayport, MN 55003-1490

     5.     Plaintiff reserves the right to substitute another

Co-Candidate for Governor or Lieutenant Governor in election

year 2014 or in any other subsequent election year.

     6.     All of the defendants (except for defendant Nelson

and inactive defendant Holder) have acted, and continue to act,

under color of state law at all times relevant to this complaint.

<u>OTHER FACTUAL ALLEGATIONS</u>

     7.     Plaintiff is a prisoner of defendants STATE OF

MINNESOTA, DAYTON, and ROY.

     8.     Plaintiff is a natural-born citizen of the United

States of America.

     9.     Plaintiff has been a resident of the state of

Minnesota continuously for more than forty (40) years.

     10.     Plaintiff is more than fifty (50) years of age.

     11.     Plaintiff meets <u>all of the qualifications</u> for the

offices of Governor and Lieutenant Governor of the State of

Minnesota, as follows: (A) citizenship, (B) residency, and

(C) age.  Minn. Const. Article V, § 2, sentence two.  Note

that Article V does <u>not</u> say (A), (B), and (C) PLUS WHATEVER

OTHER QUALIFICATIONS FOR BALLOT ACCESS THE SECRETARY OF STATE

AND/OR THE MINNESOTA LEGISLATURE DECIDE TO ADD.

     12.     On December 30, 2013, Plaintiff wrote by Certified

Mail, Return Receipt Requested, to defendants RITCHIE and

ANDERSON.   Defendants RITCHIE and ANDERSON received the said
letter on December 31, 2013, according to the Return Receipt.
As of the date of Plaintiff's drafting of this complaint,
defendants RITCHIE and ANDERSON have failed to respond to
that letter, thereby leaving Plaintiff (A) uncertain of his
fundamental constitutional rights to ballot access in the
year 2014 (and in subsequent election years) for the offices
of Governor and Lieutenant Governor and (B) in imminent
danger of losing the opportunity to exercise his fundamental
constitutional rights to political expression and association
in the year 2014 by means of an on-ballot candidacy for either
of those offices.  By their conduct, defendants RITCHIE and
ANDERSON have contravened the First, Fifth, and Fourteenth
Amendments of the United States Constitution and Article V,
§ 2, sentence two, of the Minnesota Constitution.

13.    The wrongful conduct of defendants RITCHIE and
ANDERSON in not supplying information even about their own
form, the Affidavit of Candidacy at issue in this action,
denies Plaintiff his right to perfect his on-ballot candidacy
in the year 2014 for Governor or Lieutenant Governor.

14.    Plaintiff took the necessary steps to get
photocopies made of the Affidavit of Candidacy form at issue
in this action; however, the Minnesota Correctional Facility-
Stillwater refused to make the copies--even though Plaintiff
was paying the princely sum of 25¢ per page.  Plaintiff has
filed with the Court a Declaration dated February 20, 2014,
detailing the said prison's efforts to interfere with Plaintiff's

constitutional rights to access to the courts and to petition
government for the redress of grievances, as guaranteed by
the First and Fourteenth Amendments of the United States
Constitution.

15.    The filing information for the Declaration cited
in ¶ 14 above is as follows:

Document Number: _____27_____

Filing date: _____02/24/2014_____

16.    By condoning the actions of their agents at the
Minnesota Correctional Facility-Stillwater, defendants STATE
OF MINNESOTA, DAYTON, and ROY have deprived Plaintiff of his
rights under the First and Fourteenth Amendments of the United
States Constitution with respect to the conduct described in
¶ 14 above.

17.    In the letter dated December 30, 2013, which is
described in ¶ 12 above, Plaintiff asked defendants RITCHIE
and ANDERSON whether they accept or reject Plaintiff's objections
to their stated requirements for ballot access for the offices
of Governor and Lieutenant Governor; those objections were
set forth in the section of that letter marked NOTE.  The text
of that section is as follows:

NOTE

A.    Nowhere does the Minnesota Constitution
require candidates for Governor or Lieutenant
Governor to submit an affidavit, oath, or
affirmation before their election; in fact,
not even a writing is required (oral
notification to the Secretary of State
[hereinafter the "Secretary"] is enough).
I object to the imposition of an affidavit,
oath, or affirmation to register my on-ballot

candidacy for Governor or Lieutenant Governor;
neither the Minnesota Legislature nor the
Secretary can constitutionally add ballot-
access requirements not set forth in the
governing provision of the Minnesota Constitution.

B.     Only four (4) items of information are
required by the Minnesota Constitution:
(1) minimum age for the office sought; (2)
sufficient residency in the state; (3) name
of running mate; and (4) U.S. citizenship.
I object to the compellted disclosure of
additional information (except as noted in
C, below) as a violation of the First, Fourth,
Fifth, Eighth, and Fourteenth Amendments
and the corresponding provisions in the
Minnesota Bill of Rights.

C.     As an accommodation to the Secretary, I
am willing to communicate to the Secretary
my ballot name, **Leonard J. Richards**; the
office (Governor or Lieutenant Governor)
that I am seeking; the name of my running
mate seeking the other office in the set;
the three-word name of the political party
whose nomination I am seeking; and my legal
residence address (including ZipCode).  This
is a one-time, voluntary gesture to assist
the Secretary.

D.     In the attached working-draft Affidavit of
Candidacy, the following subparts under Line 6
are requirements that the Minnesota Legislature
and the Secretary, jointly or severally, have
grafted onto the Minnesota Constitution; I
object to all of the following subparts:
(a), (b), (e), (f), (g), (i), and (j) [subpart
(l) on meeting the constitutional requirements
is only listed as an optional statement].
I also object to the imposition of a filing
fee as not being required by the Minnesota
Constitution and a violation of the First,
Fifth, Eighth, and Fourteenth Amendments and
the corresponding provisions of the Minnesota
Bill of Rights.

18.     On the next page, the text of the <u>draft</u> referred
to in ¶ 17(D) is set out.  That working draft--when viewed in
conjunction with Plaintiff's objections--shows that the
Secretary of State's "requirements" contravene the governing
law (Minn. Const. Article V, § 2, sentence two).

Filing # _____
Cash/Check # _____
Amount $300.00

## AFFIDAVIT OF CANDIDACY

TO: Secretary of State of the State of Minnesota

1. Name (as it will appear on the ballot):   Leonard J. Richards

2. Office Sought:   Governor

3. Political Party or Principle:   Democratic-Farmer-Labor

4.   Legal Residence Address:  970 Pickett Street North 149837
Bayport, MN 55003-1490

5.   **I affirm that the name at Line 1, above, is my true name or the name by which I am generally known in the community.**

6.   **I also affirm that:**

   (a) I am not eligible to vote in Minnesota under current law;

   (b) I have not filed for the same or any other office at the upcoming primary or general election;

   (c) I will be 25 years of age or older on the first Monday of the next January;

   (d) I have been a bona fide resident of the state for not less than one year next preceding my election;

   (e) I am filing for statewide office, not for a district office;

   (f) Because I am incarcerated and unable to travel to the caucus site, I could not participate in the party's most recent precinct caucuses;

   (g) Because I am not eligible to vote, I cannot vote for any of that party's candidates at the next general election;

   (h) I am filing jointly with   Thomas Edward Nelson   ;

   (i) Due to my incarceration, I am unable to provide a telephone contact number, a Website URL, or an e-mail address;

   (j) Due to my incarceration, I am unable to provide a "Campaign Contact" address in addition to my legal residence address;

   (k) I am a citizen of the United States; and

   (l) I meet all of the qualifications for the office of Governor (or Lieutenant Governor) (see Article V, Sec. 2, sentence two, of the Minnesota Constitution).

_____
Affiant's signature

_____, 2014

Subscribed and affirmed before me this
_____ day of _____, 2014.

_____
NOTARY PUBLIC

19.    The qualifications for the offices of Governor and Lieutenant Governor are different from the qualifications for the other three (3) offices of the Executive Department: Secretary of State, Auditor, and Attorney General.   Unlike the offices of Governor and Lieutenant Governor, the offices of Secretary of State, Auditor, and Attorney General require an additional qualification under the Minnesota Constitution; namely, status as "a qualified voter."  Minn. Const. Article VII, § 6; see also Minnesota Legislative Manual 2013-2014, at pages 66, 286-290.

20.    Under the Minnesota Constitution, the Governor and the Lieutenant Governor candidates run jointly; the voter casts a single vote, which applies to both offices.  Minn. Const. Article V, § 1, sentence two; see also Minnesota Legislative Manual 2013-2014, at pages 66, 287.

21.    Due to his incarceration (Plaintiff has still not been allowed access to [a] usable transcripts of the state-court criminal proceedings had against him necessary to seek post-conviction relief under Chapter 590 of the Minnesota Statutes and [b] all of his sentencing records, which also are necessary to seek post-conviction relief under the said Chapter 590), Plaintiff is unable to provide a contact telephone number to defendants RITCHIE and ANDERSON. See Minn. Stat. § 204B.06, Subd. 1b(a), which contravenes the governing law, Minn. Const. Article V, § 2, sentence two. The said governing law requires neither an affidavit nor the disclosure of a contact telephone number.

11

22.    Due to his incarceration, Plaintiff is also
unable to provide an email address and a Website URL to
defendants RITCHIE and ANDERSON. See Minn. Stat. § 204B.06,
Subds. 1, 2, 4a (as to affidavit requirement), and 7 (as
to affidavit requirement), which contravene the governing
law, Minn. Const. Article V, § 2, sentence two.  The said
governing law requires none of the following: (1) that the
candidate for Governor or Lieutenant Governor be "an eligible
voter"; (2) that such candidates submit an affidavit to
register their on-ballot candidacies; (3) that such candidates
specify a "district" from which they seek election; (4)
that such candidates state the name of their political party
or political principle "in three words or less"; (5) that
such candidates state that they participated in their party's
"most recent precinct caucus" or intend to vote for "a
majority of that party's candidates at the next ensuing general
election."

23.    The cited provisions of Minn. Stat. §0204B.06
(see ¶¶ 21, 22, above) contravene not only the Minnesota
Constitution, but also the First and Fourteenth Amendments
of the United States Constitution, which protect a citizen's
fundamental rights to political expression and association.
Imposing an unlawful qualification to register an on-ballot
candidacy for public office cannot survive judicial review.
"Voting is clearly a fundamental right." Harper v. Virginia
Bd. of Elections, 383 U.S. 663, 667 (1966). "But the right
to vote would be empty if the State could arbitrarily deny

12

the right to stand for election." <u>Lubin v. Panish</u>, 415
U.S. 709, 721-2 (1974). "The right of a party or an
individual to a place on a ballot is entitled to protection
and is intertwined with the rights of voters." <u>Lubin</u>, at
716.

24.     The governing law--Minn. Const. Article V,
§ 2, sentence two--does <u>not</u> require candidates for Governor
to establish or maintain a "Campaign Contact" address
separate from the candidate for Governor's (or candidate
for Lieutenant Governor's) residence address. Thus, Minn.
Stat. § 204B.06, Subd. 1b(c) also contravenes the said
governing law; the said Subd. 1b(c) simultaneously contravenes
the First and Fourteenth Amendments of the United States
Constitution.

25.     The "Affidavit of Candidacy" form devised,
distributed, and enforced for on-ballot candidacy for the
offices of Governor and Lieutenant Governor by defendants
RITCHIE and ANDERSON imposes a raft of qualifications that
<u>exceed the three (3) qualifications (citizenship, residency,
and age) allowed by the governing law, Minn. Const. Article
V, § 2, sentence two.</u>

26.     According to the most recent edition ("Rev. 4-12")
of the said Affidavit of Candidacy form that Plaintiff has
been able to obtain, that form imposes all of the following
<u>extra-constitutional/unconstitutional qualifications</u> that
Plaintiff, defendant Nelson, or any other candidate for Governor
or Lieutenant Governor would have to meet to get ballot access
in Minnesota in election year 2014 (or in any subsequent

election year in Minnesota when those offices were up for
election):

    (a)    Filing fee;

    (b)    Candidate's phone number;

    (c)    Candidate's email address;

    (d)    Candidate's Website URL;

    (e)    Affidavit, subscribed and sworn to (or
           affirmed) before a Notary Public or other
           officer empowered to take and certify
           acknowledgments;

    (f)    Making the representation: "I am eligible
           to vote in Minnesota"; and

    (g)    Making the representation: "If a major
           political party candidate, I either
           participated in the party's most recent
           precinct caucuses or intend to vote for a
           majority of that party's candidates at the
           next general election."

    27.    As noted at ¶ 14 above, the prison blocked Plaintiff
from making photocopies of the Secretary of State's "Affidavit
of Candidacy" form.  To try to overcome that obstacle thrown
in Plaintiff's way, Plaintiff filed the original of the form
with the Court. <u>See</u> Document 27-1, Page 1 ("Affidavit of Candidacy").

    28.    Plaintiff is <u>not</u> eligible to vote in Minnesota
under current Minnesota law.  But that is not a qualification
for the offices of Governor and Lieutenant Governor anyway.
Minn. Const. Article V, § 2, sentence two.  One of the aims
of Plaintiff's candidacy for Governor or Lieutenant Governor
is to abolish the taking away of the voting rights of persons
convicted of felonies.  Attached, on the next page, is a true
and correct copy of Plaintiff's "2014 KEY ISSUES" tract; note
C2 in the section on <u>Voting-Rights Expansion and Fair Elections</u>.

14

<u>2014 : KEY   ISSUES</u>

**A.   <u>Corrections Reform</u>**

    1. Merge the Department of Corrections into the state Department of Human Services.

    2. Begin closing--on a phased basis--all but three (3) of the state prisons: Oak Park Heights, Shakopee, and Togo (Thistledew).

    3. Supervise in the community those now held in the state prisons, <u>except</u> <u>for</u> those who are currently assaultive or unwilling to abide by the provisions of <u>STRICT</u> <u>in-community</u> <u>supervision</u>.

    4. Build a hospital-connected retirement center for elderly and disabled supervisees to facilitate their return to the community.

**B.   <u>State-Government Reform</u>**

    1. Merge all of the Departments of the state government into no more than seven (7) Departments:

        (a)  Agriculture and Commerce;
        (b)  Human Services;
        (c)  Education;
        (d)  Administration and Finance;
        (e)  Transportation;
        (f)  Public Safety; and
        (g)  Natural Resources

    2. Establish the office of Independent Inspector General with full powers to investigate <u>all</u> state-government operations and to conduct criminal and civil prosecutions, thereby bringing transparency and accountability to Minnesota state government.

    3. Restore and enhance a <u>genuine</u> safety net to protect the poor and the vulnerable.

**C.   <u>Voting-Rights Expansion and Fair Elections</u>**

    1. Lower the voting age to 16.

    2. Stop taking voting rights from convicted persons.

    3. Transfer election administration from the Secretary of State to an <u>impartial</u> Elections Commission.

15

29.     Plaintiff was unable to participate in the February 4, 2014, precinct caucuses of his designated party (Democratic-Farmer-Labor) due to his incarceration and his current status as not being an "eligible" voter in Minnesota. But that is not a qualification for the offices of Governor and Lieutenant Governor anyway.  Minn. Const. Article V, § 2, sentence two.

30.     Defendant Mark DAYTON also did <u>not</u> attend <u>his</u> February 4, 2014, Democratic-Farmer-Labor precinct caucus.

31..    Like Plaintiff, defendant NELSON was unable to participate in the February 4, 2014, precinct caucuses of his designated party (Democratic-Farmer-Labor) due to his incarceration on February 4, 2014, and his current status as not being an "eligible" voter in Minnesota.

32.     Plaintiff, due to his incarceration by defendants STATE OF MINNESOTA, DAYTON, and ROY, is not able to obtain-- regularly--timely and unobstructed access to the services of a Notary Public or other officer empowered to take and certify acknowledgments.  Sometimes a Notary Public is available to Plaintiff, and sometimes a Notary Public is <u>not</u> available to Plaintiff.  But verification is <u>not</u> a lawful requirement to register an on-ballot candidacy for Governor or Lieutenant Governor anyway.  Minn. Const. Article V, § 2, sentence two.

33.     Plaintiff cannot without undue deprivation afford to pay a filing fee to the Secretary of State as a qualification for ballot access for Governor or Lieutenant Governor; payment of such a fee is <u>not</u> a lawful requirement anyway.  Minn. Const.

16

Article V, § 2, sentence two.  Like several others provisions
in Chapter 204B of the Minnesota Statutes, Section 204B.11,
Subd. 1 is unconstitutional in every case as a contravention
of Article V, § 2, sentence two, of the Minnesota Constitution.
A filing fee is <u>not</u> a qualification for the office of Governor
or Lieutenant Governor of the State of Minnesota.

34.     Subd. 2 of Section 204B.11 of the Minnesota
Statutes is also unconstitutional as applied to Plaintiff or
any other prisoner who meets the three (3) constitutional
qualifications for the office of Governor or Lieutenant
Governor.  The said Subd. 2--sometimes called the "Richards
Law"--imposes an insuperable obstacle to an otherwise
qualified candidate who cannot afford to pay a filing fee
of hundreds of dollars.  Plaintiff, from prison, cannot
organize and conduct a petition campaign to obtain ballot
access by obtaining 2,000 signatures of "eligible" voters.

35.     In the year 1974, in the case of <u>Leonard J.
Richards v. Arlen I. Erdahl, Minnesota Secretary of State</u>,
the Ramsey County District Court, Ronald E. Hachey, J.,
ordered the Minnesota Secretary of State to place Plaintiff's
name on the ballot for the office of U.S. Representative in
Congress (8th District) <u>without paying a filing fee</u>.  That
had never happened before in Minnesota, but Judge Hachey's
order was in accord with the decision of the United States
Supreme Court in <u>Lubin v. Panish</u>, 415 U.S. 709 (1974).

36.     Following Plaintiff's successful ballot-access
lawsuit in 1974, the Minnesota Legislature the next year, 1975,

17

enacted the "Richards Law," which is currently codified as
Minn. Stat. § 204B.11, Subd. 2.   That alternative procedure
for ballot access is <u>not</u> "reasonable" under <u>Lubin</u>, as applied
to Plaintiff, because Plaintiff is incarcerated and therefore
unable to organize and conduct a petition drive.  In Plaintiff's
case, it is essential that no filing fee or petitioning
requirement be imposed as a prerequisite for Plaintiff to obtain
ballot access for the office of Governor or Lieutenant Governor.

37.   A write-in candidacy is also <u>not</u> a "reasonable"
means of gaining ballot access.   To quote from <u>Lubin</u>:

> **It is suggested that a write-in
> procedure . . . without a filing
> fee would be an adequate alternative
> to . . . [a] filing-fee requirement.
> The realities of the electoral
> process, however, strongly suggest
> that "access" via write-in votes
> falls far short of access in terms
> of having the name of the candidate
> on the ballot.  It would allow an
> affluent candidate to put his name
> before the voters on the ballot
> by paying a filing fee while the
> indigent, relegated to write-in
> provision, would be forced to rest
> his chances solely upon those voters
> who would remember his name and
> take the affirmative step of writing
> it on the ballot.  That disparity would,
> itself, give rise to constitutional
> questions and . . . the intimation
> that a write-in provision without the
> filing fee . . . would constitute "an
> acceptable alternative" appears dubious
> at best.**

<u>Lubin</u>, 415 U.S., at 719 n.5.(emphasis added).

38.   Plaintiff is entitled to register his on-ballot
candidacy and not be relegated to write-in status, as <u>Lubin</u>
makes clear on the final page of the Opinion of the Court
(page 719).

39.     In a Legal Memorandum submitted to defendants RITCHIE and ANDERSON with Plaintiff's letter dated December 30, 2013, Plaintiff first distinguished the facts in In re Pfliger, 819 N.W.2d 620 (Minn. 2012), from the facts in Plaintiff's situation and then listed the information that Plaintiff can provide to the Secretary of State for the purpose of filing for the office of Governor or Lieutenant Governor in election year 2014, as follows:

(1)  his name ("Leonard J. Richards");
(2)  the office sought (Governor or Lieutenant Governor);
(3)  his political party or principle ("Democratic-Farmer-Labor");
(4)  his legal residence address (the postal address of the prison where Richards is resident at the time of signing his filing paper);
(5)  that he has not filed for the same or any other office at the upcoming primary or general election;
(6)  that he has attained the age of 25 years;
(7)  that he has been a bona fide resident of the state for more than one year next preceding the 2014 elections;
(8)  that he is a citizen of the United States; and
(9)  the name of the person with whom he is filing jointly for the offices of Governor and Lieutenant Governor.

40.     Plaintiff objects to providing more information to the Secretary of State beyond the nine (9) items listed in ¶ 39, above.  Those nine (9) items of information are shown in the proposed Notice of Candidacy, which appears on the next page of this complaint.  For the Secretary of State to require the disclosure of more information would violate Plaintiff's rights under the Fourth and Fourteenth Amendments; in addition, such coerced disclosure would violate Amendment I.

19

(In this iteration, Plaintiff is listed as the Candidate for
Lieutenant Governor; the two Co-Candidates, however, will
decide before filing in 2014 which, Nelson [or substitute]
or Richards, will be the Candidate for Governor and which will
be the Candidate for Lieutenant Governor.)

_____ _____ _____
_____ _____ _____

## Notice of Candidacy

TO:   Secretary of State of the State of Minnesota

All information on this form is available to the public.
Information provided will appear on the Secretary of
State's website at www.sos.state.mn.us.

* Name of Candidate (as it will appear on ballot): **Leonard J. Richards**

* Office Sought: **Lieutenant Governor**

* Political Party or Principle: **Democratic-Farmer-Labor**

* Legal Residence Address:

Street Address:  970 Pickett Street North 149837

City:  Bayport       State:  Minnesota       Zip:  55003-1490

I certify that this is my true name or the name by which I
am generally known in the community.

I also certify that:

* I have not filed for the same or any other office at the upcoming
primary or general election;

* I will be at least 25 years old on the first Monday of the next
January;

* I will be a resident of Minnesota for not less than one year
on election day;

* I am a citizen of the United States of America; and

* I am filing jointly with **Thomas Edward Nelson**.

_____
Candidate Signature

_____/_____/2014
Date

_____ _____ _____
_____ _____ _____

41.     By letter dated January 11, 2014, Plaintiff requested from defendant Bert Black

(*see* ¶ 4(b)(4), above), Data Practices Compliance Officer of the Minnesota Secretary of State, a

copy of the American Fund Constitution, which defendant Brad Anderson, Election

Administrator of the Minnesota Secretary of State, had previously "retained" in the files of the

Minnesota Secretary of State.  Attached hereto is a true and correct copy of that January 11,

2014, letter, with the Secretary of State's bar-coded serial number 72847760002 imprinted in

the upper right-hand corner of the letter.  ***Defendant Black failed to respond to the said letter.***

42.     But by letter dated February 3, 2014, defendant Anderson—without mentioning

defendant Black—stated that Plaintiff's $1.00 was being returned to Plaintiff.   As of this writing,

well over a month after the date of Anderson's letter, Plaintiff has <u>not</u> received the promised

refund.

43.     Regarding the document in question—the Constitution of American Fund, a

political party—*see* Document 16-1, Pages 10, 11.

44.     Election administration should be removed from the Secretary of State to an

***impartial*** Elections Commission.  See <u>2014 KEY ISSUES</u>, at part C3, on page 15, above.

45.     The actions of defendants Black and Anderson constitute violations of Plaintiff's

rights under the First, Fifth, and Fourteenth Amendments to the United States Constitution to

petition government for the redress of grievances, to political expression and association, and to

freedom from having property taken without due process of law.  The said actions also violate

Plaintiff's rights under the corresponding provisions of the Minnesota Bill of Rights.

46.     As already stated, submitting an affidavit is *not* a lawful qualification for registering an on-ballot candidacy for the offices of Governor and Lieutenant Governor; accordingly, Subd. 1 of Minn. Stat. § 204B.10 is unconstitutional under the Qualifications Clause, Minn. Const. Article V, § 2, sentence two.

47.     Further, Subd. 6 of Section 204B.10 (as to the need to submit an affidavit of candidacy) is unconstitutional for the same reason.

48.     Subd. 6(1) of Section 204B.10 is also unconstitutional in that it imposes a qualification that exceeds the constitution-established qualifications, as the same are set forth in the Qualifications Clause, Minn. Const. Article V, § 2, sentence two.

49.     Any requirement of caucus attendance under Minn. Stat. § 202A.16 is unconstitutional as creating a qualification for the offices of Governor and Lieutenant Governor that exceeds the constitution-established qualifications, as the same are set forth in the Qualifications Clause, Minn. Const. Article V, § 2, sentence two.

50.     Plaintiff (a) declines to accept contributions of more than $750 in a calendar year in support of his candidacies for Governor or Lieutenant Governor (or any other public office) and (b) also declines to make disbursements of more than $750 in a calendar year in support of his candidacies for Governor or Lieutenant Governor (or any other public office); accordingly, Minn. Stat. § 211A.02, Subds. 1 and 2, have no applicability to Plaintiff.

51.     (Notably, Minn. Stat. § 211A.02, Subd. 2(6), does *not* require an affidavit—only "a **written statement** signed by the individual" seeking to avoid compliance with the said

financial-reporting statute (emphasis added).  This illustrates the crazy-quilt nature of the

Minnesota election statutes, which appear to be calculated to make it as difficult as possible

for prospective candidates to gain ballot access and to conduct their vote-seeking campaigns.)

    52.    All of the following courts have accorded Plaintiff filing rights without requiring

Plaintiff to pay *any* filing fees, on the basis of Plaintiff's inability to afford to pay such fees.  All

of the waivers have been just that, complete fee waivers—*not* loans, such as installment-payment

plans.

COURTS WAIVING FILING FEES:

United States Tax Court (*see* Document 16-1, Page 1)

United States District Court for the District of Minnesota

Minnesota Supreme Court

Minnesota Court of Appeals

Hennepin County [Minnesota] District Court

Ramsey County [Minnesota] District Court

Rice County [Minnesota] District Court

St. Louis County [Minnesota] District Court

Filing fees imposed on Plaintiff to register his on-ballot candidacies for Governor and Lieutenant

Governor (or any other public office) are just as unwarranted and rights-depriving as filing fees

to seek court relief would be.

    53.    A history of Plaintiff's on-ballot candidacies is given at ¶ 4(a), above.

23

54.     Without limiting Plaintiff's factual allegations appearing in ¶ 4(a), above, Plaintiff

hereby expressly declares his intention to run in 2018 (and in all succeeding election years) as an

on-ballot candidate for Governor or Lieutenant Governor of the State of Minnesota without

being subjected to any of the hindrances that Plaintiff has complained of in this First Amended

Complaint.  All such hindrances are continuing and capable of being repeated; accordingly,

Plaintiff requests permanent juridical relief.

55.     When Plaintiff sought to run for the United States Senate while immured at the

Minnesota Correctional Facility-Faribault, prison official Jaclyn "Jacie" Rabideau Carter notified

Plaintiff that prisoners cannot run for public office.  But of course Program Director Carter was

dead wrong: prisoners—even prisoners convicted of felonies—*can* run for the four (4) Federal

elective offices (President, Vice President, United States Senator, and United States

Representative) and for Minnesota Governor and Minnesota Lieutenant Governor.  The United

States Supreme Court has ruled that *no one* can add qualifications for Federal elective office

beyond the qualifications listed in Articles I and II of the United States Constitution; *see*

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 115 S. Ct. 1842, 131 L.Ed.2d 881 (1995).  The

same rule applies to the Minnesota offices of Governor and Lieutenant Governor, the exclusive

qualifications for which are set forth in Article V, § 2, sentence two, of the Minnesota

Constitution.  *See* the display on the following page showing the Federal and Minnesota

Qualifications Clauses.

24

### The Qualifications Clauses—Federal and Minnesota
### (AGE; CITIZENSHIP; RESIDENCY)

#### Federal

> For <u>President and Vice President</u>:
>> No person except a natural born **citizen**, or a citizen of the United States at the time of the adoption of this Constitution, shall be eligible to the office of president; neither shall any person be eligible to that office who shall not have attained to the **age** of thirty-five years and been fourteen years a **resident** within the United States.

U.S. Const. Article II, § 1, Cl. 3 (emphasis added).

> For <u>United States Senator</u>:
>> No person shall be a senator who shall not have attained to the **age** of thirty-five years, and been nine years  a **citizen** of the United States, and who shall not, when elected, be an **inhabitant** of that state for which he shall be chosen.

U.S. Const. Article I, § 3, Cl. 3 (emphasis added).

> For <u>United States Representative</u>:
>> No person shall be a representative who shall not have attained to the **age** of twenty-five years and been seven years a **citizen** of the United States, and who shall not, when elected, be an **inhabitant** of that state in which he shall be chosen.

U.S. Const. Article I, § 2, Cl. 2 (emphasis added).

#### Minnesota

> For <u>Governor and Lieutenant Governor</u>:
>> Each shall have attained the **age** of 25 years and, shall have been a bona fide **resident** of the state for one year next preceding his election, and shall be a **citizen** of the United States.

Minn. Const. Article V, § 2, sentence two (emphasis added).

56.     So vicious and willfully ignorant were various bloviating officials at the Faribault

state prison that Plaintiff had to take the State of Minnesota to court to stop the blocking of

Plaintiff's efforts to run for Federal elective office.  That case—*Richards v. Ritchie et al.*, Rice

County District Court case # 66-CV-06-1517—came to an end when Judge Gerald J. Wolf ruled

in Plaintiff's favor.  At the dispositive hearing, on November 30, 2007, Judge Wolf told the State

of Minnesota's attorney, Assistant Attorney General Angela Behrens, the following:

**"Your arguments don't amount to a hill of beans."**

Judgment for Plaintiff!  *See* Document 16-1, Page 12 (FEDERAL CANDIDACY NOTICE,

published in *The Kenyon Leader* on April 23, 2008, and on May 7, 2008).

57.     Shortly after Judge Wolf ruled in Plaintiff's favor, Judge Wolf retired.  His

successor, Judge William A. Johnson, awarded Plaintiff costs, which the State of Minnesota

paid by depositing the money in Plaintiff's prisoner trust account.  *See* the ORDER of Judge

Johnson dated and filed March 16, 2009, a true and correct copy of which is attached to this

complaint.

58.     The said case had been heard initially in Federal court by Magistrate Judge

Boylan, who wrote a scholarly memorandum detailing his reasons for returning the case to state

court.  The Federal-court case number is 06-cv-3788-PAM-AJB.

59.     Sore losers, the State of Minnesota's officials revved up a campaign of **retaliation**

against Plaintiff, which campaign is ongoing.

60.     While incarcerated in the Linden geriatric/medical unit at the Minnesota

26

Correctional Facility-Faribault, Plaintiff attempted to seek votes as a write-in candidate for the office of Governor of the State of Minnesota in the year 2010.

61.    In connection with the said write-in candidacy, Plaintiff distributed by United States Postal Service mail and by prison internal ("kite") mail the then-current edition of his political tract entitled **MARK BRANDT DAYTON**, Dayton being one of the opposing candidates for Governor in the year 2010.

62.    On the *same day* that Plaintiff mailed a copy of the political tract referred to in the paragraph next above to a prospective voter employed by the State of Minnesota at the Faribault state prison, Plaintiff mailed a copy of that *same* political tract to U.S. Magistrate Judge Franklin L. Noel, who—like the state-prison employee at Faribault—was also a prospective voter.

63.    U.S. Magistrate Judge Noel received from Plaintiff, by United States Postal Service mail, Plaintiff's then-current edition of Plaintiff's **MARK BRANDT DAYTON** political tract. *Without objection or travail*, Judge Noel's chambers in due course filed the said **MARK BRANDT DAYTON** tract in the official records of the Court at Document 17, Page 2, in Case No. 10-cv-3971-DSD-FLN; the filing date was 10/28/10.

64.    In the instant case before Judges Tunheim and Mayeron, Plaintiff filed the edition of his **MARK BRANDT DAYTON** political tract described in ¶¶ 61-63, above.  That filing is at Document 1-1, Page 10; the filing date was 11/05/13.

65.    After the 2010 General Election, Plaintiff filed with the Court an *updated* edition of his **MARK BRANDT DAYTON** political tract; that *updated* edition noted that **in the year**

27

2010, Mark Brandt Dayton "bought himself a four-year term as Governor of Minnesota."

That *updated* edition was filed in the official records of the Court at Document 29, Page 2, in

Case No. 10-cv-3971-DSD-FLN; the filing date was 12/27/10.

66.     Plaintiff was not alone in noting that defendant Dayton bought the 2010 election

for Governor.  For instance, Gary D. Albertson, the publisher of the weekly newspaper in Cook,

Minnesota, the *Cook News-Herald*, stated on March 24, 2011, that "Mark Dayton bought the

governorship." *Cook News-Herald*, Mar. 24, 2011, at page 4, col. two.  (cooknewsherald.com)

67.     Under the banner "Dayton to accept governor's salary," Rachel E. Stassen-Berger,

a Minneapolis *Star Tribune* reporter, wrote as follows:

> He [Dayton] has spent millions on his own political
> campaigns during the past few decades, including
> more than $3 million on his race for governor.

*Star Tribune*, Jan. 14, 2011, at page B2.

68.     Not content to buy the governorship, defendant Dayton had the gall to take what

amounted to a "discount" on his political expenses by "accepting" a salary as governor—for an

election that he did not *actually* win.  That's not all: Dayton promised in 2010 to **"tax the rich."**

But he omitted three words: **"except Mark Dayton."**  At the same time that Dayton pocketed

the governor's salary, he dodged Minnesota taxes by keeping money stashed in tax-advantaged

South Dakota trusts (South Dakota has no state income tax).  At the very least, Dayton should

have returned his money to Minnesota through *decanting*, a legal process of transferring assets

from one trust to another.  Had Dayton returned the money in his South Dakota trusts to

28

Minnesota trusts, that money would be subject to Minnesota state income tax on capital gains and ordinary income.

69.     Plaintiff's **MARK BRANDT DAYTON** political tract (*see* Document 1-1, Page 10) is true and correct in all respects, Plaintiff is informed and believes.

70.     Unlike Judge Noel, the Faribault state prison officials went on a rampage, punishing Plaintiff severely for exercising his First Amendment rights to send his political tract entitled **MARK BRANDT DAYTON** (*see* Document 1-1, Page 10) to *a prospective voter* at the Faribault state prison.  Prison personnel at Faribault—and their labor-union bosses—were solidly backing defendant Mark Brandt Dayton for Governor; they refused to allow *any* criticism of Dayton *at all*—not even by a rival candidate.

71.     **To learn who rules over you, simply find out who you are not allowed to criticize.**

Voltaire.

72.     On October 19, 2010—**exactly** two (2) weeks before the November 2, 2010, General Election—Plaintiff was taken to punitive Segregation because, so the story goes, one (1) low-level prison employee allegedly objected to the content of Plaintiff's **MARK BRANDT DAYTON** political tract; that person was not even the prospective voter to whom the political tract was sent, but rather a secretary (grandiloquently styled "Administrative Support") who intercepted the political tract before it reached the prospective voter.  On the "strength" of that second-hand objection, Plaintiff was "sentenced" to thirty (30) days of punitive Segregation.

29

The crackpot original charge, "threatening" (a <u>major</u> prison-rule violation), was **dropped** in favor of the crackpot <u>minor</u> charge of "disorderly conduct," a notorious "garbage charge" wielded against prisoners who are *politically active* or who *litigate* to improve conditions in prisons and in society generally (Plaintiff is both—and will remain so for the rest of his life).

73.     Plaintiff appealed the punishment to the prison warden (a time-server who was made a warden for about a year to "top out" on his pension), who refused to correct the injustice. The warden also informed Plaintiff that Plaintiff's exhaustion of remedies was complete: "You have exhausted your appeal process.  Any future correspondence regarding this issue will not be addressed."  (Letter, Warden Thielen to Richards, November 29, 2010, regarding Report # 430150.)

74.     Prison "discipline" matters—including, in Plaintiff's case, punishment for exercising First Amendment political rights—are handled separately from matters dealt with through the general grievance process.

75.     Plaintiff, uncounseled, was denied necessary medical care during his 30 days in <u>punitive Segregation</u>, being told that he would receive the denied care only when he was released from <u>punitive Segregation</u>.  Denial of necessary medical care was used by defendant State of Minnesota to quell any resistance that Plaintiff might mount to the State of Minnesota's crushing of his First Amendment rights to political expression and political association and his rights to substantive and procedural due process under the Fourteenth Amendment.

76.     Plaintiff was released from <u>punitive Segregation</u> on November 18, 2010.

77.     Plaintiff also was threatened with **a retaliatory transfer** to a less desirable prison ***if* he contested the *major* disciplinary charge**.  That threat was carried out by defendant State of Minnesota—despite the dropping of the ***major*** charge—when Plaintiff was sent in a two-stage process ("diesel therapy") from Faribault on November 1, 2012, to Oak Park Heights and then from Oak Park Heights on November 21, 2012, to the Stillwater prison, where at this writing he remains.

78.     Plaintiff was forced out of the Linden geriatric/medical unit at the Faribault state prison by defendant Roy's agency, which failed day after day, week after week, and month after month to provide to Plaintiff the **Diabetic/Gluten-Free Diet** that Plaintiff's health requires and that the December 23, 2011, disability accommodation (*see* Document 16-1, Pages 4-5) ensures.

79.     Plaintiff's 2010 candidacy for Governor was also wrecked at the final stage: two (2) weeks before the General Election.  The "discipline" charge was a pretext—and nothing more—to block Plaintiff from taking *any* votes *at all* away from Dayton, who was in a close race with the Republican candidate.  As Faribault state prison officials (and the prison's labor-union bosses, such as the AFSCME greedsters) knew very well, Plaintiff had previously received **more than 14,500 votes** against an entrenched incumbent (Oberstar) in **just *one* (1) Congressional District of Minnesota *alone***.  That was more than Dayton's margin of victory as a ***statewide* candidate** in the contested 2010 General Election.  *See* Document 16-1, Pages 13-14. Determined to make sure that their candidate would win, Faribault prison officials pulled out all the stops to harm Plaintiff's health, to blacken Plaintiff's name (Plaintiff was coming up for

31

parole), and to kill Plaintiff's gubernatorial campaign against Dayton.

80.    Defendant Thomas A. Roy (*see* ¶ 4(b)(6), above) was appointed to the office of

Commissioner of Corrections of the State of Minnesota on January 20, 2011, by defendant Mark

Brandt Dayton, for a term running from January 31, 2011, to January 5, 2015.  Defendant Roy is

still holding that office, which costs Plaintiff and other taxpayers more than $100,000 per year—

in salary *alone*; lavish benefits complete the "compensation package."

81.    Plaintiff came up for parole on February 14, 2011, just a few weeks after

defendant Dayton appointed defendant Roy to the Commissioner of Corrections sinecure.  At the

parole hearing, defendant Roy was ***the sole voting member* of the parole panel**, all of the other

members being only <u>advisers to the voting member</u>.  Unlike what defendant Roy has done with

other life-sentenced prisoners coming up for parole, defendant Roy never bothered to speak with

Plaintiff *even once* before the hearing, which was conducted remotely, by TV (Roy in St. Paul

and Plaintiff in Faribault).

82.    Before the parole hearing, Plaintiff filed objections (by mail) with defendant Roy

over—*inter alia*—Roy's close connection with Plaintiff's gubernatorial opponent Dayton.  At the

hearing, on February 14, 2011, and over Plaintiff's objection (the tape of the hearing was "edited"

to leave out parts favorable to Plaintiff), defendant Roy refused to recuse himself from his quasi-

judicial role as sole voting member and also refused to *even consider* any of Plaintiff's objections

already filed.  Barging ahead, defendant Roy denied parole to Plaintiff, who was sentenced under

the life-sentence statute that permits parole after 17½ years of incarceration.  Plaintiff is now in

his 28th year of non-stop incarceration!

83.    Plaintiff's First Amendment rights remain trampled by defendants State of Minnesota, Dayton, and Roy, despite Plaintiff's indisputable constitutional right to disseminate his **MARK BRANDT DAYTON** political tract—and any other political tract—to prospective voters (and other fellow citizens) without being punished or hindered in any way whatsoever.

84.    The said violations of Plaintiff's First Amendment rights by defendants State of Minnesota, Dayton, and Roy are continuing and capable of repetition in the absence of effective juridical relief.

85.    Plaintiff has been the target of venomous harassment for *decades*, especially after being falsely accused of murder by the Hennepin County Courthouse Club. *See* Document 16-1, Pages 8, 9.

86.    Plaintiff is informed, and believes, that defendant Roy also harbors personal animus toward Plaintiff, for "reasons" inexplicable to Plaintiff.  Plaintiff has <u>never</u> had any personal difficulty with any of the following neighbors of defendant Roy in or near the Fond du Lac Indian Reservation, in Carlton County:

(a)    <u>Arne Vainio, Jr., M.D.</u>

Plaintiff has never met Dr. Vainio (or his wife, who is also a medical doctor).  Nor did Plaintiff ever meet Dr. Vainio's father, Arne Vainio, Sr., who committed suicide many years ago in Sturgeon Township, in northern St. Louis County, Minnesota. (Plaintiff's mother's cousin John Ketola, D.V.M., was also from Sturgeon Township; for many

33

years, Dr. Ketola owned and operated an animal hospital a few blocks north of the courthouse in Hibbing, Minnesota.) Plaintiff's only connection to Dr. Vainio is that Dr. Vainio's aunt Bertha (née Vainio) Hennessy was a family friend as well as a high-school classmate to Plaintiff's two half-sisters, June Elizabeth Wilson (d. 2001) and May Violet Wilson (d. 1982). Plaintiff several times visited Bertha ("Bertie") and her husband at their house in the Playa del Rey section of far southwestern Los Angeles (221 Montreal Street, Playa del Rey, CA 90293-7735); the hillside site overlooks the Pacific Ocean and commands a sweeping view of the Los Angeles basin, Los Angeles City Hall being visible far to the east. Bertie and her husband for decades were real-estate investors in Southern California and in Las Vegas, Nevada; their investments included the land under the Tropicana Hotel in Los Vegas; land at Lake Elsinore (dry when they bought, later filled with water); an air-freight terminal in El Segundo, California, near Los Angeles International Airport/LAX; numerous apartment rentals in Venice, California, and other real estate.

    (b)    <u>The George Barney Family</u>

George Barney's wife, Hennie, was a cousin to Plaintiff's mother (1902-1997). George Barney and his wife had many children, some of whom have intermarried with the Sunnarborg clan. Some members of the George Barney family became Lutheran ministers, at least one having pastored a congregation in Esko, Minnesota. Plaintiff was a houseguest of the George Barney family in Thomson Township, of Carlton County, many years ago.

34

87.    Retaliation by defendants State of Minnesota, Dayton, and Roy began at the Faribault prison and continues at the Stillwater prison.

88.    Even though defendants State of Minnesota, Dayton, and Roy, through their Department of Corrections, have recognized Plaintiff's right to a **gluten-free** life and related accommodations for Plaintiff's diabetes and other medical conditions, the said defendants have repeatedly violated the disability accommodation the State of Minnesota granted to Plaintiff on December 23, 2011.  That accommodation appears at Document 16-1, Pages 4-5; note especially, on page 5, that **"Any amount of gluten will cause damage to the intestinal walls."** That admission was made by the State of Minnesota and incorporated as the attachment to the **approved** Offender Request for Reasonable Accommodation dated December 23, 2011.

89.    The said disability accommodation <u>requires</u> defendants State of Minnesota, Dayton, and Roy to provide to Plaintiff a diet that meets <u>all</u> of the following criteria:

(1)    Fully WBRO-free [WBRO = Wheat, Barley, Rye, and Oats];

(2)    Supplemented with food to overcome the nutrient-absorption deficiency characteristic of Celiac Disease;

(3)    Palatable;

(4)    At least comparable in quality and quantity to non-medical diets;

(5)    Diabetes-compatible; and

(6)    Served as 3 meals a day.

Document 16-1, Page 4 (at section 1, which is captioned *Type of accommodation requested*).

90.     The required medical diet must include foods and beverages from all State of

Minnesota sources accessible to Plaintiff, as follows:

    (1)     Central Dining Hall food service;

    (2)     Canteen [prison store];

    (3)     Vending machines;

    (4)     Restorative Justice food sales;

    (5)     Christmas gift bags;

    (6)     Medications;

    (7)     Communion wafers; and

    (8)     Off-site (*e.g.,* medical) trips.

Document 16-1, Page 4 (at section captioned *Statement of Disability*).

91.     In addition, defendants State of Minnesota, Dayton, and Roy supplemented the

said disability accommodation (dated December 23, 2011) to include all dental materials,

pursuant to **Grievance # 4474**.

92.     Defendants State of Minnesota, Dayton, and Roy have admitted liability for

providing to Plaintiff a **gluten-free** regimen to avoid life-threatening complications of Celiac

Disease and Diabetes, but the said defendants have with deliberate indifference failed to provide

to Plaintiff the ingestibles necessary to comply with the said medical regimen.

93.     All ingestibles provided to Plaintiff by defendants State of Minnesota, Dayton,

and Roy must comply in all respects with the 12/23/2011 disability accommodation and with the

dental-materials supplement thereto.

94.    The **retaliation** visited upon Plaintiff after his 2010 campaign for Governor was destroyed accelerated after Plaintiff was diagnosed with Celiac Disease less than a year later, in the summer of 2011.  Defendant Roy's agency used Plaintiff's new medical need for a permanent **gluten-free** regimen as a club to further harm Plaintiff, as the following illustrates:

(a)    Food Service Director Mr. R. Hacker, at the Faribault state prison, told Plaintiff in November, 2011, in the Central Dining Hall, that

**"Doctors have invented the gluten problem."**

(b)    The said Food Service Director Hacker on that same occasion told Plaintiff that

**"There is no such thing as lactose intolerance."**

(c)    The said Food Service Director Hacker flatly refused to provide to Plaintiff the food and beverages that defendant Roy's agency admitted Plaintiff is entitled to under the 12/23/2011 disability accommodation. For instance, on the last night of Plaintiff's stay at the Faribault state prison (October 31, 2012), the evening "meal" included the following flagrant violation of Plaintiff's medical diet:

**Sara Lee-brand food item that contained three (3) different ingredients containing harmful gluten; all three (3) such ingredients were listed on the product label, which also bore the Federally-mandated "CONTAINS: WHEAT" toxicity warning!**

(d)    Plaintiff was sexually harassed by an obese nurse named **Kelly Hughes** at the Linden geriatric/medical unit at the Faribault state prison.  Most commonly, nurse Hughes would harass Plaintiff in Exam Room # 5 in the prison clinic.   Hughes would direct Plaintiff to sit on the examination table, ostensibly (and for an inordinate length of time) to take Plaintiff's

blood pressure. Then Hughes would rub her crotch against Plaintiff's left knee, reaching sexual satisfaction. Hughes on other occasions would stand in the doorway to Plaintiff's bedroom, for no medical purpose; wisely, Plaintiff resisted the opportunity to palpate Hughes's nipples and vulva.

95.     The Linden geriatric/medical unit at the Faribault state prison was a dangerous place! For instance, a sociopathic prisoner named **Michael Roy Hoffman** (Minnesota Prisoner # 135884) was allowed to practice unlicensed nursing in the Linden unit, being styled a "PCA"; in that capacity, Hoffman had the run of the unit. So viciously and persistently did Hoffman torment disabled Linden patient **Scott Tyson** that, shortly after Plaintiff left Faribault, Tyson **hanged himself from his hospital bed!** Death-by-hanging-from-a-hospital-bed was something new in Plaintiff's existence. (Hoffman, who also ran the Faribault state prison gambling racket, also informed on prisoner **Sy Tien Pham** [Minnesota Prisoner # 198522], one of Hoffman's gambling runners, when Hoffman himself came under investigation; Hoffman thus extricated himself from punishment at a fellow prisoner's expense—typical behavior of a sociopath. Hoffman also bragged that **"Jacie Carter's on my payroll."** That is the *same* Jacie Carter who barked at Plaintiff that <u>prisoners cannot run for public office</u> [*see* ¶ 55, above].)

96.     Trying to hide their misconduct, defendants State of Minnesota, Dayton, and Roy have failed to provide to Plaintiff a ***follow-up*** Upper Gastro-Intestinal endoscopy with biopsy to determine the degree of healing (*if any*!) in the lining of Plaintiff's small intestine. Only such a biopsy can determine *whether* healing has occurred and, if so, *to what extent*.

38

97.    The said defendants have also failed to *ever* provide to Plaintiff the diagnostic genetic testing to determine *for sure* whether the damage to the lining of Plaintiff's small intestine found on the initial biopsy in 2011 is *actually* due to Celiac Disease or to *a different cause*. **Cancer, infections, and allergic reactions to foods and other substances *can* cause the damage to the lining of the small intestine that might have been misdiagnosed as Celiac Disease.** (Plaintiff is certainly intolerant to harmful gluten; however, the damage to the lining of Plaintiff's small intestine found on the initial biopsy in 2011 might have been caused by something other than the specialized form of gluten intolerance called Celiac Disease. If the small-intestine damage has been misdiagnosed, Plaintiff is being denied necessary treatment for **what is *actually* causing the damage to Plaintiff's small intestine.**)

98.   On December 23, 2011, defendant ROY's division of defendant STATE OF

MINNESOTA, the Department of Corrections, granted Plaintiff a disability accommodation,

as provided by the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the

Rehabilitation Act (*see* ¶ 2, above), which disability accommodation recognized Plaintiff's

continuing serious medical need for a **gluten-free** life for the rest of Plaintiff's natural life.

99.   The certificate for the disability accommodation referred to in the paragraph next

above appears in this action as Document 16-1, Pages 4-5.

100.   Regarding the serious medical nature of Celiac Disease, *one* of the medical

conditions for which Plaintiff was granted the said disability accommodation, *see* Document

11-1, Pages 1-4, and Document 16-1, Pages 6-7.

101.   On August 23, 2012, defendant ROY's Department of Corrections affirmed

Plaintiff's right to **gluten-free** dental materials in Grievance # **4474**.

102.   Shortly thereafter, defendant ROY's Department of Corrections began making

available to Plaintiff three (3) **gluten-free** dental materials; specifically, **gluten-free**

TOOTHPASTE, **gluten-free** DENTAL FLOSS, and **gluten-free** MATERIALS USED FOR

PLAINTIFF'S DENTAL CARE IN THE PRISON DENTAL CLINIC.

103.   On November 1, 2012, defendant ROY sent Plaintiff for 21 days from the

Minnesota Correctional Facility-Faribault to the Medical Unit (also known as "Complex 8")

at the Minnesota Correctional Facility-Oak Park Heights for ***alleged needed medical care.***

104.   At the said Medical Unit, Plaintiff was denied **gluten-free** TOOTHPASTE

40

and **gluten-free** DENTAL FLOSS <u>for his *entire 21-day stay* in the Medical Unit</u>.  That

deprivation—which is capable of being repeated at any time that Plaintiff needs (or is

*alleged* to need) medical care in the Medical Unit—prevented Plaintiff from providing

himself with dental self-care necessary to preserve his natural teeth.

105.     The disability accommodation granted to Plaintiff expressly includes

"off-site (e.g., medical) trips," yet defendants STATE OF MINNESOTA, DAYTON, and

ROY made no provision to have **gluten-free** TOOTHPASTE and **gluten-free** DENTAL

FLOSS available at the Oak Park Heights Medical Unit for Plaintiff's dental self-care.

106.     Denial of necessary **gluten-free** dental materials can be repeated

at any other prison, hospital, or other residential setting at the whim of defendant ROY's

Department of Corrections, should Plaintiff be sent to such a setting.

107.     On November 21, 2012, defendant ROY again moved Plaintiff, this

time from the Medical Unit at Oak Park Heights to the Minnesota Correctional Facility-

Stillwater, where at this writing Plaintiff remains.

108.     At the Minnesota Correctional Facility-Stillwater, Plaintiff eventually

obtained **gluten-free** TOOTHPASTE and **gluten-free** DENTAL FLOSS from the prison

clinic, in every case *at Plaintiff's expense*.  (Plaintiff wishes to acknowledge the emergency

assistance of nurse Dan Fix at the Stillwater prison in retrieving from Plaintiff's property

the **gluten-free** TOOTHPASTE and the **gluten-free** DENTAL FLOSS denied Plaintiff at

the Oak Park Heights Medical Unit.)

109.    Then beginning in September, 2013, the prison clinic stopped making **gluten-free**
TOOTHPASTE and **gluten-free** DENTAL FLOSS available to Plaintiff.  Plaintiff submitted
payment vouchers to the prison clinic (which is also known as "Health Services") for **gluten-free**
TOOTHPASTE and **gluten-free** DENTAL FLOSS, to no avail.  Thus once again, Plaintiff was
rendered unable to provide himself with the materials necessary for dental self-care to preserve
his natural teeth due to the deprivation of a reliable, uninterrupted supply of **gluten-free**
TOOTHPASTE and **gluten-free** DENTAL FLOSS.

110.    **Gluten-free** TOOTHPASTE and **gluten-free** DENTAL FLOSS are not available
in the prison store (also called the "Canteen"); accordingly, Plaintiff is totally dependent on the
prison clinic to obtain the necessary **gluten-free** dental self-care materials.

111.    The recurrent capricious deprivations of access to **gluten-free** dental self-care
materials are capable of repetition at any time at the whim of defendant ROY and his
subordinates in defendant ROY's Department of Corrections.  Such capricious deprivations
are a tool of retaliation available to defendant ROY and his subordinates; retaliation against
Plaintiff has already occurred on November 1, 2012, and again on November 21, 2012, when
Plaintiff was sent first to the Oak Park Heights Medical Unit and then to the Stillwater prison.
Those instances of "diesel therapy" happened when Plaintiff tried repeatedly to get **gluten-free**
food and **gluten-free** medications (and other **gluten-free** ingestibles) at the Linden geriatric/
medical unit at the Minnesota Correctional Facility-Faribault.

112.    Dental care accorded prisoners in the Minnesota Department of Corrections is

minimal, to the point of being grossly inadequate. Missing teeth are the order of the day in the

Minnesota state prisons; so many prisoners are missing teeth that every day in the prisons looks

like Halloween.

113.    Dental care is an essential part of the treatment to which Plaintiff is entitled for

his Celiac Disease, a life-threatening medical condition the only treatment for which (at the

present stage of medical progress) is a STRICT **gluten-free** life.

114.    Plaintiff's Celiac Disease was diagnosed by defendant ROY's Department of

Corrections at the Minnesota Correctional Facility-Faribault in the summer of 2011.

115.,    Besides the need for a STRICT **gluten-free** diet, Plaintiff has a serious medical

need for **gluten-free** dental materials. Not only must dental *self-care* materials be **gluten-free**,

but the *materials used by dentists and dental paraprofessionals* must also be **gluten-free**. With

respect to the need for **gluten-free** materials for care provided in dental clinics, a leading

authority on Celiac Disease, Peter H. R. Green, M.D., the Director of the Celiac Disease

Center at Columbia University (New York City), has written as follows:

> Because of the risk of gluten ingestion, you should
> inform your dentist of your celiac disease diagnosis
> to ensure that all polishing pastes, fluoride, and
> prescribed medications are gluten-free.

(Green, *Celiac Disease: A Hidden Epidemic*, Revised and Updated Edition, at page 162.)

116.    In denying Plaintiff reliable, uninterrupted access to **gluten-free** dental self-care

materials, defendants STATE OF MINNESOTA, DAYTON, and ROY have shown

deliberate indifference to Plaintiff's known serious medical need for **gluten-free** dental materials.

43

117.   Plaintiff's natural teeth have been damaged by the deprivation of reliable, uninterrupted access to necessary dental self-care materials, the exact amount of damages to be determined by the jury.  Plaintiff here pleads special damages for his outlays for purchases from the Minnesota Department of Corrections of **gluten-free** TOOTHPASTE and **gluten-free** DENTAL FLOSS; the dollar amounts will only be exactly determinable once Plaintiff gets the financial records of such purchases from the Department of Corrections during discovery.

118.   In depriving Plaintiff of reliable, uninterrupted access to necessary **gluten-free** dental self-care materials, defendants STATE OF MINNESOTA, DAYTON, and ROY have violated, and are able to continue to violate, Plaintiff's rights under the Americans with Disabilities Act, under the Rehabilitation Act, under Section 1983 and related provisions of the United States Code, under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, and under Article I, § 8, of the Minnesota Constitution.

119.   The stated violations of Plaintiff's rights are capable of repetition in the absence of effective juridical relief in the form of a declaratory judgment and a permanent injunction.

120.   The Court should also retain jurisdiction for at least five (5) years after ruling on the merits in this action to make it more likely that defendants STATE/DAYTON/ROY will honor the injunction.  That defendants STATE/DAYTON/ROY have a demonstrated propensity to violate Plaintiff's rights to a **gluten-free** life as recognized by the disability accommodation granted to Plaintiff on December 23, 2011, is clear beyond dispute.  For instance, despite the fact that almost three (3) years have come and gone since Plaintiff's Celiac Disease was diagnosed

44

(and more than two [2] *decades* have come and gone since Plaintiff's **Diabetes** was diagnosed),

the said defendants still refuse to provide Plaintiff with a **gluten-free** and **diabetes-compatible**

**diet**. *See* the three (3) Nelson declarations on file in this action, as follows:

    (a) *Declaration of Thomas Edward Nelson* (dated Jan. 29, 2014)

        Filed on _____02/05_____, 2014

        Document ___22___, Page ___1___

    (b) *Second Declaration of Thomas Edward Nelson* (dated Feb. 2, 2014)

        Filed on _____02/05_____, 2014

        Document ___23___, Page ___1___

    (c) *Third Declaration of Thomas Edward Nelson* (dated Feb. 17, 2014)

        Filed on _____02/20_____, 2014.

        Document ___26___, Page ___2___

121.    Plaintiff has not previously sought juridical relief for the denial, and future denial,

by defendants State of Minnesota, Dayton, and Roy (and their successors in office) of Plaintiff's

right to reliable, uninterrupted access to **gluten-free** dental self-care and professional-care

materials provided to Plaintiff by the said defendants (and their successors in office) without

charge to Plaintiff as part of necessary medical/dental care for his Celiac Disease.

122.    In reading about Celiac Disease, it can be helpful to consider relevant nomen-

clature.  **Celiac Disease** is sometimes called **Celiac Sprue** or **Gluten-Sensitive Enteropathy**;

those terms are also sometimes abbreviated to **CD, CS,** and **GSE**.  *See* Document 11-1, Page 4.

*See also* Document 11-1, Pages 2-3 (U.S. Department of Justice information sheet accessed 5/21/2013).

123. Health care provided to prisoners is a serious problem throughout the United States.

> **[I]t is well documented that inmate**
> **health care of every kind is substandard.**

David Kaiser and Lovisa Stannow (in *The New York Review of Books*, Oct. 24, 2013, at pages 57-59 [quotation from page 58], reviewing Allen J. Beck et al., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12: National Inmate Survey, 2011-12* and *Sexual Victimization in Juvenile Facilities Reported by Youth, 2012: National Survey of Youth in Custody, 2012* (U.S. Bureau of Justice Statistics, www.bjs.gov).

124. In the Minnesota state prisons, prisoners have been killed and injured in recent years by inadequate health care provided by defendants State of Minnesota, Dayton, and Roy.

> **Since 2000, under Corizon Health Inc., the [Minnesota]**
> **state prison system has had at least nine deaths and**
> **numerous injuries related to poor and delayed care,**
> **according to a 2012 [Minneapolis] *Star Tribune***
> **investigation.**

Paul McEnroe, "State prisons get new health care provider." [Minneapolis] *Star Tribune* (Oct. 18, 2013, at page 1A). *FFI*: Paul McEnroe, 612.673.1745.

125. On or about February 20, 2014, the Legislative Auditor of the State of Minnesota issued a report on the state of health care provided to Minnesota state prisoners. Excerpts from a newspaper article about that report appear on the next page of this complaint:

**Prison health services
need work, report says**

Laura Yuen
MPR.org/100.5 FM

ST. PAUL—A new report concludes health care services provided to the
roughly 9,000 adult inmates in Minnesota prisons should be better
coordinated and accountable.

[R]ecent high-profile deaths in state prisons helped prompt Nobles' office
to conduct the inquiry. It examined how the Department of Corrections
cares for the medical, dental, and mental-health needs of offenders.

Minnesota Legislative Auditor Jim Nobles said it was important for his
office to examine whether the state is fulfilling a constitutional require-
ment to deliver adequate health care to inmates, who typically are sicker
than the average population. Nearly a third of inmates in Minnesota's
aging prison population have chronic ailments, including heart disease
and diabetes.

The auditor's report found that despite those challenges, Minnesota has yet
to develop a consistent way to manage people with chronic conditions.

[A] recommendation would create a state ombudsman for corrections.

That would be a relatively low-cost way to provide a voice to inmates with
grievances, state Sen. Mary Kiffmeyer said.

"You need somebody in your corner. If you're appealing to the very same
people that are running the entity, it's really hard," said Kiffmeyer, R-Big
Lake. "If all they're being told is, "You go hire your own attorney,'
while the agency has attorneys, it seems like a very unfair situation and it
puts them in a difficult spot."

But Roy, the corrections commissioner, said he's not ready to commit to
an ombudsman.

Duluth News Tribune, Feb. 21, 2014, at page C4.

126.  **The Shane Cooper Memorial Website** is an appropriate name for the public-access database that defendant Roy's agency runs to scare the public into fearing Plaintiff and other state prisoners.  Shane Cooper was <u>murdered</u> on December 2, 2013, at the Oak Park Heights prison.  The killer got word that Shane Cooper had been convicted of a sex offense and took that fact as a license to kill.  Only after Shane Cooper was murdered did defendant Roy's agency "purge" most of the data from its public-access database.  Cooper is still quite dead.

127.  **Thomas Edward Nelson**, a placeholder, is not an essential party to this action; Plaintiff listed him as a defendant only as a courtesy because Mr. Nelson's name appears in some of the court papers that Plaintiff has filed, such as in page 20 of this complaint.  Plaintiff seeks no juridical relief respecting Nelson under facts currently known to Plaintiff.

128.  **Snooping**--in violation of Plaintiff's constitutional rights--on correspondence between Plaintiff (and other Minnesota prisoners) and lawyers, courts, and other legal correspondents is an ongoing practice in defendant Roy's agency.  That practice is capable of being repeated endlessly unless the Court grants effective juridical relief to halt the practice.  Besides insisting on doing prisoners' photocopying (Minnesota prisoners have no access to self-operated photocopiers for privileged papers), defendant Roy's agency snoops on <u>all</u> privileged letters and other documents that its prisoners prepare on computers in the prison Law Libraries.  Unless prisoners sign a "consent" form abandoning their privilege rights, they cannot print out their writings.