UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LEONARD J. RICHARDS,                                    CIVIL NO. 13-3029 (JRT/JSM)

       Plaintiff,

v.                                                              <u>REPORT AND RECOMMENDATION</u>

MARK BRANDT DAYTON,
*Governor of the State of Minnesota,*
*in his individual and official capacities;*
LORI R. SWANSON,
*its Attorney General;*
STATE OF MINNESOTA;
DONALD MARK RITCHIE,
*Minnesota Secretary of State*
*(the "Secretary") in his individual*
*and official capacities also known*
*as Mark Ritchie;*
BRAD ANDERSON,
*Election Administrator of the Secretary,*
*in his individual and official capacities;*
BERT BLACK,
*Data Practices Compliance Officer of*
*the Secretary, in his individual and*
*official capacities;*
THOMAS A. ROY,
*Minnesota Commissioner of Corrections,*
*in his individual and official capacities*
*also known as Tom Roy;* and
THOMAS EDWARD NELSON,
*in his individual capacity as Plaintiff's*
*co-candidate for Governor or Lieutenant*
*Governor of the State of Minnesota in*
*election year 2014*;

       Defendants.


JANIE S. MAYERON, United States Magistrate Judge

     The above matter came before the Court upon State Defendants' Motion to

Dismiss [Docket No. 31].   The matter has been referred to the undersigned United

States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I.    FACTUAL BACKGROUND

Plaintiff Leonard J. Richards ("Richards") is an inmate at the Minnesota Correctional Facility in Stillwater, Minnesota ("MCF-Stillwater").   Richards has brought this prisoner civil rights action against the State of Minnesota and various state officers in their individual and official capacities,[1] pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and § 504 of the Rehabilitation Act ("RA"), along with pendent claims based on the Minnesota Constitution.

### A.    The First Amended Complaint

Richards alleged the following in his First Amended Complaint.[2]

In 2010, Richards attempted to run as a write-in candidate for Governor of Minnesota while he was imprisoned at the Minnesota Correctional Facility in Faribault, Minnesota ("MCF-Faribault").[3]   FAC, ¶ 60.   In connection with his candidacy, Richards mailed a copy of his "political tract," entitled "MARK BRANDT DAYTON," to an

---

[1]    Defendant Thomas Edward Nelson is Richards' purported co-candidate for Governor or Lieutenant Governor of Minnesota.   First Amended Complaint ("FAC"), ¶ 4 [Docket No. 28].   According to Richards, Nelson "is not an essential party to this action; Plaintiff listed him as a defendant only as a courtesy because Nelson's name appears in some of the court papers that Plaintiff has filed . . . . Plaintiff seeks no juridical relief respecting Nelson under facts currently known to Plaintiff." Id., ¶ 127.   Further, there is no indication he has been served with the action.   Accordingly, Nelson should be dismissed as a defendant.

[2]    The First Amended Complaint is 89 pages long and spans in excess of 250 paragraphs.   As best as this Court can discern, it has summarized the allegations and claims set forth in this pleading.

[3]    Richards also claimed that he sought to run for United States Senate while he was imprisoned at MCF-Faribault.   Id., ¶ 55.   However, Richards provided no details concerning this campaign.

employee of MCF-Faribault.  <u>Id.</u>, ¶ 62.  In response, Faribault prison officials devised a campaign of retaliation against Richards.  <u>Id.</u>, ¶¶ 59, 70.

On October 19, 2010, Richards was taken to punitive segregation because a prison employee objected to Richards' political tract.  <u>Id.</u>, ¶ 72.  Richards was charged with "threatening," which was eventually dropped in favor of a "disorderly conduct" charge.  <u>Id.</u>  According to Richards, disorderly conduct is "a notorious 'garbage charge' wielded against prisoners who are <u>politically active</u> or who <u>litigate</u> to improve conditions in prisons and in society generally . . . ."  <u>Id.</u> (emphasis in original).  Richards maintained that the discipline charge was a pretext to block Richards from taking votes away from Dayton in the 2010 election.  <u>Id.</u>, ¶ 79.  Richards appealed his punishment to the prison warden, who dismissed Richards' claim and informed Richards that he had exhausted his administrative remedies.  <u>Id.</u>, ¶ 73.

While in punitive segregation, Richards was denied necessary medical care to "quell any resistance that [Richards] might mount to the State of Minnesota's crushing of his First Amendment rights to political expression and political association and his rights to substantive and procedural due process under the Fourteenth Amendment."  <u>Id.</u>, ¶ 75.  Richards was released from punitive segregation on November 18, 2010.  <u>Id.</u>, ¶ 76.

Upon his release, Richards was threatened with a retaliatory transfer if he contested the "threatening" charge.  <u>Id.</u>, ¶ 77.  The prison ultimately dropped the charge, but on November 1, 2012, Richards was nevertheless transferred from MCF-Faribault to MCF-Oak Park Heights, and then from MCF-Oak Park Heights to MCF-Stillwater on November 21, 2012.  <u>Id.</u>

On February 14, 2011, Richards came up for parole.  Id., ¶ 81.  At the parole hearing, defendant Tom Roy, the Minnesota Commissioner of Corrections, was the sole voting member of the parole panel.  Id.  Roy did not speak with Richards prior to the hearing, which was conducted via television, with Roy in St. Paul and Richards in Faribault.  Id.  Before the parole hearing, Richards filed objections with Roy regarding his close connection with Dayton.  Id., ¶ 82.  At the hearing, Roy refused to recuse himself or to consider any of Richards' objections.  Id.  Richards was denied parole.  Id.

In the summer of 2011, Richards was diagnosed with celiac disease[4] by the Minnesota Department of Corrections ("DOC").  Id., ¶ 114.  An initial biopsy revealed that Richards' small intestine had been damaged due to celiac disease; however, Richards never received a follow-up upper gastrointestinal endoscopy with biopsy to determine whether Richards' small intestine was healing.  Id., ¶¶ 96, 97.  In addition, Richards was not provided diagnostic genetic testing to ascertain whether the damage to his small intestine was actually due to celiac disease.  Id., ¶ 97.

On December 23, 2011, Richards was granted a disability accommodation under the ADA, which required defendants to provide Richards a strict gluten-free diet.  Id., ¶ 98 (citing [Docket No. 16-1 (Declaration of Leonard Richards)], p. 4 (Offender Request for Accommodation Form approving request for gluten-free diet)).  However, the State of Minnesota, Dayton, and Roy repeatedly failed to comply with the disability

---

[4]     Celiac disease is "a digestive condition triggered by consumption of the protein gluten, which is primarily found in bread, pasta, cookies, pizza crust and many other foods containing wheat, barley or rye.  People with celiac disease who eat foods containing gluten experience an immune reaction in their small intestines."  Questions and Answers about the Lesley University Agreement and Potential Implications for Individuals with Food Allergies, U.S. Department of Justice, Civil Rights Division (January 2013), http://www.ada.gov/q&a_lesley_university.htm.

accommodation. Id., ¶¶ 78, 88 (citing [Docket 16-1], pp. 4-5), 98. Instead, Roy's agency used Richards' gluten intolerance to retaliate against Richards for his 2010 campaign for Governor of Minnesota. Id., ¶ 94. Specifically, in November 2011, the Food Service Director at MCF-Faribault told Richards, "Doctors have invented the gluten problem." Id., ¶ 94(a). The director then refused to provide Richards gluten-free food and beverages, as required under the disability accommodation. Id., ¶ 94(c). In further retaliation for Richards' gubernatorial campaign, a nurse named Kelly Hughes sexually harassed Richards during his medical examinations at MCF-Faribault. Id., ¶ 94(d).

Sometime prior to August 23, 2012, the DOC supplemented Richards' disability accommodation to include gluten-free dental materials. Id., ¶¶ 91, 101. Shortly thereafter, the DOC began providing Richards gluten-free toothpaste, gluten-free dental floss, and gluten-free materials for use in the prison dental clinic. Id., ¶ 102.

On November 1, 2012, Richard was sent to the medical unit at MCF-Oak Park Heights for "alleged needed medical care." Id., ¶ 103. At the medical unit, he was denied gluten-free toothpaste and dental floss for his entire 21-day stay, even though his disability accommodation expressly included "off-site (e.g. medical) trips." Id., ¶¶ 104, 105.

On November 21, 2012, Richards was transferred to the medical unit at MCF-Stillwater. Id., ¶ 107. There, Richards eventually obtained gluten-free toothpaste and dental floss from the prison clinic at his own expense. Id. However, beginning in September, 2013, the prison clinic stopped carrying gluten-free dental materials. Id., ¶ 109. Richards submitted payment vouchers to the prison clinic for gluten-free

toothpaste and dental floss, but his efforts were unsuccessful.[5]  Id.  Richards' teeth have been damaged due to "the deprivation of reliable, uninterrupted access to necessary dental self-care materials . . . ."  Id., ¶ 117.

On December 31, 2013, Richards sent a letter to defendants Donald Mark Ritchie, Secretary of State for the State of Minnesota, and Brad Anderson, Election Administrator to Ritchie, regarding the requirements for running for Governor and Lieutenant Governor of Minnesota.  Id., ¶ 12.  Ritchie and Anderson did not respond to the letter, "thereby leaving [Richards] (A) uncertain of his fundamental constitutional rights to ballot access in the year 2014 (and in subsequent election years) for the offices of Governor and Lieutenant Governor, and (B) in imminent danger of losing the opportunity to exercise his fundamental constitutional rights to political expression and association in the year 2014 by means of an on-ballot candidacy for either of those offices."  Id.

On January 11, 2014, Richards sent a letter to defendant Bert Black, Data Practices Compliance Officer to Ritchie, requesting a copy of the American Fund Constitution,[6] which Anderson had retained in the files of the Minnesota Secretary of State.  Id., ¶ 41.  In his letter, Richards enclosed a check for $1.00.  Id. (attaching January 11, 2014 Letter from Leonard Richards to Bert Black [Docket No. 28-1]).  Black never responded to the letter.  FAC, ¶ 41.  Anderson, on the other hand, sent a letter to

---

[5]    Because gluten-free toothpaste and dental floss were not available at the prison store, the only way to obtain those items was from the prison clinic.  Id., ¶ 110.

[6]    The American Fund is a political party formed by Richards in 2013.  See Docket No. 16-1 (Declaration of Leonard Richards), pp. 10, 11.

Richards stating that $1.00 was being returned to him.  Id., ¶ 42.  Richards has not yet received his $1.00.  Id.

Richards initiated the present action on October 6, 2013, in the District Court for Washington County, Minnesota, against Eric Holder, Attorney General for the United States, Dayton, Roy, and the State of Minnesota.  Summons and Complaint [Docket No. 1-1].  The gravamen of the Complaint was Richards' need for gluten-free dental materials.  Id.  The case was removed by Holder to this District Court on November 5, 2013, and he immediately moved to dismiss.[7]  Notice of Removal [Docket No. 1]; Motion to Dismiss [Docket No. 3].  Following the filing of the motion to dismiss, Holder was dismissed by Richards from the suit.  Order for Dismissal with Prejudice dated December 10, 2013.  [Docket No. 13].  On April 10, 2014, Richards filed a First Amended Complaint against the State of Minnesota, Dayton, Roy, Ritchie, Black, and Anderson in their official and individual capacities, in which he asserted the following claims for relief:

**State Ballot Access**: In violation of Minn. Stat. §§ 204B and 202A; the Minnesota Constitution; and the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, defendants Dayton, Ritchie, Anderson, Black, and the State of Minnesota denied Richards the right to run for Governor or Lieutenant Governor of Minnesota by failing to provide notary services for prisoners at all times, (FAC, ¶ 32) ("Sometimes a Notary Public is available to Plaintiff, and sometimes a Notary Public is not available to Plaintiff"), and by:

---

[7]     Although the case was removed to federal court on November 5, 2013, there is no evidence that the state defendants received notification of the removal or were served the Complaint.  The state defendants were served the First Amended Complaint in late April and early May 2014.  [Docket No. 62].

- Imposing illegal qualifications for ballot access—namely, that a candidate (1) provide a contact telephone number, email address, website URL, and "campaign contact" address; (2) submit an affidavit for registering on-ballot candidacy, which affirms that he is an eligible voter, and that he attended his political party's caucus; (3) specify a district from which he seeks election; (4) state the name of his political party or principle in three words or less; (5) and pay a filing fee; and

- Failing to answer Richards' letter to Ritchie and Anderson, which sought information concerning requirements for on-ballot candidacy.

FAC, ¶¶ 11-13, 17-29, 31-41, 43-55, 130-38, 143-45.  Richards seeks declaratory and injunctive relief, including removal of election administration from the control of Ritchie in favor of an impartial elections committee.  Id., ¶ 147; id., Relief Requested ("RR"), ¶¶ A.2-5, 9-17, 18, 19, 36; B.4; C.1-16, 17, 19.[8]

**Federal Ballot Access**:  In violation of Article I of the United States Constitution, as well as the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, defendants Dayton, Ritchie, Anderson, and the State of Minnesota denied Richards the right to run for President, Vice President, United States Senator, and United States Representative by requiring that candidates: (1) pay a filing fee to register on-ballot candidacy; (2) submit an affidavit to register on-ballot candidacy; and (3) disclose more ballot-qualifying information than required by Article I of the United States Constitution.  FAC, ¶¶ 55, 139-145.  Richards seeks declaratory and injunctive relief for these violations.  RR, ¶¶ A.5-17; C.4-6, 9-15.

**Due Process**: Black and Anderson failed to return Richards' $1.00, which was submitted to the Secretary of State's Office in exchange for a copy of the American

---

[8] The First Amended Complaint is consecutively numbered from the beginning through the "Claims for Relief" section.  However, beginning at the "Relief Requested" section, Richards changed course and employed an alphanumeric labelling system.  Thus, the Court refers to that section separately.

Fund Constitution, in violation of Richards' right against having property taken without due process of law.  FAC, ¶¶ 41-43, 45; RR, ¶ 146.

**Parole Hearing**: Roy and the State of Minnesota denied Richards a fair parole hearing, in violation of his substantive and procedural rights to due process, his right to equal protection under the Fifth and Fourteenth Amendments to the United States Constitution, and the Minnesota Bill of Rights.  FAC, ¶¶ 81, 82, 154.  Richards seeks an injunction requiring defendants immediately to provide a fair and equal opportunity for Plaintiff to be paroled and to provide a new parole hearing.  RR, ¶¶ B.24, 25.

**Access to Courts:** In violation of the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, defendants Dayton, Roy, and the State of Minnesota denied Richards the right of access to courts and to petition the government for the redress of grievances by (1) refusing to make photocopies of Richards' Affidavit of Candidacy form; (2) denying Richards access to usable transcripts of state-court criminal proceedings necessary to seek post-conviction relief; (3) snooping on Richards and other prisoners while preparing legal documents.  FAC, ¶¶ 14, 21 27, 128, 129, 171.  Richards seeks a declaratory judgment, as well as an injunction ordering defendants to provide photocopying services each business day, to refrain from refusing to make photocopies for litigation purposes, and to refrain from accessing any of his written communications to lawyers, courts, or other privileged persons.  RR, ¶¶ A.37; B.2-3, 5.

**Retaliation:** In violation of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, the ADA and RA, and the Minnesota Constitution, defendants Dayton, Roy, Ritchie, Anderson, Black, and the State of

Minnesota retaliated against Richards for attempting to run for state and federal office in 2010 and seeking votes as a write-in candidate for the office of Governor of Minnesota in 2010. Specifically, these defendants:

- Sent Richards to punitive segregation for attempting to disseminate his Dayton political tract;

- Denied Richards necessary medical care during his time in punitive segregation;

- Subjected Richards to a retaliatory transfer from MCF-Faribault to MCF-Oak Park Heights, and then to MCF-Stillwater;

- Denied Richards a diabetic and gluten-free diet;

- Failed to provide Richards a follow-up upper gastrointestinal endoscopy with biopsy and genetic testing;

- Interfered with Richards' right to prepare legal papers for filing in court, and with Richards' communications with lawyers and courts;

- Denied Richards a fair parole hearing in 2011;

- Interfered with Richards' right to seek public office; and

- Condoned sexual harassment by Nurse Kelly Hughes at MCF-Faribault.

FAC, ¶¶ 59-79, 84-88, 94, 96, 97, 148-66, 169. Richards seeks declaratory and injunctive relief. RR, ¶¶ A.1, 20-32, 34-35; B.1, 5-22, 26-30; C.18-19.

**Medical and Dental Care:** In violation of the ADA, RA, and the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, defendants Dayton, Roy, and the State of Minnesota failed to provide Richards with a diabetic and gluten-free diet; gluten-free medication, toothpaste, and dental floss; and an upper gastrointestinal endoscopy with biopsy and genetic testing. FAC, ¶¶ 78, 88-93, 98-125, 150, 151, 153,

156-61, 163-65, 168, 170.   For these violations, Richards seeks declaratory and injunctive relief.  Id., ¶¶ 119, 156; RR, ¶¶ A.24, 26-32, 34-35; B.6-16.

**Political Speech:** In violation of the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, the State of Minnesota refused to disseminate Richards' political tract to a prospective voter at MCF-Faribault in October, 2010,.  FAC, ¶ 155.  Richards seeks a declaratory judgment and an injunction ordering defendants to refrain from impeding Richards' right to distribute any of his political tracts.  RR, ¶¶ A.21; B.19-23.

**Sexual Harassment:**   In violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, defendants Dayton, Roy, and the State of Minnesota condoned sexual harassment by nurse Kelly Hughes against Richards at MCF-Faribault.  FAC, ¶ 162. Richards seeks an injunction against any further abuse by nurse Hughes or any other state employee.  RR, ¶ B.17.

In addition to the specific relief requested for each count, Richards seeks compensatory and punitive damages, attorney's fees and costs, and the filing of a report in the International Criminal Court seeking criminal prosecution of the defendants for "crimes against humanity."  RR, ¶¶ D, E, F, G, H.[9]

---

[9]   Subsequent to his service and filing of the First Amended Complaint, Richards submitted a Declaration with his Memorandum in Opposition to Defendants' Motion to Dismiss.  Declaration A [Docket No. 74].  In this Declaration, Richards stated that on May 20, 2014, he submitted a "Notice of Candidacy" to the Secretary of State.  Id., Ex. 1, p. 1.  Black wrote back to Richards, stating that the "Notice of Candidacy" was being returned and that Richards was not filed as a candidate for any office.  Id.  Additionally, Black informed Richards that, in order to file as a candidate, he had to file a notarized Affidavit of Candidacy and either pay a filing fee or provide a petition in lieu of the fee. Id. (citing Minn. Stat. §§ 204B.03, 204B.06).  Richards also stated in this Declaration that in mid-July, 2014, he asked the law librarian at MCF-Stillwater whether she knew of any prisoners who had paid to have a notary come to prison to notarize documents for a

B.    **Defendants' Motion to Dismiss**

On May 21, 2014, defendants filed the present Motion to Dismiss on the grounds that the First Amended Complaint did not contain a short and plain statement of Richards' claims, and the claims failed as a matter of law.   State Defendants' Memorandum in Support of Motion to Dismiss ("Defs.' Mem."), p. 1 [Docket No. 32]. Defendants argued that, under the Eleventh Amendment to the United States Constitution, the State of Minnesota is completely immune from suit in federal court by its own citizens, and therefore all claims against the State should be dismissed.  Id., p. 5.   Defendants also contended that the Eleventh Amendment grants immunity to state officers in their official capacities for retrospective and monetary relief; thus, to the extent Richards was asserting such claims, they should be dismissed.  Id., pp. 5-6.

As for claims asserted against state officers in their official capacities seeking prospective injunctive relief for violations of federal law, defendants submitted that "a federal court can only have jurisdiction over the claim if the litigant establishes that: (1) the defendant is a state official who 'ha[s] some connection with the enforcement' of the challenged statute and (2) the defendant has 'threaten[ed] and [is] about to commence proceedings' to enforce the statute."  Id., p. 6 (quoting Ex parte Young, 209 U.S. 123, 156-57 (1908)).   Therefore, to the extent that Richards was seeking prospective injunctive relief that was not based on a continuing violation of federal law, his official-capacity claims against Dayton, Roy, Ritchie, Anderson, and Black ("State Defendants") are clearly barred and must be dismissed.  Id.

---

prisoner.   Declaration A, ¶ 5.   The librarian told Richards that she knew of only one prisoner who had managed to do this, and that the prisoner had to pay $200 to have the notary come to the prison.  Id.   The librarian also mentioned that Minnesota prisoners are having "real problems" getting notary services.  Id.

More particularly, defendants asserted that Richards' challenges to the constitutionality of state-office qualifications failed under the second prong of Young, because Richards has not alleged that Ritchie, Black, and Anderson (collectively, the "OSS Defendants") have rejected his candidacy for office or informed him that his candidacy will be rejected. Id., p. 7.

In addition, defendants maintained that any claims for injunctive relief for violations of state law are barred under Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89 (1984). Id., p. 6. But even if Pennhurst did not apply, Minnesota does not have a statutory equivalent of § 1983, and Minnesota courts have not recognized a private right of action for violation of the Minnesota Constitution. Id., p. 7 n. 1 (citations omitted).

In addition to these jurisdictional hurdles, defendants contended that the claims against the OSS Defendants, Dayton and Roy failed as a matter of law.

With regard to Richards' contention that OSS Defendants violated his constitutional rights by failing to respond to his December 2013 letter to the Office of the Secretary of State ("OSS"), defendants argued that they had no legal duty to provide information or legal advice to prospective candidates. Id., p. 10. With respect to his claims against the OSS Defendants that he cannot be denied the right to run for governor or lieutenant governor, defendants asserted that because Richards is a convicted felon with no right to vote under Minnesota law, he is ineligible to run for these offices. Id., pp. 8-9.

Specifically, defendants maintained:

> Minnesota election law provides that "[c]andidates of a major
> political party for any partisan office except presidential

elector . . . shall apply for a place on the primary ballot by filing an affidavit of candidacy as provided in section 204B.06[.]" Minn. Stat. § 204B.03.  Section 204B.06, in turn, requires that a candidate's affidavit of candidacy "shall state that the candidate . . . is an eligible voter" and "must state a telephone number where the candidate can be contacted." Minn. Stat. § 204B.06, subds. 1, 1(1), 1b(a). The statute further provides:

> A candidate who seeks the nomination of a major political party for a partisan office shall state on the affidavit of candidacy that the candidate either participated in that party's most recent precinct caucus or intends to vote for a majority of that party's candidates at the next ensuing general election.

Id. at subd. 2.

Because Richards is a convicted felon whose civil rights have not been restored, he is ineligible to vote in Minnesota elections. Minn. Const. art VII, § 1; Minn. Stat. § 201.014, subd. 2(a).

Id.

According to defendants, the United States Supreme Court has held that states may place reasonable restrictions on the eligibility for state office, such as Minnesota's eligible-voter requirement, and therefore Richards has no grounds to challenge Minnesota's candidacy requirements.  Id., pp. 11-16 (citations omitted).  Further, "[n]either the Minnesota nor the United States Constitution forbids the Minnesota Legislature from placing restrictions on would-be gubernatorial candidates that are in addition to the restrictions specified in Article V, Section 2 of the Minnesota Constitution."  Id., p. 15.

As for Richards' contention that OSS Defendants violated his constitutional rights by requiring him to either (1) pay a $300 filing fee, or (2) submit a nominating petition

signed by 2,000 eligible Minnesota voters, defendants maintained that there was no legal basis for this claim. Id., pp. 13-14.

With respect to Richards' claims against Dayton and Roy in their official capacities, defendants asserted that the claims failed as a matter of law because he did not clearly identify what Roy or Dayton personally did to violate his rights. Id., pp. 16-19. In this regard, defendants submitted that the First Amended Complaint failed to comply with Rule 8 of the Federal Rules of Civil Procedure, as the 89-page, 258-paragraph pleading was neither short, nor plain, nor concise. Id., pp. 16-18. Alternatively, if Richards was attempting to raise a failure-to-supervise claim against Dayton or Roy in their individual capacities under 42 U.S.C. § 1983, Roy and Dayton could not be held liable because they were not directly and personally involved in the alleged deprivation of Richards' constitutional rights. Id., pp. 19-20.

Finally, defendants maintained that Richards' challenge to Roy's decision to deny him parole was barred by Heck v. Humphrey, 512 U.S. 477 (1994), and, at any rate, the decision did not violate Richards' rights to procedural or substantive due process and equal protection under the law. Id., pp. 21-30.

In response to defendants' arguments, Richards asserted the following:

- The State of Minnesota mistreated him by transferring him to three of its prisons in less than one month. Memorandum of Plaintiff in Opposition to the State Defendants' Motion to Dismiss ("Pl.'s Mem."), pp. 3-4 [Docket No. 73].

- He is permitted to assert his medical care claims against the State Defendants in their official capacities under § 1983, and because Congress abrogated states' Eleventh Amendment sovereign immunity under the ADA and RA, his claims against the State of Minnesota and its officials for both money and injunctive relief are not barred. Id., pp. 6-7.

- The <u>Pennhurst</u> doctrine does not prohibit his claims based on state-law violations because federal courts may enforce state law when doing so is necessary to protect a federal constitutional right.  Further, he has properly pleaded supplemental jurisdiction.  <u>Id.</u>, pp. 8-9.

- He did not use "notice pleading" because <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), requires more detailed pleading.  In addition, he sued all parties necessary for relief, since many of them cooperated to violate his constitutional rights.   And since defendants violated several of Richards' rights, it was necessary for the First Amended Complaint to be lengthy.  <u>Id.</u>, p. 10.

- He did establish that his 2014 candidacy will be rejected based on a rejection letter, dated May 29, 2014, from Black.  This was a "credible threat" of adverse action by the government, and thus it was not necessary for Richards to delay his suit.  <u>Id.</u>, p. 11.

- There is no genuine basis for defendants to challenge his qualifications to run for Governor or Lieutenant Governor, or for Congress.  <u>Id.</u>, p. 12.  Further, defendants have conceded that he has the qualifications to run for Congress.  <u>Id.</u>

- Defendants repeatedly failed to cite the Minnesota Legislative Manual and published false information on the qualifications for Governor and Lieutenant Governor, thus misrepresenting the facts in this case.  <u>Id.</u>, pp. 13-14.

- No court has ever ruled that one must be an eligible voter to qualify for Minnesota Governor or Lieutenant Governor, and the Minnesota Constitution, Minnesota Statutes, and Minnesota Legislative Manual shows that he is eligible to run for those offices.  <u>Id.</u>, pp. 15-19.  Per Article V, § 2 of the Minnesota Constitution, and the Minnesota Legislative Manual governing statewide elections for 2013-2014, there are only three qualifications for governor and lieutenant governor – age, residency and citizenship.  <u>Id.</u>, pp. 16-17.  While Article VII of the Minnesota Constitution generally determines who can vote for state office, and who is generally eligible to run for state office, "except as otherwise provided in this constitution," this Article has no application to the qualifications for governor or lieutenant governor.  <u>Id.</u>, p. 16.  Further, none of the statutes bearing on the qualifications for governor or lieutenant governor reference Article VII.  <u>Id.</u>, p. 18.

- The State's policy that his Affidavit of Candidacy must be notarized is unconstitutional because it "has the likely effect of handicapping a class of candidates and has the sole purpose of creating additional

qualifications *indirectly*." <u>Id.</u>, p. 20 (citing <u>U.S. Term Limits, Inc. v. Thornton</u>, 514 U.S. 779, 836 (1995)) (emphasis added by Richards).

- The State's policy allowing for free notary services in prison does not provide for the notarization of Affidavits of Candidacy, and the state's proposed alternative—making arrangements for private notary services—is prohibitively expensive, and thus unconstitutionally discriminates against indigent candidates. <u>Id.</u>, pp. 22-24.

- The State engaged in a scheme to keep him off the 2014 ballot for U.S. Representative for the Sixth District. <u>Id.</u>, pp. 25-26.

- While the hearing conducted by Roy was called a "parole hearing," it was "more a conditions-of-confinement hearing," which led to Roy's determination that Richards "was entitled to a medium-custody placement; specifically, in the Linden geriatric/medical unit at the Faribault prison." <u>Id.</u>, p. 28. The thrust of his complaint was not on the denial of parole, but on Roy's refusal to consider Richards' already filed objections regarding Roy's close connection with Dayton. <u>Id.</u>, (citing FAC, ¶ 82).

In reply, defendants contended again that only eligible voters may run for public office in Minnesota. State Defendants' Reply Memorandum in Support of Motion to Dismiss ("Defs.' Reply"), pp. 3-4 [Docket No. 92]. Defendants submitted that although Article V, § 2 of the Minnesota Constitution lists specific qualifications for governor and lieutenant governor (age, residence, and citizenship), the baseline requirement of voter eligibility set forth in Article VII , Section 6 of the Minnesota Constitution applies to all state offices, including governor and lieutenant governor. <u>Id.</u>, pp. 3-5 (citing <u>State v. Sullivan</u>, 45 Minn. 309, 310-11, 47 N.W. 802, 802 (1891) (["The requirement that a person must be an eligible voter to run for any office] was intended as a restriction, and it has the effect of a constitutional declaration that <u>only such persons</u> as by the provisions of this article *are entitled to vote shall be 'eligible' to any elective office*.") (emphasis added in original); <u>see</u> <u>also</u> <u>State ex rel. McCarthy v. Moore</u>, 87 Minn. 308, 92 N.W. 4 (1902) (holding that the limitation in Minn. Const. art. VII, § 7, "relates to

essential qualifications, and dispenses with any other test to hold office (as birth, education, and the like) than the right to vote . . . . The right to vote and the right to hold office are declared to be co-ordinate."); State ex rel. Arpagaus v. Todd, 225 Minn. 91, 93, 29 N.W.2d 810, 811 (1947) ("Eligibility for any public office in Minnesota is thus expressly made [by Minn. Const. art. VII, § 6] to depend upon the right to vote.")).

Defendants rejected Richards' allegation that the prison librarian told him that a previous prisoner paid $200 to obtain private notary services because the statement constitutes double hearsay and is contrary to Minnesota law, which sets the maximum fee for notarization of affidavits at $5. Id., pp. 6-7. In any event, Richards failed to meet other requirements for candidacy—such as submitting filing fee—and therefore Richards' challenge is moot. Id., p. 8.

With regard to Richards' contention that his First Amended Complaint was necessarily lengthy to comply with the pleading requirements set forth in Iqbal and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), defendants noted that plaintiffs must still comply with Rule 8 of the Federal Rules of Civil Procedure. Id., pp. 8-10. Finally, defendants argued that the exceptions to the Pennhurst doctrine cited by Richards have no application in this case. Id., pp. 11-12.

## II.    STANDARD OF REVIEW

A civil complaint will be dismissed upon motion by a defendant, if the plaintiff has failed to plead an actionable claim for relief against that defendant. Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. In re Operation of Missouri River Sys. Litig., 418

F.3d 915, 917 (8th Cir. 2005) (citations omitted); see also Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994).   In addition, "the court must resolve any ambiguities concerning the sufficiency of the plaintiffs' claims in favor of the plaintiffs, and give the plaintiffs the benefit of every reasonable inference drawn from the well-pleaded facts and allegations in their complaint." Ossman v. Diana Corp., 825 F. Supp. 870, 880 (D. Minn. 1993) (internal quotation marks omitted) (quoting Retail Clerks Int'l Ass'n v. Schermerhorn, 373 U.S. 746, 753 n. 6 (1963)).

Further, litigants must properly plead their claims under Rule 8 of the Federal Rules of Civil Procedure and meet the principles articulated by the United States Supreme Court in Twombly and Iqbal.  Rule 8(a)(2), "which sets forth the general rules of pleading, requires 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Gomez v. Wells Fargo Bank, N.A., 676 F.3d 655, 664-65 (8th Cir. 2012).  "Each allegation must be simple, concise, and direct." Id.; see also Michaelis v. Nebraska State Bar Ass'n, 717 F.2d 437, 438 (8th Cir. 1983) ("Similarly, [Rule 8(d)(1)] specifies that each averment of a pleading is to be simple, concise and direct.").  "'The words 'short and plain' are themselves short and plain, and they mean what they say: A complaint must be concise, and it must be clear.'"  United States ex rel. Ellis v. City of Minneapolis, Civ. No. 11-0416 (PJS/TNL), 2012 WL 6652885, at *1 (D. Minn. Dec. 21, 2012) (quoting Gurman v. Metro Hous. and Redev. Auth., 842 F. Supp. 2d 1151, 1152 (D. Minn. 2011)).[10]

---

[10]     Rule 8 is intended to permit the Court and all parties to be clearly aware of all of the claims which are presented by the Complaint.  The United States Supreme Court has noted the practical importance of "sharpening and limiting the issues" in the pleading stages, to facilitate resolution at the final stage.  O'Donnell v. Elgin, Joliet & Eastern Ry. Co., 338 U.S. 384 at 392 (1949).   One commentator has noted:

To satisfy Rule 8, "a complaint need not contain 'detailed factual allegations[.]'" United States ex rel. Raynor v. Nat'l Rural Utilities Co-op. Fin., Corp., 690 F.3d 951, 955 (8th Cir. 2012) (quoting Twombly, 550 U.S. at 555).  However, "it must contain facts with enough specificity 'to raise a right to relief above the speculative level.'" Id. (citation omitted).  Accordingly, a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).  To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S., at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quoting Twombly, 550 U.S. at 556).  ""Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.  However, "[i]t is the plaintiffs' burden, under both Rule 8 and Rule 11, to reasonably investigate their claims, to research the relevant law, to plead only viable claims, and to plead those claims concisely and clearly, so that a defendant can readily respond to them and a court can readily resolve them."  Gurman, 842 F. Supp. 2d at 1153.

---

"Unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."  5 Wright and Miller, Federal Practice and Procedure § 1281, p. 522.  Or, as one court more bluntly stated: "Judges are not like pigs, hunting for truffles buried in briefs." United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam).

"[P]ro se litigants are held to a lesser pleading standard than other parties." Fed.
Express Corp. v. Holowecki, 552 U.S. 389, 402 (2008) (citing Estelle v. Gamble, 429
U.S. 97, 106 (1976)). Thus, "if the essence of an allegation is discernible, even though
it is not pleaded with legal nicety, then the district court should construe the complaint in
a way that permits the layperson's claim to be considered within the proper legal
framework." Stone v. Harry, 364 F.3d 912, 915 (8th Cir. 2004). Nevertheless, even a
pro se complaint must allege facts—not bare, unsupported, legal conclusions. Martin v.
Sargent, 780 F.2d 1334, 1337 (8th Cir.1985) (emphasis added); see also Frey v. City of
Herculaneum, 44 F.3d 667, 671 (8th Cir.1995) ("At the very least . . . the complaint must
contain facts which state a claim as a matter of law and must not be conclusory")
(citation omitted).

Finally, as a general rule, the Court may not consider materials "outside the
pleadings" on a motion to dismiss. However, "a court may consider the complaint,
matters of public record, orders, materials embraced by the complaint, and exhibits
attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6) of the
Federal Rules of Civil Procedure." Wickner v. McComb, 2010 WL 610913, at *5 (D.
Minn. 2010) (citing Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir.
1999)).

## III.  DISCUSSION

### A.  Rule 8 Pleading Requirements

As an initial matter, the Court finds that Richards' First Amended Complaint does
not comply with the pleading requirements of Rule 8.

The First Amended Complaint is not short.  Unlike the original Complaint, which is only 7 pages long, the First Amended Complaint spans 88 pages and contains 258 paragraphs.  Richards has buttressed this monumental pleading with countless declarations, letters, and affidavits that are often repetitious.  See Docket Nos. 11, 16, 22-24, 26, 27, 30, 38-42, 48, 52, 59, 60, 64, 74, 75, 80, 85, 86, 88, 90, 94-100, 102, 104, 105, 106.  Due to these additional filings, the entire pleading stretches well beyond 100 pages, and courts in this District have dismissed complaints far shorter than the one before this Court.  See, e.g., Murphy v. Aurora Loan Servs., LLC, Civ. No. 11-2750 (ADM/JJK), 2013 WL 2403602, at *4 (D. Minn. May 31, 2013) (dismissing 72-page complaint); Ellis, 2012 WL 6652885, at *1-3 (dismissing 64-page complaint).

Moreover, the First Amended Complaint is neither plain, direct nor concise.  To the contrary, Richards jumps from topic to topic without any consistent method of organization.  The factual narrative is muddled, repetitive, and continually interrupted by political commentary,[11] irrelevant anecdotes,[12] and disparaging remarks about

---

[11]    For instance, on page 15 of the First Amended Complaint, Richards attached a copy of his 2014 political platform for Governor of Minnesota.

[12]    In paragraph 86, Richards recounted the family history of a Dr. Vainio, whom Richards stated he has never met.  He then went on to describe in detail his relationship with a Bertha Hennessy, who is not a party to this suit:

> Plaintiff several times visited Bertha ("Bertie") and her husband at their house in the Playa del Rey section of far southwestern Los Angeles (XXX Montreal Street, Playa del Rey, CA 90293-7735); the hillside site overlooks the Pacific Ocean and commands a sweeping view of the Los Angeles basin, Los Angeles City Hall being visible far to the east. Bertie and her husband for decades were real-estate investors in Southern California and in Las Vegas, Nevada; their investments included the land under the Tropicana Hotel in Los [sic] Vegas; land at Lake Elsinore (dry when

defendants.[13]   The lack of organization and sheer volume of extraneous information made it very difficult to determine what claims Richards is attempting to raise.  See McAninch v. Wintermute, 491 F.3d 759, 766 (8th Cir. 2007) (amended complaint containing "lengthy, irrelevant, and largely incomprehensible factual allegations, [and] discussions of case law supposedly supporting claims" is properly rejected) (internal quotation marks omitted).

Even more problematic is the fact that Richards frequently fails to identify which claims he is asserting against which defendants.  For example, he makes the following assertions:

> 59.   [T]he State of Minnesota's officials revved up a campaign of **retaliation** against Plaintiff, which campaign is ongoing.
>
> * * *
>
> 79.   Faribault prison officials pulled out all the stops to harm Plaintiff's health, to blacken Plaintiff's name (Plaintiff was coming up for parole), and to kill Plaintiff's gubernatorial campaign against Dayton.
>
> * * *

---

> they bought, later filled with water); an air-freight terminal in El Segundo, California, near Los Angeles International Airport/LAX; numerous apartment rentals in Venice, California, and other real estate.

FAC, ¶ 86(a).

[13]   With regard to Governor Dayton, Richards made the following statement:

> Not content to buy the governorship, defendant Dayton had the gall to take what amounted to a "discount" on his political expenses by "accepting" a salary as governor—for an election that he did not <u>actually</u> win.  That's not all: Dayton promised in 2010 to "tax the rich."  But he omitted three words: "except Mark Dayton."

FAC, ¶ 68.

85. Plaintiff has been the target of venomous harassment for <u>decades</u>, especially after being falsely accused of murder by the Hennepin County Courthouse Club.

FAC, ¶¶ 59, 79, 85 (emphasis in original).

As these examples illustrate, Richards either directs his claims generally against every conceivable defendant, or, conversely, fails to identify any defendant at all. This type of "kitchen-sink" or "shotgun" pleading does not provide defendants with "fair notice of the nature and basis or grounds for a claim" as required by Rule 8. <u>Topchian v. JPMorgan Chase Bank, N.A.</u>, 760 F.3d 843, 848 (8th Cir. 2014); <u>Murphy</u>, 2013 WL 2403602, at *4 ("[N]either the Butler Plaintiffs' Counts 1 and 2, nor the Murphy Plaintiffs' Claim 1 and 2 are clear as to which Defendants the counts relate to . . . . Therefore, they do not provide proper notice to the Defendants.") (citing <u>Blaylock v. Wells Fargo Bank, N.A.</u>, Civ. No. 12–693 (ADM/LIB), 2012 WL 2529197, at *3 (D. Minn. June 29, 2012)); <u>see also</u> <u>Gurman v. Metro Hous. & Redevelopment Auth.</u>, 842 F. Supp. 2d 1151, 1153 (D. Minn. 2011) ("This Court has repeatedly criticized the filing of "kitchen-sink" or "shotgun" complaints—complaints in which a plaintiff brings every conceivable claim against every conceivable defendant.") (footnote omitted).[14]

---

[14] "Kitchen-sink" complaints were emphatically rejected in <u>Liggins v. Morris</u>, 749 F. Supp. 967 (D. Minn. 1990), where the court held following:

The time has come for practitioners in this district to prepare complaints alleging violations of 42 U.S.C. § 1983 in a fashion that will identify the specific claims of individual plaintiffs for specific constitutional violations as against only culpable defendants. . . . Accordingly, when hereafter confronted with a complaint that does nothing more than identify a multitude of parties plaintiff, a number of defendants, a series of counts, and allegations of violations of every known constitutional provisions and common law cause of action, the court will deem the complaint inadequate. Such a complaint will be subject to dismissal for

Richards is not represented by counsel. However, pro se parties are not excused from complying with the Federal Rules of Civil Procedure. Am. Inmate Paralegal Assoc. v. Cline, 859 F.2d 59, 61 (8th Cir. 1988) ("Pro se litigants are not excused from complying with court orders or substantive and procedural law."); Ellis, 2012 WL 6652885, at *2 ("The Federal Rules of Civil Procedure apply to pro se litigants."). Further, the Court notes that Richards is an experienced pro se litigant who has filed several actions in federal court. See Richards v. Great Western Ins. Co., Civ. No. 11-965 (JRT/TNL); Richards v. Lakewood Cemetery Ass'n, Civ. No. 10-964 (ADM/FLN); Richards v. Associated Bank NA, Civ. No. 10-3971 (DSD/FLN); Richards v. Fabian, Civ. No. 08-4709 (JMR/JSM); Richards v. Windschitl, Civ. No. 06-3788 (PAM/AJB); Richards v. Alango Cemetery Ass'n, Civ. No. 03-4564 (RHK/RLE).

In sum, the Court finds that the First Amended Complaint does not comply with the pleading requirements under Rule 8. However, because Richards is unrepresented by counsel, the Court will not recommend dismissal of the suit on this basis at this time. Rather, to the extent that this matter survives defendants' motion to dismiss or Richards is permitted to file another amended complaint, he will be held accountable to the Federal Rules of Civil Procedure, including the pleading standards dictated by Rule 8, as well as the Local Rules for this District.

---

failure to comply with Rule 8 and Rule 11 of the Federal Rules of Civil Procedure. In addition, the potential application of sanctions in the form of attorney's fees or other appropriate relief under Rule 11 will be seriously addressed.

Id. at 971.

25

**B.      Claims Against the State and Individual Defendants under 42 U.S.C. § 1983**

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Pursuant to § 1983, an individual may "vindicate rights conferred by the Constitution or laws of the United States." Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000); see also Azul-Pacifico, Inc. v. City of Los Angeles, 973 F.2d 704, 705 (9th Cir. 1992), cert. denied 506 U.S. 1081 ("Plaintiff has no cause of action directly under the United States Constitution. . . . [A] litigant complaining of a violation of a constitutional right must utilize 42 U.S.C. § 1983.") (citing Thomas v. Shipka, 818 F.2d 496, 499 (6th Cir. 1987) ("where a plaintiff states a constitutional claim under 42 U.S.C. § 1983, that statute is the exclusive remedy for the alleged constitutional violation"), vacated on other grounds by 488 U.S. 1036 (1989); Hunt v. Robeson Cnty. Dept. of Social Serv., 816 F.2d 150 (4th Cir. 1987); Morris v. Metro. Area Transit Auth., 702 F.2d 1037 (D.C. Cir. 1983)).

### 1.      Eleventh Amendment Immunity

The Eleventh Amendment provides that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI.

Under the Eleventh Amendment, federal courts lack subject matter jurisdiction over a claim against a state when that state has not consented to the suit. See Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73 (2000); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 64-65 (1996). Thus, "[u]nless a State has waived its Eleventh Amendment immunity or Congress has overridden it, . . . a State cannot be sued directly in its own name regardless of the relief sought." Kentucky v. Graham, 473 U.S. 159, 167 n. 14 (1985); see also Morstad v. Dep't of Corr. & Rehab., 147 F.3d 741, 743-44 (8th Cir. 1998); Murphy v. State of Ark., 127 F.3d 750, 754 (8th Cir. 1997). When a lawsuit is barred by the Eleventh Amendment, the case must be dismissed for lack of subject matter jurisdiction. Seminole Tribe, 517 U.S. at 64-65.

(a)      Claims against the State of Minnesota

Congress did not abrogate the states' immunity by enacting 42 U.S.C. § 1983. See Quern v. Jordan, 440 U.S. 332, 345 (1979); see also Larson v. Kempker, 414 F.3d 936, 939 n. 3 (8th Cir. 2005) ("Section 1983 does not contain a clear legislative statement abrogating a state's immunity under the Eleventh Amendment.") (citation omitted). In addition, the State of Minnesota has not waived its immunity from § 1983 claims, (Phillips v. Minnesota State Univ., Civ. No. 09-1659 (DSD/FLN), 2009 WL 5103233, *3 (D. Minn. 2009)), nor has Minnesota consented to suit.[15] See DeGidio v.

---

[15] "A state may waive its immunity from suit in federal court by voluntarily submitting its rights for judicial determination." Skelton v. Henry, 390 F.3d 614, 618 (8th Cir. 2004) (citing Lapides v. Bd. of Regents, 535 U.S. 613, 618–19 (2002)). "A state voluntarily invokes the federal court's jurisdiction by filing suit in a federal court or agreeing as a defendant to remove the case to federal court." Id. (citation omitted). "In contrast, a state does not waive its immunity by entering a general appearance or by defending a case in federal court so long as it asserts its Eleventh Amendment sovereign immunity defense in a timely manner." Id. (citing Union Elec. Co. v. Mo. Dep't of Conservation, 366 F.3d 655, 659–60 (8th Cir.2004)).

Perpich, 612 F. Supp. 1383, 1388-89 (D. Minn. 1985) (finding that waiver of immunity by a state will be found "only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'") (quoting Florida Dep't of Health & Rehabilitation Servs. v. Florida Nursing Home Ass'n, 450 U.S. 147 (1981)).

Accordingly, based on the Eleventh Amendment, the Court concludes that all claims asserted under 42 U.S.C. § 1983 against the State of Minnesota should be dismissed for a lack of subject matter jurisdiction.

(b)     Official Capacity Claims against State Defendants

Eleventh Amendment immunity extends to claims against state officials for damages and retrospective relief since "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office [and] is no different from a suit against the State itself." Will v. Mich. Dep't of State

---

This case was originally filed in Washington County District Court. Richards named as defendants Eric Holder, Dayton, Roy, and the State of Minnesota. Holder (the only federal defendant) received a Summons and Complaint on October 9, 2013, and subsequently filed a notice of removal to this District on November 5, 2013. See Notice of Removal of Action to Federal Court [Docket No. 1]. However, the State Defendants did not join in the removal action, nor did they file a written consent agreement. In fact, there is no indication that the State Defendants even received proper notice of these proceedings until after the case had been removed. See May 27, 2014 Letter from Leonard J. Richards to Hon. John R. Tunheim [Docket No. 49-1] ("I have just learned that a Minnesota Assistant Attorney General will be representing the six (6) State of Minnesota defendants (Ritchie, Anderson, Black, Roy, Dayton, and State of Minnesota). By a copy hereof, I am serving [notice of hearing on Motion for Temporary Restraining Order and Preliminary Injunction on] the said attorney for the State of Minnesota defendants."). The state defendants were served the First Amended Complaint in late April and early May 2014. [Docket No. 62].

Because the state defendants did not act to remove this case to federal court, and because they asserted an Eleventh Amendment defense at the earliest opportunity, the Court finds that defendants have not waived their immunity.

Police, 491 U.S. 58, 71 (1989) (citation omitted); see also Morstad, 147 F.3d at 743

(finding that state employees sued in official capacities are not liable for damages under

§ 1983).

Richards has asserted § 1983 claims for compensatory and punitive damages

against Dayton, Roy, Ritchie, Anderson, and Black ("State Defendants") in their official

capacities.  However, none of the State Defendants has consented to suit.  As such, the

Eleventh Amendment bars these § 1983 claims for compensatory and punitive

damages against the State Defendants in their official capacities, and this Court lacks

jurisdiction over the matter.  See Randall v. LeBlanc, No. 05-2504, 2005 WL 2897903,

at *1 (8th Cir. Nov. 4, 2005) (per curium) (finding that the plaintiff's request for "damages

fails because the defendant federal prison officials--all of whom were sued in their

official capacities--are immune from liability for monetary damages in this case.") (citing

Hagemeier v. Block, 806 F.2d 197, 202-03 (8th Cir. 1986)).[16]

On the other hand, § 1983 claims for prospective injunctive relief can be brought

against state employees in their official capacities so long as the claims meet the

requirements set forth in Ex Parte Young.  Serna v. Goodno, 567 F.3d 944, 952 (8th Cir.

2009) ("[I]n accordance with Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714

---

[16]      To the extend Richards is seeking retroactive equitable relief or a declaratory
judgment for a past constitutional violation, his claims are barred under the Eleventh
Amendment.  See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506
U.S. 139, 146 (1993) (Eleventh Amendment "does not permit judgments against state
officers declaring that they violated federal law in the past . . . .") (citing Green v.
Mansour, 474 U.S. 64, 68 (1985)); Skelton, 390 F.3d at 617 (Eleventh Amendment
"bar[s] the award of any retroactive relief for violations of federal law that would require
payment of funds from a state treasury.") (citing Edelman, 415 U.S. at 677); McGee v.
Feneis, Civ. No. 07-4868 (PJS/FLN), 2009 WL 2928245, at *4 (D. Minn. Sept. 8, 2009)
("Suits for retroactive equitable relief against state officials in their official capacity are
also barred by the Eleventh Amendment . . . .") (emphasis in original) (citation omitted).

(1908), the Eleventh Amendment bars damages claims against the states, but generally does not bar claims for prospective injunctive relief against public officials in their official capacities."); Sherbrooke Turf, Inc. v. Minn. Dept. of Transp., 345 F.3d 964, 967 n. 1 (8th Cir. 2003) ("Eleventh Amendment immunity may bar the claims against MnDOT and NDOR, which are state agencies, but the state officials may be sued for injunctive relief.") (citing Will, 491 U.S. at 66-67, 71 n. 10)); Alsbrook v. City of Maumelle, 184 F.3d 999, 1010 n. 19 (8th Cir. 1999) (en banc), cert. granted, 528 U.S. 1146, cert. dismissed, 529 U.S. 1001 (2000) ("[A] state official may be sued in his or her official capacity for injunctive relief.") (citation omitted)).

"In Ex parte Young, 209 U.S. at 157, 28 S.Ct. 441, the Supreme Court held that the Eleventh Amendment does not bar a suit against a state official to enjoin enforcement of an allegedly unconstitutional statute, provided that 'such officer [has] some connection with the enforcement of the act.'" Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon, 428 F.3d 1139, 1145 (8th Cir. 2005) (alteration in original) (citation omitted).

As the Supreme Court explained:

> In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of that act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.

Ex parte Young, 209 U.S. at 157.

Accordingly, "[t]he Ex parte Young exception only applies against officials 'who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal

Constitution.'" 281 Care Comm. v. Arneson, 766 F.3d 774, 797 (8th Cir. 2014) (citation

omitted); Harris v. Hammon, 914 F. Supp. 2d 1026, 1035 (D. Minn. 2012) (same); see

also id. ("Absent a real likelihood that the state official will employ his supervisory

powers against plaintiffs' interests, the Eleventh Amendment bars federal court

jurisdiction.") (citing Long v. Van de Kamp, 961 F.2d 151, 152 (9th Cir.1992) (per

curiam)).

> Young has been focused on cases in which a violation of
> federal law by a state official is ongoing as opposed to cases
> in which federal law has been violated at one time or over a
> period of time in the past, as well as on cases in which the
> relief against the state official directly ends the violation of
> federal law as opposed to cases in which that relief is
> intended indirectly to encourage compliance with federal law
> through deterrence or directly to meet third-party interests
> such as compensation.

Papasan v. Allain, 478 U.S. 265, 277-78 (1986); see also Randolph v. Rodgers, 253

F.3d 342, 348 (8th Cir. 2001) ("Ex parte Young simply permits an injunction against a

state official in his official capacity to stop an ongoing violation of federal law.") (citation

omitted).

Applying these principles to Richards' claims against the State Defendants, the

Court finds that his official capacity claims for prospective injunctive relief against the

OSS Defendants fail.   First, on a motion to dismiss, this Court may not consider

materials outside the First Amended Complaint, unless they are matters of public

record, orders and materials embraced by the complaint, or exhibits attached to the

complaint.   See Porous Media Corp., 186 F.3d at 1079.   Defendants argued that

Richards' claims for prospective injunctive relief were barred with respect to the OSS

Defendants because no one in the OSS had rejected or threatened to reject Richards'

candidacy for the upcoming election. Defs. Mem., p. 7.  As a result, Richards has failed

to establish the second prong of the Ex parte Young test—namely, that the defendant has "threaten[ed] and [is] about to commence proceedings" to enforce the allegedly unconstitutional statute.  Id., p. 6 (quoting 209 U.S. at 156-57).  In response, Richards contended that the Secretary of State's office did reject his candidacy for the 2014 election, citing a letter dated May 28, 2014, from defendant Black to Richards in which Black informed him that he had to file a notarized Affidavit of Candidacy and pay a filing fee or provide a petition in lieu of the fee.  Pl.'s Mem., p. 11 (citing Declaration A, Ex. 1 [Docket No. 74]).  However, this letter is not mentioned or embraced by the First Amended Complaint, and thus, it cannot be considered in connection with defendants' motion.

Second, and more to the point, even if this letter were alleged in the First Amended Complaint (or the Court were to permit Richards to amend and add this allegation to his complaint), the allegation that the OSS Defendants unlawfully refused his candidacy application to run for U.S. House of Representative fails to meet the requirements articulated in Ex parte Young.  In order to state a viable claim for prospective injunctive relief, an event that occurred once in the past does not support a claim of an ongoing violation of federal law in the future.  Here, Richards has pointed to a one-time rejection of his Notice of Candidacy.  While Richards urges that it will happen again, there is no indication that it will or more significantly, on what grounds (i.e whether it will be rejected for failure to submit a filing fee, a petition in lieu of the fee, or a notarized Affidavit of Candidacy).  What is more, even if any future Affidavit of Candidacy were rejected because it was not notarized, (which is now the thrust of Richards' claim that he cannot meet the requirements for a properly prepared Affidavit

of Candidacy), the persons responsible for its rejection are not the OSS Defendants but those persons responsible for implementing the DOC's rules with respect to the use of a prison notary.  See E.E.O.C. v. State of Ill., 69 F.3d 167, 170 (7th Cir. 1995) ("'A person aggrieved by the application of a legal rule does not sue the rule *maker* – Congress, the President, the United States, a state, a state's legislature, the judge who announced the principle of common law. He sues the person whose acts hurt him.'") (emphasis in original) (quoting Quinones v. City of Evanston, 58 F.3d 275, 277 (7th Cir.1995)).   In sum, none of the OSS Defendants have any connection with the enforcement of the actions that Richards seeks to remedy.[17]   Richards claims against the OSS Defendants in their official capacities fail under both prongs of Ex parte Young.

---

[17]     In his opposition brief, Richards claimed for the first time that the requirement of a notarized affidavit was unconstitutional.  Pl.'s Mem., p. 20.  Setting aside the fact that he made no such claim in the First Amended Complaint, and assuming he were to seek to amend and assert such a claim against the OSS Defendants, the claim would likely be futile.

   Federal courts have upheld notarization requirements in the absence of some evidence that the statute at issue is unusually burdensome.

   In Am. Party of Texas v. White, 415 U.S. 767 (1974), several minority political parties objected to a Texas statute requiring that all signatures evidencing support for a political party be notarized.  These signatures were necessary for unaffiliated or minority-party candidates to appear on the ballot.  See id. at 772-775.  The Court upheld the statute, noting that the plaintiffs "ma[de] little or no effort to demonstrate its impracticability or that it is unusually burdensome."  Id. at 787; see also Fishman v. Schaffer, 429 U.S. 1325, 1328-29 (1976) (Marshall, J., in chambers) ("[A] requirement more burdensome than Connecticut's that all signatures be notarized at the time they are collected is not unconstitutional, at least absent more proof of impracticability or unusual burdensomeness than was before the Court.") (citing Am. Party of Texas, 415 U.S. at 787).  The Court also agreed with the district court's finding that there was "no alternative if the State was to be able to enforce its laws to prevent voters from crossing over or from voting twice for the same office."  Id.

   In Am. Constitutional Law Found., Inc. v. Meyer, 120 F.3d 1092 (10th Cir. 1997), aff'd sub nom. Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182 (1999), a Colorado statute required circulators of ballot-initiative petitions to "sign affidavits

averring that the signatures [they] collected [were] valid." Id. at 1099 (citation omitted). The court found that "[t]here is little, if anything, in the record to support plaintiffs' claim that the affidavit requirement significantly burdens political expression by decreasing the pool of available circulators.  Hence exacting scrutiny is not required." Id. (footnote omitted).

On the other hand, in Perez-Guzman v. Gracia, 346 F.3d 229 (1st Cir. 2003), the First Circuit upheld a district court order striking down a Puerto Rico law, which required that new political parties collect over 100,000 separately notarized petitions.  In Puerto Rico, only attorneys could serve as notaries, and thus there were fewer than 8,000 notaries in the entire commonwealth. Id. at 230, 232 (citation omitted).  The court noted that "the lawyer-notarization requirement greatly hampered [plaintiff's] efforts to gather signatures because, in addition to convincing voters that a new political party was needed, he also had to convince them to repair to an attorney's office." Id. at 239.  In addition, the court found that the cost of notarizing 100,000 petitions would be at least $1,500,000. Id. at 240.  Thus, the court concluded that "Puerto Rico's lawyer-notarization requirement imposes a severe burden on [plaintiff's] rights." Id. at 243.

Minnesota's notarization requirement is significantly less onerous than those in the above cases.  First, unlike in Am. Party of Texas, Minnesota requires all candidates to provide a notarized Affidavit of Candidacy, regardless of party affiliation or office sought.  In that respect, candidates of well-established parties have no advantage over unaffiliated or new-party candidates.  Second, Minnesota only requires notarization of the Affidavit of Candidacy.  It does not require that signatures appearing on a nominating petition be notarized.  Thus, unlike in Texas, a single notary stamp will suffice.  Finally, unlike in Perez-Guzman, notaries in Minnesota do not have to be licensed attorneys.  Therefore, as a practical matter, notary services are considerably more accessible (and presumably less expensive) than in Puerto Rico.

In sum, Minnesota's notarization requirement "'in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life.'" Am. Party of Texas, 415 U.S. at 787 (quoting Jenness v. Fortson, 403 U.S. 431, 439 (1971)). Accordingly, the Court finds that Minn. Stat. § 204B.09(b) does not impose a severe burden on the right to ballot access.

Because the notarization requirement is not a "severe burden," Minnesota need only have a rational, nondiscriminatory interest in requiring that Affidavits of Candidacy be notarized.  "States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364-65 (1997) (citations omitted).  Minnesota's notarization requirement rationally furthers these interests by preventing frivolous or fraudulent candidacies and ensuring that candidates are committed to the electoral process.

Third, as set out in the section below addressing the ballot access claims against the OSS Defendants in their individual capacities, for the same reasons, these claims fail as a matter of law against the OSS Defendants in their official capacities.

As for any claims against Dayton and Roy in their official capacities, these claims fail for the most part, because they too do not meet the requirements dictated by Ex parte Young.  As for Dayton, there were no facts stated in the First Amended Complaint that showed any involvement by him in any of the claims asserted by Richards, much less any acts by him of an ongoing nature such that he could be enjoined from performing them in the future.  All claims against him in his official capacity should be dismissed.

Likewise, as for Roy, with the exception of his involvement in Richards' parole hearing[18] and Richards' continued medical and dental care,[19] there were no facts alleged that Roy played a role in any alleged deprivation of Richards' right to access the courts, or alleged acts of retaliation, failure to distribute Richards' political tract, or sexual harassment.  But even if such facts had been pled, there were no facts alleged of ongoing conduct by Roy which would entitle Richards to prospective injunctive relief.

For all of these reasons, the Court recommends granting defendants' Motion to Dismiss as to all § 1983 claims for damages and all claims for injunctive relief asserted against the OSS Defendants and Dayton in their official capacities.  In addition, the

---

Accordingly, Minn. Stat. § 204B.09(b) is a reasonable and constitutional restriction on the right to ballot access.  Richards is unlikely to succeed on the merits of this claim.

[18]     As set out below, that claim fails on the merits.

[19]     As set out below, claims against Roy which are governed by the ADA, cannot be asserted against Roy in a § 1983 action.  See n. 37, infra.

Court recommends granting defendants' motion as to all § 1983 claims for damages and all claims for injunctive relief asserted against Roy, except those claims bearing on his involvement in Richards' parole hearing and Richards' continued medical and dental care, which the Court recommends be dismissed on other grounds, as set out below.

(c)   Individual Capacity Claims against the State Defendants

To state an actionable § 1983 claim against a defendant in his or her personal capacity, a complainant must allege a set of historical facts, which, if proven true, would demonstrate that the defendant violated the complainant's federal constitutional rights while acting under color of state law.   West v. Atkins, 487 U.S. 42, 48 (1988). Furthermore, "[l]iability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights" protected by the Constitution.   Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990); Speed v. Ramsey Cnty., 954 F. Supp. 1392, 1397 (D. Minn. 1997) (same).   In other words, civil rights claimants must sufficient plead facts showing each named defendant's personal involvement in alleged constitutional wrongdoing.   Ellis v. Norris, 179 F.3d 1078, 1079 (8th Cir. 1999) (emphasis added); see also Beck v. LaFleur, 257 F.3d 764, 766 (8th Cir. 2001) (upholding summary dismissal of civil rights claims, because plaintiff's complaint "failed to allege sufficient personal involvement by any of defendants to support such a claim").

Section 1983 actions against an individual cannot be premised on respondeat superior liability; a defendant can only be liable for his or her personal acts.   See Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Jackson v. Nixon, 747 F.3d 537, 543 (8th Cir.

2014) ("To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights.") (citation omitted); White v. Holmes, 21 F.3d 277, 280 (8th Cir. 1994) ("A supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity.") (quoting Bolin v. Black, 875 F.2d 1343, 1347 (8th Cir.), cert. denied, 493 U.S. 993 (1989)).  As such, general responsibility for supervising a facility is not sufficient to establish personal liability.  See Estate of Rosenberg by Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995) (citing Ouzts v. Cummins, 825 F.2d 1276, 1277 (8th Cir. 1987)).

"While the doctrine of respondeat superior does not apply to § 1983 cases, a supervisor may still be liable under § 1983 if either his direct action or his 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." Jackson, 747 F.3d at 543 (citations omitted).  As such, "a supervising officer can be liable for an inferior officer's constitutional violation only 'if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.'"  Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010) (quoting Otey v. Marshall, 121 F.3d 1150, 1155 (8th Cir. 1997)).

Applying these principles to Richards' claims against the State Defendants, the Court finds that Richards has alleged no facts regarding any relevant activities or conduct by Dayton.[20]  Nowhere in the First Amended Complaint does Richards contend that Dayton personally participated in the denial of Richards' constitutional rights, or that

---

[20]    In the First Amended Complaint, Richards maintained that Dayton failed to attend his 2014 Democratic-Farmer-Labor precinct caucus, and that Dayton "bought" the Minnesota governorship and dodged state taxes.  FAC, ¶¶ 30, 68.  These allegations are irrelevant to any of Richards' legal claims.

he failed to supervise or train an employee who caused a violation. Accordingly, Richards' claims against Dayton in his personal capacity should be dismissed.

Similarly, Richards has failed to allege any personal involvement by Roy, except as it relates to Roy's participation in Richards' parole hearing. The First Amended Complaint does not allege any facts from which this Court could conclude that Roy directly interfered with Richards' right to access the courts or pursue a state or federal office; had any personal involvement in the failure to distribute Richards' political tract; or participated in any manner in the activities and conduct that Richards alleges amounted to retaliation, sexual harassment, or deprived Richards of any necessary medical and dental. Further, Richards alleged no facts to support a claim that Roy failed to supervise or train an employee who caused any such alleged violation. In other words, Richards has not pleaded specific factual allegations showing what Roy allegedly did or failed to do, while acting under color of state law, which violated Richards' constitutional rights. On that basis, any claims against Roy in his individual capacity alleging a denial of access to the court, retaliation, denial of medical and dental care, and sexual harassment should be dismissed.

At the same time, the First Amended Complaint did allege that Roy was personally involved in Richards' parole hearing on February 14, 2011. Specifically, Richards contended that Roy, as Commissioner of Corrections, was the sole voting member of his parole panel. FAC, ¶¶ 80, 81. Richards maintained that he had objected to Roy's close connection with Richards' gubernatorial campaign against Dayton, but Roy refused to recuse himself or to consider any of Richards' objections. Id., ¶ 82. These allegations establish that Roy had a causal link to, and direct responsibility for,

the purported deprivation of Richards' rights.   Likewise, as to the OSS Defendants (Ritchie, Anderson, and Black), defendants did not assert that Richards had not alleged sufficient personal involvement in his state and federal ballot claims.   Consequently, the Court addresses the merits of Richards' § 1983 claims against Roy in his individual capacity regarding Richards' parole hearing, and against the OSS Defendants in their personal capacity regarding their conduct with respect to Richards' attempts to seek state and federal offices.[21]

i.     Parole Hearing

Richards asserted that on February 14, 2011, Roy deprived him of a fair parole hearing by failing to speak with him prior to the hearing and by refusing to consider his objections to Roy's close connection with Dayton, in violation of Richards' rights under the Fifth and Fourteenth Amendments to procedural due process, substantive due process, and equal protection of law.

First, the Court must address defendants' argument that Richards' challenge to his parole hearing is barred by Heck v. Humphrey because Richards is seeking to challenge the fact or length of his confinement.

In Heck, the United States Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called

---

[21]     Defendants argued the merits of Richards' parole-hearing and ballot-access claims only.  Therefore, the Court cannot consider the substance of any other claims at this time.

into question by a federal court's issuance of a writ of
habeas corpus, 28 U.S.C. § 2254.

512 U.S. at 486-87 (footnote omitted).   In other words, "a state prisoner's claim for
damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff
would necessarily imply the invalidity of his conviction or sentence,' unless the prisoner
can demonstrate that the conviction or sentence has previously been invalidated."
Edwards v. Balisok, 520 U.S. 641, 643 (1997) (quoting Heck, 512 U.S. at 487).   The
exclusive remedy for a state prisoner challenging the fact or duration of his confinement
is a petition for habeas corpus.   Preiser v. Rodriguez, 411 U.S. 475, 488-90 (1973).
"This holding has been referred to as the 'favorable termination' requirement."   Marlowe
v. Fabian, 676 F.3d 743, 746-47 (8th Cir. 2012) (citing Heck, 512 U.S. at 499 n. 4
(Souter, J., concurring)).

The Heck rule applies "no matter the relief sought (damages or equitable relief),
no matter the target of the prisoner's suit (state conduct leading to conviction or internal
prison proceedings)—if success in that action would necessarily demonstrate the
invalidity of confinement or its duration."   Wilkinson v. Dotson, 544 U.S. 74, 81-82
(2005) (emphasis in original); see also Miller v. Indiana Dep't of Corr., 75 F.3d 330, 331
(7th Cir. 1996) ("The issue, we emphasize, is not the relief sought, but the ground of the
challenge."); Sheldon v. Hundley, 83 F.3d 231, 233 (8th Cir. 1996) ("Under Heck,
however, we disregard the form of relief sought and instead look to the essence of the
plaintiff's claims.) (citation omitted).   The rule also applies to prison disciplinary
sanctions affecting the fact or duration of confinement.   See Balisok, 520 U.S. at 645.

Based on these principles, this Court finds that Richards' challenge to his parole
hearing is not barred by Heck.   Richards maintained that this hearing was not a parole

40

hearing at all.  Pl.'s Mem., p. 28.  Rather, it was "more a conditions-of-confinement hearing," which led to Roy's determination that Richards "was entitled to a medium-custody placement; specifically, in the Linden geriatric/medical unit at the Faribault prison."  Id.  Richards further clarified that the "thrust of [his] complaint regarding the hearing in question centered on the faulty procedure, not on the denial of parole."  Id. (emphasis in original) A claim that attacks only the procedures of a hearing is generally permissible under § 1983 because success on such a claim would not necessarily imply the invalidity of the hearing's outcome.  See Bandy v. Comm'r of Corr., Civ. No. 13-2209 (JRT/LIB), 2014 WL 28792, at *4 (D. Minn. Jan. 2, 2014).

As in Bandy, a finding that the procedures used at Richards' parole hearing were faulty would not necessarily imply that the decision denying him parole (if indeed, that was what he was seeking) was erroneous.  That decision would be left undisturbed, regardless of this Court's determination.  At best, Richards could be granted a new parole hearing at which he may or may not be released.  As the United States Supreme Court explained in Wilkinson,

> Dotson and Johnson seek relief that will render invalid the state procedures used to deny parole eligibility (Dotson) and parole suitability (Johnson).  Neither respondent seeks an injunction ordering his immediate or speedier release into the community.  And as in Wolff [v. McDonnell, 418 U.S. 539 (1974)], a favorable judgment will not necessarily imply the invalidity of [their] conviction[s] or sentence[s].  Success for Dotson does not mean immediate release from confinement or a shorter stay in prison; it means at most new eligibility review, which at most will speed consideration of a new parole application. Success for Johnson means at most a new parole hearing at which Ohio parole authorities may, in their discretion, decline to shorten his prison term.  Because neither prisoner's claim would necessarily spell speedier release, neither lies at the core of habeas corpus.  Finally, the prisoners' claims for future relief (which, if successful, will

41

not necessarily imply the invalidity of confinement or shorten
its duration) are yet more distant from that core.

544 U.S. at 82 (emphasis in original) (internal citations and quotation marks omitted).

The reasoning set forth in Wilkinson clearly governs defendants' challenge based on Heck.  Richards has not sought immediate or accelerated release.  Rather, he has requested a new parole hearing, which, even if successful, would not necessarily imply that his first parole hearing was invalid.  Accordingly, Richards' challenge is not Heck-barred, and the Court now moves to the merits of his claims that he was denied a fair parole hearing, in violation of his rights to procedural and substantive due process and equal protection under the law.

The Fourteenth Amendment provides: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "This clause has two components: the procedural due process and the substantive due process components."  Singleton v. Cecil, 176 F.3d 419, 424 (8th Cir. 1999) (internal citations and quotation marks omitted).  "Analysis of either must begin with an examination of the interest allegedly violated."  Young v. City of St. Charles, Mo., 244 F.3d 623, 627 (8th Cir. 2001).  "'The possession of a protected life, liberty or property interest is a condition precedent to the government's obligation to provide due process of law, and where no such interest exists, there can be no due process violation.'"  McDonald v. City of Saint Paul, 679 F.3d 698, 704 (8th Cir. 2012) (quoting Dobrovolny v. Moore, 126 F.3d 1111, 1113 (8th Cir. 1997)); see also Wilkinson v. Austin, 545 U.S. 209, 221 (2003) ("The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake.  A liberty

interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies . . . .") (citations omitted); Orr v. Larkins, 610 F.3d 1032, 1034 (8th Cir. 2010) ("To prevail on a Fourteenth Amendment due process claim, [a plaintiff] must first demonstrate that he was deprived of life, liberty or property by government action.") (citing Phillips v. Norris, 320 F.3d 844 (8th Cir. 2003)).

If Richards was seeking to be paroled, as he alleged in the First Amended Complaint, any due process challenge fails because "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1, 7 (1979); see also Jackson v. Nixon, 747 F.3d 537, 543 (8th Cir. 2014) ("[I]nmates have no constitutional right to parole . . . .") (citation omitted); Nolan v. Thompson, 521 F.3d 983, 989 (8th Cir. 2008) ("The Supreme Court has not recognized a liberty interest in parole release under the federal Constitution.") (citation omitted)."

"Nevertheless, states can, by statute, create a constitutionally protected liberty interest in early release." Lonergan v. Fabian, Civ. No. 10-4188 (JRT/LIB), 2011 WL 6888797, at *2 (D. Minn. Dec. 30, 2011) (citing Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974)). "[A] state may create such a liberty interest when its statutes or regulations place substantive limitations on the exercise of official discretion or are phrased in mandatory terms." Nolan, 521 F.3d at 989 (citation omitted); see also Jennings v. Lombardi, 70 F.3d 994, 995-996 (8th Cir. 1995) ("A statute, regulation, or official policy pronouncement will give rise to a protected property interest only where (1) it contains particularized substantive standards or criteria that guide the decisionmakers, and (2) it

uses <u>mandatory</u> language requiring the decisionmakers to act in a certain way, thus limiting the official's discretion.") (citing <u>Craft v. Wipf</u>, 836 F.2d 412, 417 (8th Cir. 1987) (emphasis added)); <u>Dace v. Mickelson</u>, 816 F.2d 1277, 1279 (8th Cir. 1987) ("[A] state may create a liberty interest in parole by enacting a statute which instills in an inmate an 'expectancy of release.'") (citation omitted).  Thus, the Eighth Circuit has found a liberty interest in parole where the "decisionmaker is <u>required</u> to base its decisions on specific, defined criteria . . . ."  <u>Evans v. Dillahunty</u>, 662 F.2d 522, 525 (8th Cir. 1981) (emphasis added).

Under Minnesota law, "[w]hen an inmate becomes eligible for supervised release, the decision to grant supervised release rests within the discretion of the commissioner."  <u>Roby v. Roy</u>, No. A10-1882, 2011 WL 2672253, at *3 (Minn. Ct. App. July 11, 2011) (citing Minn. Stat. § 244.05. subd. 5).  "The commissioner of corrections <u>may</u>, under rules promulgated by the commissioner, give supervised release to an inmate serving a mandatory life sentence . . . after the inmate has served the minimum term of imprisonment specified in subdivision 4."  Minn. Stat. § 244.05. subd. 5 (emphasis added).  In addition, "[t]he commissioner of corrections <u>may</u> parole any person sentenced to confinement in any state correctional facility for adults under the control of the commissioner of corrections . . . ."  Minn. Stat. § 243.05, subd. 1 (emphasis added).

"A first degree murderer is sentenced to a mandatory minimum sentence of life imprisonment.  Minn. Stat. § 609.185.  The guidelines do not create a liberty interest. On the contrary, an inmate serving a mandatory sentence for first degree murder has no

right to be assigned a target release date."[22]  State v. Morse, 398 N.W.2d 673, 679 (Minn. Ct. App. 1987).

Based on applicable state law, the Court concludes that Richards has no protected life, liberty, or property interest in being paroled.  Roy, as the Commissioner of Corrections, was under no duty to release Richards, nor was he required to base his determination on "specific, defined criteria."  Rather, the decision to grant parole was in Roy's discretion, and Richards could have no legitimate expectation that he would be released.  Accordingly, because "'[t]he possession of a protected life, liberty or property interest is a condition precedent to the government's obligation to provide due process of law," McDonald, 679 F.3d at 704, Richards' procedural and substantive due process rights were not violated (assuming he were seeking parole).

On the other hand, if, as Richards now suggests, he was not seeking to be paroled but rather to be confined in a particular prison or place within a prison while serving his prison term, the Court finds his procedural and substantive rights were not violated because, as a threshold matter, he has no protected life, liberty, or property interest in residing in any particular prison or unit within prison.

To show a deprivation of a protected liberty interest, the inmate "must identify conditions that impose 'atypical or significant hardship . . . in relation to the ordinary incidents of prison life.'"  Orr, 610 F.3d at 634 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).  The Eighth Circuit Court has interpreted Sandin to mean that prisoner due process rights are implicated only when there have been "deprivations which work such

---

[22]   Richards is currently serving two life sentences for first-degree murder pursuant to Minn. Stat. § 609.185.  See State v. Richards, 552 N.W.2d 197 (Minn. 1996); State v. Richards, 495 N.W.2d 187 (Minn. 1992).

major disruptions in a prisoner's environment and life that they present dramatic departures from the basic conditions and ordinary incidents of prison sentences." Moorman v. Thalacker, 83 F.3d 970, 972 (8th Cir. 1996) (emphasis added.) A prisoner had no constitutionally protected liberty interest in remaining in less restrictive prison environment. Federal courts have repeatedly recognized that unwanted prison transfers and segregated confinement are normal and expected experiences of prison life, and they are not the type of "atypical and significant hardship" that implicate constitutionally protected liberty interests. See Olim v. Wakinekona, 461 U.S. 238, 250 (1983) (prison authorities "may transfer a prisoner 'for whatever reason or for no reason at all' ") (quoting Meachum v. Fano, 427 U.S. 215, 228 (1976)); Freitas v. Ault, 109 F.3d 1335, 1337 (8th Cir. 1997) (prisoner had no constitutionally protected liberty interest in remaining in a less restrictive prison environment, and he therefore was not entitled to due process before being transferred to a more restrictive institution); Portley-El v. Brill, 288 F.3d 1063, 1065 (8th Cir. 2002) ("administrative and disciplinary segregation are not atypical and significant hardships . . . ."); Callender v. Sioux City Residential Treatment Facility, 88 F.3d 666, 668-69 (8th Cir. 1996) (prisoner was not entitled to due process before being transferred from a work release facility to far more restrictive housing in a state reformatory); Moorman, 83 F.3d at 971 (due process not required before effecting prisoner's transfer from minimum security facility to maximum security facility).

Having failed to establish he had a protected life, liberty or property interest in residing in any particular prison or unit within the prison, Richards' claims that Roy violated his rights to due process are meritless as a matter of law.

Richards' final challenge to his parole hearing is premised on the Equal Protection Clause, which provides: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."   U.S. Const. amend. XIV, § 1. "The Fourteenth Amendment requires that the government 'treat similarly situated people alike,' a protection that applies to prison inmates."   Murphy v. Missouri Dept. of Corr., 372 F.3d 979, 984 (8th Cir. 2004) (citing Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999)).  In order to succeed on an equal protection claim, a claimant must prove that he has been treated differently from other similarly situated individuals, either by operation of a state law or regulation, or by a decision by a state official.   See Bogren v. Minnesota, 236 F.3d 399, 408 (8th Cir. 2000) ("In general, the Equal Protection Clause requires that state actors treat similarly situated people alike"), cert denied, 534 U.S. 816 (2001) (citing Klinger v. Dep't. of Corr., 31 F.3d 727, 731 (8th Cir. 1994), cert. denied, 513 U.S. 1185 (1995)).

> The heart of an equal protection claim is that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest. Timm v. Gunter, 917 F.2d 1093, 1103 (8th Cir.1990). The Supreme Court has explained that "if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996).

Weiler v. Purkett, 137 F.3d 1047, 1051-52 (8th Cir. 1998) (en banc)); see also Koscielski v. City of Minneapolis, 435 F.3d 898, 901 (8th Cir. 2006) ("Koscielski must prove he was treated differently by the government than similarly situated persons and the different treatment was not rationally related to a legitimate government objective.") (citation omitted).

If a plaintiff "is not a member of a suspect class and his claims do not involve a fundamental right, his federal equal protection claims are subject to rational basis review." Carter v. Arkansas, 392 F.3d 965, 968 (8th Cir.2004). "Under this review, a court must reject an equal protection challenge to a statutory classification 'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" Id. (citation omitted).

Richards has failed to state an equal protection claim because he has not established that he has been treated differently from other similarly situated prisoners. Richards' sole allegation of disparate treatment is as follows: "Unlike what defendant Roy has done with other life-sentenced prisoners coming up for parole, defendant Roy never bothered to speak with Plaintiff even once before the hearing . . . ." FAC, ¶ 82 (emphasis in original). This allegation is woefully inadequate to make out an equal protection claim. And, at any rate, "[a] few individual examples of unequal treatment are 'insufficient to provide more than minimal support to an inference of classwide purposeful discrimination.'" Weiler, 137 F.3d at 1052 (quoting Inmates of Neb. Penal & Corr. Complex v. Greenholtz, 567 F.2d 1368, 1381 (8th Cir.1977)).[23] Accordingly, Richards' equal protection claim should be dismissed.

For all of these reasons, the Court recommends granting defendants' Motion to Dismiss with respect to all claims against Roy in his individual capacity arising out of the parole hearing as they fail to state a claim as a matter of law.

---

[23] Even if Richards had pled sufficient facts to demonstrate a pattern of disparate treatment, his claim would likely fail under the rational basis test. "Neither prisoners nor indigents constitute a suspect class . . . ." Murray v. Dosal, 150 F.3d 814, 818 (8th Cir. 1998). Moreover, there is no fundamental right to parole or early release from a term of imprisonment. Greenholtz, 442 U.S. at 7. As such, this Court must reject Richards' challenge if there is any conceivable nondiscriminatory explanation for Roy's actions.

ii.     Ballot Access Claims Against OSS Defendants

The Court now turns to the merits of Richards' ballot-access claims. Richards asserted that the OSS Defendants unconstitutionally restricted his right to run for both state and federal office. For the reasons stated below, the Court finds that Richards has failed to state a claim as to both claims against the OSS Defendants in their individual capacity as a matter of law.

Article I, § 4, cl. 1 of the United States Constitution provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, <u>shall be prescribed in each State</u> by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators." (emphasis added). This provision is also known as the "Elections Clause."

"[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." <u>Storer v. Brown</u>, 415 U.S. 724, 730 (1974). Accordingly, "[t]he Elections Clause gives States authority 'to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.'" <u>U.S. Term Limits</u>, 514 U.S. at 834 (quoting <u>Smiley v. Holm</u>, 285 U.S. 355, 366 (1932)). "States are thus entitled to adopt 'generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself.'" <u>Id.</u> (citing <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 788 n. 9 (1983)).

"For a ballot access restriction to be found unconstitutional, a challenger first must establish that the law imposes a substantial burden." <u>Libertarian Party of N.</u>

Dakota v. Jaeger, 659 F.3d 687, 694 (8th Cir. 2011) (citation omitted); see also Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) ("When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary.") (citation and internal quotation marks omitted).

"Regulations that impose severe burdens on associational rights must be narrowly tailored to serve a compelling state interest." Clingman v. Beaver, 544 U.S. 581, 586 (2005) (citation omitted).  "[W]hen regulations impose lesser burdens, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'" Id. at 586-87 (citation omitted).  However, "[a]n undue burden, which essentially removes all realistic chance for a minor party or independent candidate to ever access the general election ballot, cannot be justified by any state interest, regardless of how compelling the interest may be." Jaeger, 659 F.3d at 694 (citations omitted).  "[T]he crux of this analysis is to determine whether the challenged statute 'freezes the status quo' of a two-party system, or whether '[i]t affords minority political parties a real and essentially equal opportunity for ballot qualification.'" Id. (quoting Am. Party of Tex. v. White, 415 U.S. 767, 787-88 (1974).

"[T]he rule fashioned by the [Supreme] Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause." Storer, 415 U.S. at 730.  As such, a "[d]ecision in this context, as in others, is

very much a matter of degree, very much a matter of consider(ing) the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification." Id. (internal citations and quotation marks omitted).

Richards first claimed that Ritchie and Anderson failed to respond to his letter dated December 30, 2013, in which Richards made several objections to the state's requirements for on-ballot candidacy, thereby leaving him uncertain of his fundamental constitutional rights to ballot access and in imminent danger of being excluded from the 2014 ballot for governor and lieutenant governor. FAC, ¶¶ 12, 17. Richards contended that Ritchie and Anderson, by their refusal to answer his letter, had violated the First, Fifth, and Fourteenth Amendments to the United States Constitution.

This claim fails as a matter of law. Richards has cited no authority for the proposition that a state agency has a constitutional duty to respond to a citizen's demand for information or action, or that the failure to do so constitutes a denial of his fundamental right to run for office. To the contrary, "[t]here is no discernible basis for a constitutional duty to disclose, or for standards governing disclosure of or access to [government] information. Houchins v. KQED, Inc., 438 U.S. 1, 14 (1978); id. at 16 (Stewart, J., concurring) ("The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government . . . ."); see also In re Boston Herald, Inc., 321 F.3d 174, 180 (1st Cir. 2003) ("Both the

constitutional and the common law rights of access have applied only to judicial documents.") (citation omitted).  This claim must therefore be dismissed.[24]

Next, Richards claimed that Minn. Stat. §§ 204B.06 and 204B.11[25] impose unconstitutional qualifications for the offices of Minnesota Governor and Lieutenant Governor.  FAC, ¶¶ 21-26, 33-36, 46-48.  Those statutes provide that a candidate, in order to appear on the ballot, must submit an Affidavit of Candidacy, in which he must affirm that he is an eligible voter.  Minn. Stat. § 204B.06, subd. 1(1); 204B.09, subd. 1(b).  In addition, the candidate must either pay a filing fee or submit a nominating petition in lieu of the fee.  Minn. Stat. § 204B.11.  The nominating petition must include a certain number of signatures from eligible voters.[26]  Id.

Richards claimed that the voter eligibility requirement for governor and lieutenant governor runs afoul of Article V, § 2 of the Minnesota Constitution and the Minnesota Legislative Manual governing statewide elections for 2013-2014, both which state that there are only three qualifications for governor and lieutenant governor (age, residency and citizenship), and Article VII of the Minnesota Constitution, which generally

---

[24]     Richards also asserted that the failure to respond to his letter violated Article V, § 2, sentence two, of the Minnesota Constitution.  As explained below, all claims based on violations of the Minnesota Constitution must be dismissed.

[25]     Richards also alleged that "[a]ny requirement of caucus attendance under Minn. Stat. § 202A.16 is unconstitutional as creating a qualification for offices of Governor and Lieutenant Governor that exceeds the constitution-established qualifications, as the same are set forth in the Qualifications Clause, Minn. Const. Article V, § 2, sentence two."  FAC, ¶ 49.  Section 202A.16 governs who may participate and vote in precinct caucuses.  This claim is baseless.  First, there is no requirement of caucus attendance in § 202A.16.  Second, Richards has not alleged that he attempted to attend his party's caucus, or that his candidacy was rejected due to his failure to attend.

[26]     The number of signatures required depends on the office sought.  For governor or lieutenant governor, the petition must include 2,000 signatures.  Minn. Stat. § 204B.11, subd. 2(a).

references voter eligibility, has no application to the qualifications for governor or lieutenant governor. Pl.'s Mem., pp. 16-17.

Richards also maintained that he cannot pay the $300 filing fee due to his indigence and incarceration, nor can he "organize and conduct a petition campaign to obtain ballot access by obtaining 2,000 signatures of 'eligible' voters."[27]  FAC, ¶¶ 33, 34. Additionally, Richards stated that he cannot submit a notarized Affidavit of Candidacy because notary services in Minnesota prisons are not always available. Id., ¶ 32.

Richards objected to these additional state-imposed "qualifications" because, as the Supreme Court held in U.S. Term Limits, state restrictions on candidacy are "unconstitutional when [they] ha[ve] the likely effect of handicapping a class of candidates and ha[ve] the sole purpose of creating additional qualifications indirectly." Pl.'s Mem., p. 20 (citing 514 U.S. at 836).  Richards also noted that in Lubin v. Panish, 415 U.S. 709 (1974), the United States Supreme Court ruled that "ballot access must be genuinely open to all, subject to reasonable requirements."  Pl.'s Mem., p. 23 (emphasis

---

[27]  At the outset, there is no indication that Richards ever attempted to gather 2,000 signatures for a nominating petition. In fact, Richards admitted that the American Fund, a political party, was "stand[ing] by with immediately withdrawable bank funds sufficient for Plaintiff to pay the nonrefundable $300 filing fee." Memorandum of Plaintiff Replying to the State Defendants' Memorandum Opposing Plaintiff's Motion for a T.R.O. and a Preliminary Injunction ("Pl.'s TRO Reply"), p. 13 [Docket No. 84] (footnote omitted); Richards Declaration C, ¶ 4 [Docket No. 85].  Richards also confirmed that he "overcame for 2014 the filing-fee hurdle through the funding provided to him by the American Fund to pay the State-required $300 to the Secretary of State."  Pl.'s TRO Reply, p. 16; Richards Declaration C, ¶ 4 [Docket No. 85].  It is questionable, therefore, whether Richards can demonstrate an "injury in fact," such that he has standing to bring his claim.  See Iowa League of Cities v. E.P.A., 711 F.3d 844, 869 (8th Cir. 2013) ("'To show standing under Article III of the U.S. Constitution, a plaintiff must demonstrate (1) injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) the likelihood that a favorable decision by the court will redress the alleged injury.'") (citation omitted).  However, because Richards' admission does not appear in the First Amended Complaint, the Court will not recommend dismissal on these grounds.

in original).   Thus, "allowing states to evade the Qualifications Clauses by 'dress[ing]' eligibility to stand for Congress in ballot access clothing' trivializes the basic principles of our democracy that underlie those clauses."  Id., pp. 23-24 (citing U.S. Term Limits, 514 U.S. at 731 (citations omitted)).

Defendants responded that Minnesota's requirements to run for office constitute reasonable restrictions under federal law, but even if they were not, it does not matter because, as a felon, Richards is not an "eligible voter" under Minnesota law, and therefore he cannot run for Governor or Lieutenant Governor of Minnesota.   Defs.' Reply, pp. 11-16.[28]

At the outset, the Court must determine whether being an eligible voter is in fact a requirement for gubernatorial candidacy under Minnesota law.

Article VII, § 6 of the Minnesota Constitution provides:

> **Eligibility to hold office.** Every person who by the provisions of this article is entitled to vote at any election and is 21 years of age is eligible for any office elective by the people in the district wherein he has resided 30 days previous to the election, except as otherwise provided in this constitution, or the constitution and law of the United States.

This section, as the Minnesota Supreme Court held, "was intended as a restriction, and it has the effect of a constitutional declaration that only such persons as

---

[28]   Defendants also contended that states may constitutionally deny felons the right to vote.  Defs.' Mem., pp. 11-13.  That argument may be beside the point, because Richards has not challenged his disenfranchisement.  Rather, Richards asserted that the requirement that candidates be "eligible voters" violates the United States Constitution.

by the provisions of this article are entitled to vote shall be 'eligible' to any elective office."[29] Sullivan, 47 N.W. at 802.

At the same time, Article V, § 2 provides:

> **Term of governor and lieutenant governor; qualifications.** The term of office for the governor and lieutenant governor is four years and until a successor is chosen and qualified. Each shall have attained the age of 25 years and, shall have been a bona fide resident of the state for one year next preceding his election, and shall be a citizen of the United States.

This section says nothing about the eligibility to vote. Rather, the only qualifications explicitly stated are age, residency, and citizenship. The question, therefore, is whether the eligible-voter requirement in Article VII, § 6 applies to Article V, § 2, thereby creating an additional qualification for the offices of governor or lieutenant governor.

In his memorandum, Richards contended that age, residency, and citizenship are the only qualifications for governor or lieutenant governor. Pl.'s mem., pp. 15-19. Richards argued that while Article VII, § 6 determines who is generally eligible to vote, the phrase "except as otherwise provided in this constitution" renders the voter eligibility requirement inapplicable to Article V, § 2, which contains no such requirement. Id., p. 16.

Richards' argument was previously considered and rejected by the Minnesota Supreme Court. In Meyers v. Roberts, 246 N.W.2d 186 (Minn. 1976), the plaintiff, Meyers, ran and received a majority of the votes for the office of court commissioner of Nobles County. Id. at 186-87. Because Meyers would not be 21 years old at the time

---

[29]    Until 1974, Article V, § 6 was known as "Section 7."  See S.F. 1713, 68th Leg., Reg. Sess. (Minn. 1974).

of taking office, as required by Article VII, § 6 of the Minnesota Constitution, the county auditor refused to certify Meyers as the duly elected candidate.  Id. at 187.  Meyers argued that in Article VII, § 6, the language "except as otherwise provided in this constitution or the constitution and law of the United States" referred to Article VI, § 5, which did not specify a minimum age for the office of court commissioner.  Id. at 189-90.  In Meyers' view, "the failure of the legislature to specify by law any minimum age for holding the office of court commissioner is an expression of its intention that there be no minimum age for the holding of that office."  Id. at 190.  The court rejected that argument, citing its earlier opinion in Jude v. Erdahl, 207 N.W.2d 715 (1973), where the court held:

> (W)e are of the opinion that the intent of the legislature and of the voters is better served by limiting that exception (in art. 7, s 6) to offices where the age requirements are Expressly specified, as in art. 5, s 3 (art. 5, s 2, in the 1974 Constitution adopted November 5, 1974), dealing with the minimum age of candidates for governor and lieutenant governor, and the provisions of the United States Constitution specifying the age requirements for candidacy to Federal office.

Meyers, 246 N.W.2d at 190 (quoting Jude, 207 N.W.2d at 719).

Here, as in Meyers, the absence of an express eligible-voter provision in Article V, § 2 does not imply that the Minnesota legislature intended that there be no such requirement.  Rather, "[e]ligibility for any public office in Minnesota is . . . expressly made to depend upon the right to vote."  State ex rel. Arpagaus, 29 N.W.2d at 811 (emphasis added) (citing Minn. Const. art V, § 2).  Indeed, if the eligible-voter requirement had to be explicitly stated for each office, Article VII, § 6 would be rendered meaningless.  See Minn. Stat. § 645.17(1) ("[T]he legislature does not intend a result that is absurd, impossible of execution, or unreasonable."); Minn. Stat. § 645.17(2)

("[T]he legislature intends the entire statute to be effective and certain."); In re Estate of Jotham, 722 N.W.2d 447, 454 (Minn. 2006) ("[I]f possible, no word or phrase of a statute should be deemed superfluous or insignificant.") (citing Amaral v. Saint Cloud Hosp., 598 N.W.2d 379, 384 (Minn. 1999)).

For all of these reasons, the Court concludes that, under Minnesota law, a candidate for governor or lieutenant governor must be eligible to vote.

The Court turns now to the question whether Minnesota's eligible-voter requirement violates Richards' constitutional right to ballot access.

Although the right to vote is clearly fundamental, there is no similar fundamental right to run for office. Clements v. Fashing, 457 U.S. 957, 963 (1982) ("Far from recognizing candidacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot "does not of itself compel close scrutiny.'") (citing Bullock v. Carter, 405 U.S. 134, 143 (1972)); Parker v. Lyons, 757 F.3d 701, 707 (7th Cir. 2014) (per curiam) ("[S]tates may deprive convicted felons of the right to vote— a right that, unlike Parker's interest in running for office, is fundamental and subject to strict scrutiny."); Stiles v. Blunt, 912 F.2d 260, 266 n. 10 (8th Cir. 1990) ("Unlike the right to vote, the right to run for office is not a fundamental right."). Moreover, "citizens do not have a fundamental right to vote for any particular candidate." Stiles, 912 F.2d at 266 n. 10.

On the other hand, "'[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.'" Clements, 457 U.S. at 963 (citation omitted). "[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least

some theoretical, correlative effect on voters." Bullock v. Carter, 405 U.S. 134, 143 (1972). Accordingly, "ballot access cases . . . focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the 'availability of political opportunity.'" Clements, 457 U.S. at 964 (citing Lubin, 415 U.S. at 716).

Here, it is difficult to see how requiring candidates to be eligible voters unnecessarily burdens the political rights of other eligible voters. Felons, minors, and non-residents may constitutionally be denied the right to vote. Richardson v. Ramirez, 418 U.S. 24, 54 (1974) ("[T]he exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment . . . . [Section] 1, in dealing with voting rights as it does, could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the else drastic sanction of reduced representation which § 2 imposed for other forms of disenfranchisement."); Marston v. Lewis, 410 U.S. 679 (1973) (holding that 50-day durational voter residency requirement is constitutional); Stiles, 912 F.2d at 266 ("[W]e join the other courts that have considered this issue in holding that minimum age requirements need only rationally further a legitimate state interest to be constitutional.") (citations omitted). A state law requiring candidates to hold the same voting status as their constituents is no more burdensome to voters than the enfranchisement limitations themselves.[30]

---

[30] The United States Supreme Court has distinguished eligible-voter requirements from impermissible registered-voter requirements. In Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182 (1999), the Court rejected Colorado's requirement that circulators for ballot initiative petitions be registered voters. The Court held that "[t]he requirement that circulators be not merely voter eligible, but registered voters, . . .

The minimal burden of Minnesota's eligible-voter requirement is not subject to exacting scrutiny.  Rather, Minnesota need only have a reasonable, non-discriminatory interest in limiting candidacy to those with the right to vote.

> A state has a compelling interest in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in insuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections. Consequently, a state has a legitimate interest in regulating the number of candidates on the ballot in order to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections. Moreover, a [s]tate has an interest, if not a duty, to protect the integrity of its political process from frivolous or fraudulent candidacies. A state's interest in eliminating frivolous candidates from the ballot is sufficiently implicated to insist that political parties appearing on the general ballot demonstrate a significant, measurable quantum of community support. Accordingly, the state's alleged interests of preventing ballot overcrowding, avoiding voter confusion caused by frivolous candidates, as well as ensuring an efficient election process and avoiding the expense associated with run-off elections are all sufficiently compelling as to justify infringing upon the rights to vote, to freely associate, and to promote political beliefs.

Jaeger, 659 F.3d at 697 (internal citations and quotation marks omitted).

Minnesota's eligible-voter limitation furthers these compelling interests by reducing frivolous candidacies by non-residents or minors who are not qualified or competent to run for state office.  See, e.g., Minn. Const. art. V, § 2; cf. Meyers, 246 N.W. at 188 ("Minnesota has a legitimate interest in assuring that those who hold public

---

decreases the pool of potential circulators as certainly as that pool is decreased by the prohibition of payment to circulators [which was held unconstitutional in Meyer v. Grant, 486 U.S. 414 (1988)]."  Id. at 194.

office possess maturity, experience, and competence. Virtually the only way to accomplish this objective is to set a minimum age for holding office.").

For all of these reasons, the Court finds that Minnesota's eligible-voter requirement, Minn. Stat. § 204B.06, subd. 1, does not violate the Federal Constitution. Accordingly, because Richards is not an eligible voter, he cannot run for governor or lieutenant governor of Minnesota, and his claim should be dismissed.[31]

Lastly, Richards contended that Minnesota's on-ballot candidacy requirements, which apply to efforts to run for both state and federal offices, unconstitutionally restricted his right to run for federal office.

First, as to the requirement that candidates either pay a filing fee or submit a petition with 2,000 signatures (for state office or United States Senator) or 1,000 signatures (for representative to Congress), the Court finds that Richards claim fails as a matter of law.

In Lubin, the United States Supreme Court held that, "in the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay." 415 U.S. at 718. In so holding, the Court noted that

> there are obvious and well-known means of testing the 'seriousness' of a candidacy which do not measure the probability of attracting significant voter support solely by the neutral fact of payment of a filing fee. States may, for example, impose on minor political parties the precondition of demonstrating the existence of some reasonable quantum of voter support by requiring such parties to file petitions for a place on the ballot signed by a percentage of those who

---

[31]   Because Richards cannot run for Minnesota governor or lieutenant governor, the Court need not consider whether Minnesota's other on-ballot candidacy requirements are constitutional.

voted in a prior election. Similarly, <u>a candidate who establishes that he cannot pay the filing fee required for a place on the primary ballot may be required to demonstrate the 'seriousness' of his candidacy by persuading a substantial number of voters to sign a petition in his behalf.</u>

<u>Id.</u> at 718-19 (emphasis added) (internal citation and footnote omitted).

Minnesota provides precisely the type of alternative means of ballot access contemplated by <u>Lubin</u>.  To register for on-ballot candidacy for the offices of Minnesota governor or lieutenant governor, or for United States representative, a candidate must pay a filing fee of $300, and $400 for United States senator.  Minn. Stat. § 204B.11, subd. 1(a), (b).  However, "a candidate may present a petition in place of the filing fee." <u>Id.</u>, subd. 2.  A petition to run for statewide office, such as Minnesota governor or lieutenant governor, or to run for United States senator must include the signatures of 2,000 eligible voters; for United States Representative, 1,000 signatures are required. <u>Id.</u> subd. 2(a),(b).  Thus, consistent with <u>Lubin</u>, Minnesota requires candidates seeking to run for Congress to demonstrate the "seriousness" of their candidacy either by paying a fee or submitting a nominating petition.

That does not end the inquiry, however.  Because Minn. Stat. § 204B.11 limits voters' options for political candidates, the statute imposes a substantial burden on the right to ballot access.  <u>See</u> <u>Jaeger</u>, 659 F.3d at 694 (state statute requiring candidate to receive number of votes at primary election "limits candidates' access to the general ballot, which affects both the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. . . . Consequently, we conclude [the statute] imposes a substantial burden on . . . candidates' First and Fourteenth Amendment rights by restricting their access to the general elections ballot.") (citations and internal quotation

marks omitted). Accordingly, Minn. Stat. § 204B.11 must be narrowly tailored to serve a compelling state interest.

As stated previously, a state has a compelling interest in protecting the integrity of the electoral process, avoiding overcrowding of the ballot, and preventing frivolous candidacies. Jaeger, 659 F.3d at 697. To determine whether the state's means of advancing these compelling interests are narrowly tailored, "[t]he Supreme Court often focuses on the amount of support a candidate is required to show when determining whether a ballot access restriction is constitutional, specifically considering the percentage of signatures or votes required." Id. at 695 (citations omitted).

In this case, the number of registered voters in Minnesota as of November 3, 2014, was 3,137,539. See Number of Registered Voters by County, Office of the Minnesota Secretary of State, http://www.sos.state.mn.us/index.aspx?page=531 (last accessed Jan. 18, 2015). Thus, to fulfill the 2,000-signature requirement, a candidate for Minnesota governor must obtain nominations from less than one-tenth of one percent of eligible voters.

Courts have routinely upheld state statutes requiring nomination by more than one percent of the number of eligible voters. See, e.g., Munro v. Socialist Workers Party, 479 U.S. 189, 190 (1986) (upholding as constitutional a requirement that, to appear on the general ballot, a minor-party candidate must appear on the primary election ballot and receive at least 1% of all votes cast for that particular office); Am. Party of Texas v. White, 415 U.S. 767, 783 (1974) (upholding requirement that gubernatorial candidates obtain signatures of 1% of voters registered for previous

general election); <u>Lindstedt v. Missouri Libertarian Party</u>, 160 F.3d 1197, 1199 (8th Cir. 1998) (same).

Here, the onus of obtaining a petition signed by less than one-tenth of one percent of eligible voters is considerably less burdensome than in the above cases, and thus a "'reasonably diligent . . . candidate [can] be expected to satisfy the signature requirements.'"  <u>Manifold v. Blunt</u>, 863 F.2d 1368, 1374 (8th Cir. 1988) (alteration in original) (citing <u>Storer</u>, 415 U.S. at 742).  As such, the 1,000-signature requirement set forth in Minn. Stat. § 204B.11, subd. 2(b), is a reasonable and constitutional restriction on the fundamental right to vote.

Further, the Court is not persuaded by Richards' argument that Minnesota's regulations have the "likely effect of handicapping a class of candidates and ha[ve] the sole purpose of creating additional qualifications indirectly."  Pl.'s Mem., p. 20 (citing <u>U.S. Term Limits</u>, 514 U.S. at 836).  In <u>Gralike v. Cook</u>, 191 F.3d 911 (8th Cir. 1999), the Eighth Circuit struck down an amendment to the Missouri Constitution which "requires non-incumbent candidates to take a pledge to use their authority to amend the United States Constitution to impose the term limits in § 16 if elected.  It orders that those who do not take the pledge have the label 'DECLINED TO PLEDGE TO SUPPORT TERM LIMITS' printed next to their names on the ballot."  <u>Id.</u> at 915.  The court held that the amendment violated <u>U.S. Term Limits</u> because, first of all, it

> specifically target[ed] a distinct class of candidates—those who oppose term limits, refuse to take the term limits pledge, or fail to do one or more of the actions prescribed by the Amendment while serving in Congress.  This class of candidates is singled out on the ballot with the damaging labels. The label provisions will have the likely effect of coercing candidates to support the term limits mandate or

> removing candidates who fail to do so by persuading voters not to elect them.

Id. at 923.

> Second, the court found that the amendment had

>> the sole, expressed purpose of adding the qualification to congressional service that candidates must have served fewer than three terms in the House or two terms in the Senate. . . . The fact that the Missouri Amendment seeks to do so by compelling members of Congress from Missouri to initiate, pursue, and support the Article V amendment process does not change the analysis under U.S. Term Limits, as it is still an indirect attempt to add a qualification to those listed in the Qualifications Clause.

Id. at 923-24. Accordingly, the court found that the amendment was "highly likely to handicap term limit opponents and other labeled candidates, [and thus] it fail[ed] the U.S. Term Limits test." Id. at 924 (citing 514 U.S. at 829).

Here, unlike in Gralike, the 1,000-signature provision does not specifically target prisoners, felons, or any other class of candidates. Rather, the provision applies to all candidates who cannot or will not pay the $300 filing fee. Moreover, Richards has offered no evidence suggesting that the purpose of the requirement was an indirect attempt to add a qualification that candidates for political office be non-felons. In short, although Richards may personally find it difficult to obtain 1,000 signatures due to his imprisonment, that is not the aim of the statute, and therefore it does not violate U.S. Term Limits. Richards' federal ballot claim should be dismissed.[32]

---

[32]    As to Richards' claim that he cannot submit a notarized Affidavit of Candidacy for state or federal office due to MCF-Stillwater's failure to provide notary services, as discussed in Section III.B.1(b), supra, there is no appropriate relief that this Court could order the OSS Defendants to provide to address this conduct. Richards has asserted his ballot-access claim against the OSS Defendants, not against employees at the prison or with the DOC. None of the OSS Defendants are responsible for setting or enforcing the DOC's or MCF-Stillwater's notary policy now or in the future. Therefore,

In summary, for all of the reasons stated, all claims against the State Defendants in their individual capacities should be dismissed.

### 3.      Claims under the Minnesota Constitution

Pursuant to 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."

The Eleventh Amendment limits the scope of supplemental jurisdiction.  Under the Eleventh Amendment, "federal court[s] [lack] jurisdiction over state law claims against unconsenting states or state officials when the state is the real, substantial party in interest, regardless of the remedy sought."  Cooper v. St. Cloud State Univ., 226 F.3d 964, 968 (8th Cir. 2000) (emphasis added) (citing Pennhurst, 465 U.S. at 120-21).  "This constitutional bar applies with equal force to pendent state law claims."  Id. (citation omitted); see also D.C., Inc. v. Missouri, 627 F.3d 698, 701 n. 1 (8th Cir. 2010) ("Consistent with Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the district court declined to make a declaration of state law or issue an injunction based on a violation of state law.") (citation omitted); Grand River Enters. Six Nations, Ltd. v. Beebe, 467 F.3d 698, 701-02 (8th Cir. 2006) ("Absent waiver by the state, a federal court has no power to order a state officer exercising delegated authority to comply with duties imposed by state law.") (citation omitted).

---

even if Richards' factual allegations are true, this Court could not order the OSS Defendants to provide the notary services Richards seeks.

Accordingly, all claims asserted by Richards under the Minnesota Constitution should be dismissed with respect to the State of Minnesota. Further, all state-law claims asserted against the State Defendants in their official capacities should be dismissed, as the Eleventh Amendment also bars federal jurisdiction over state-law claims against unconsenting state officials. Cooper, 226 F.3d at 968 (citing Pennhurst, 465 U.S. at 120-21).

On the other hand, the Eleventh Amendment does not prohibit state-law claims against state officials in their individual capacities. Guillemard-Ginorio v. Contreras-Gomez, 585 F.3d 508, 531-32 (1st Cir. 2009) ("The federal judiciary is authorized to hear supplemental claims for damages under state law pursuant to 28 U.S.C. § 1367, and in the context of personal capacity suits, the Eleventh Amendment places no limitations on that jurisdictional grant."); Williams v. Com. of Ky., 24 F.3d 1526, 1543 (6th Cir. 1994) ("[N]either the Eleventh Amendment nor Pennhurst deprives federal courts of jurisdiction over state law claims for damages against state officials sued in their individual capacities.") (citations omitted); Wilson v. UT Health Ctr., 973 F.2d 1263, 1271 (5th Cir. 1992) ("Pennhurst and the Eleventh Amendment do not deprive federal courts of jurisdiction over state law claims against state officials strictly in their individual capacities.") (citation omitted).

Nevertheless, even though the Eleventh Amendment does not bar state-law claims against the individual State Defendants, Richards has failed to state a claim alleging a violation of the Minnesota Constitution because Minnesota courts have not recognized a private right of action to address violations of the Minnesota Constitution.

> Minnesota courts explicitly refuse to find causes of action for
> damages under the Minnesota Constitution on their own

> unless the Minnesota Supreme Court has recognized the
> cause of action. <u>See</u> <u>Mitchell v. Steffen</u>, 487 N.W.2d 896,
> 905 (Minn. Ct. App. 1992) (finding that even if cause of
> action for damages existed under the Minnesota
> Constitution, sovereign immunity barred torts for deprivation
> of constitutional rights), <u>aff'd on other grounds</u>, 504 N.W.2d
> 198 (Minn. 1993); <u>Bird v. State, Dep't of Pub. Safety</u>, 375
> N.W.2d 36, 40 (Minn. Ct. App. 1985) (recognizing that
> Minnesota Supreme Court has not recognized any tort for
> the violation of due process rights).

<u>Riehm v. Engelking</u>, 538 F.3d 952, 969 (8th Cir. 2008); <u>see also</u> <u>Porter v. Hennepin</u>

<u>Cnty.</u>, Civ. No. 06-3142 (JRT/FLN), 2008 WL 2202961, at *6 (D. Minn. May 23, 2008)

("Unlike 42 U.S.C. § 1983, Minnesota has no statutory scheme that creates a private

right of action for violations of the Minnesota Constitution.") (citation omitted); <u>Fearing v.</u>

<u>St. Paul Police Dep't</u>, Civ. No. 02-4744 (ADM/JSM), 2005 WL 914733, at *5 (D. Minn.

Apr. 20, 2005) ("[C]ourts have repeatedly stated that Minnesota has not recognized

private remedies for violations of the Minnesota Constitution."); <u>cf.</u> <u>Jones v. James</u>, Civ.

No. 02-4131 (JNE/RLE), 2005 WL 459652, at *8 (D. Minn. Feb. 24, 2005) ("Minnesota

does not recognize a tort for deprivation of due process . . . .").

Accordingly, all of Richards' claims against the defendants claiming a violation of

the Minnesota Constitution should be dismissed.

**C.**  **Claims under the ADA and RA**

Richards alleged that the State of Minnesota, Dayton and Roy failed to provide

him a gluten-free and diabetic diet, gluten-free toothpaste, gluten-free dental floss, and

gluten-free dental materials for use in the prison clinic, as required by a December 23,

2011, disability accommodation granted by the DOC.  Richards also claimed that he

never received an upper gastrointestinal endoscopy with biopsy or genetic testing to

confirm the existence of celiac disease and to determine whether his intestinal tract was

healing.   Such deprivations, according to Richards, violated the ADA and RA, and constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.   Richards sought damages and injunctive relief against the State, Dayton and Roy.

### 1.    ADA Claims

"The ADA consists of three titles addressing discrimination against the disabled in different contexts."   Gorman v. Bartch, 152 F.3d 907, 911 (8th Cir. 1998).   "Title I prohibits employment discrimination, 42 U.S.C. § 12112, Title II prohibits discrimination in the services of public entities, 42 U.S.C. § 12132, and Title III prohibits discrimination by public accommodations involved in interstate commerce such as hotels, restaurants, and privately operated transportation services, 42 U.S.C. §§ 12182, 12184."   Id.

Richards has not indicated which title provides the cause of action for his ADA claims.   However, because Richards is not an employee of the defendants, and state prisons are not private entities providing public accommodations, see DeBord v. Bd. of Educ. of Ferguson-Florissant Sch. Dist., 126 F.3d 1102, 1106 (8th Cir. 1997), it is evident that Richards is proceeding under Title II.   Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998) ("State prisons fall squarely within the [Title II] statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'") (citing 42 U.S.C. § 12131(1)(B)).

Title II of the ADA dictates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination

by any such entity." 42 U.S.C. § 12132. Under the ADA, a claimant may seek both damages and injunctive relief. 42 U.S.C. § 12133 (citing 29 U.S.C. § 794a(2) (citing 42 U.S.C. § 2000d-7 ("In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State."))).

"Title II [of the ADA] provides disabled individuals redress for discrimination by a 'public entity.'" Alsbrook, 184 F.3d at 1005 (citing 42 U.S.C. § 12132). "That term, as it is defined within the statute, does not include individuals." Id., (citing 42 U.S.C. § 12131(1). While suits against state employees in their official capacity are considered actions against the public entity and authorized by § 12132, (see Randolph, 253 F.3d at 345-48), this public-entity limitation "precludes ADA claims against state officials in their individual capacities . . . ." Randolph, 253 F.3d at 348; Alsbrook, 184 F.3d at 1005 n. 8 ("[T]he commissioners may not be sued in their individual capacities directly under the provisions of Title II. Title II provides disabled individuals redress for discrimination by a 'public entity.' See 42 U.S.C. § 12132. That term, as it is defined within the statute, does not include individuals.") (citations omitted); Crawford v. Corr. Med. Servs., Civ. No. 08-6190 (JNE/AJB), 2009 WL 3336127, at *8 (D. Minn. Oct. 15, 2009) ("Plaintiff cannot bring a Title II ADA claim against Dr. Kaul in his individual capacity, because 'Title II provides disabled individuals redress for discrimination by a 'public entity' [and] [t]hat term, as it is defined within the statute, does not include individuals.'") (citations omitted) (emphasis in original); Roblero-Barrios v. Ludeman, Civ. No. 07-4101 (MJD/FLN), 2008 WL 4838726, at *5 (D. Minn. Nov. 5, 2008) ("[T]he public-entity limitation precludes ADA

claims against state employees in their individual capacities.") (citation omitted); Day v. Minnesota, Civ. No 05-2675 (MJD/RLE), 2007 WL 4321999, at *23 (D. Minn. Dec. 6, 2007), aff'd, 354 F. App'x 272 (8th Cir. 2009) ("As a preliminary matter, we note that Title II of the ADA does not authorize suits against officers in their individual capacities, and accordingly, the Board members, who have been sued in their individual capacities, are entitled to a dismissal of those claims, as a matter of law."). Consequently, Richards' ADA damage claims against Dayton and Roy in their individual capacities should be dismissed.

The Court now turns to Richards' ADA claims against the State of Minnesota and defendants Dayton and Roy in their official capacities. In their supporting memorandum, defendants did not specifically address Richards' ADA claims. However, defendants did assert generally as to all claims that the State of Minnesota is completely immune from suit based on the Eleventh Amendment, and any claims against Dayton and Roy fail under Ex parte Young because neither had any connection or involvement with the conduct at issue such that they could be enjoined from engaging in such conduct in the future.

Richards responded that Congress had abrogated Eleventh Amendment immunity for claims for damages and injunctive relief against states under the ADA. Pl.'s Mem., p. 6 (citing United States v. Georgia, 546 U.S. 151, 155-160) (2006)). Richards also argued that, pursuant to the ADA, he may assert damage claims against the State Defendants in their official capacities, as well as against the State of Minnesota itself. Id., p. 6. Richards admitted, however, that the ADA does not permit claims for punitive damages. Id., p. 7.

The Court concludes that Richards' claims against Dayton in his official capacity must be dismissed because Richards has not alleged any facts to show that Dayton played any role in the failure to provide him a gluten-free and diabetic diet, gluten-free toothpaste, gluten-free dental floss, and gluten-free dental materials for use in the prison clinic, or an upper gastrointestinal endoscopy with biopsy or genetic testing to confirm the existence of celiac disease and to determine whether his intestinal tract was healing.  Thus, there is nothing Dayton can be enjoined from doing that could provide Richards the relief he seeks.

At the same time, however, the Court concludes that Richards can maintain his ADA claim against the State for injunctive relief and damages, and against Roy in his official capacity for injunctive relief for these alleged violations.

In Randolph, the Eighth Circuit held that Randolph, a hearing impaired inmate could proceed with his ADA (and RA) suit against Dora Schriro, the director of the Missouri Department of Corrections, in her official capacity for prospective injunctive relief under Ex parte Young.  253 F.3d at 349.  In addition to having authority over the Missouri DOC, Srchiro had reviewed and denied one of Randolph's requests for a sign language interpreter.  Randolph v. Rodgers, 980 F. Supp. 1051, 1054, 1056 (E.D. Mo. 1997).

Like Schriro, Richards has alleged that Roy, as Commissioner of Corrections for the State of Minnesota, has authority over the DOC, which is responsible for the provision of accommodations (including gluten-free dental materials) required by the ADA.  Further, Richards claimed that Roy sent him to MCF-Faribault to the Medical Unit for needed medical care, and therefore, he could be ordered prospectively to provide

the gluten free food and materials, along with the medical care sought by Richards.

See, e.g., FAC, ¶¶ 98, 101, 102, 104, 111.  By statute as Commissioner of Corrections,

Roy has the following powers and duties relevant to Richards' claims:

> (b) To determine the place of confinement of committed persons in a correctional facility or other facility of the Department of Corrections and to prescribe reasonable conditions and rules for their employment, conduct, instruction, and discipline within or outside the facility.
> ***
> (d) To administer, maintain, and inspect all state correctional facilities.
> ***
> (g) To organize the department and employ personnel the commissioner deems necessary to discharge the functions of the department, including a chief executive officer for each facility . . . .
>
> (h) To define the duties of these employees and to delegate to them any of the commissioner's powers, duties and responsibilities, subject to the commissioner's control and the conditions the commissioner prescribes.

Minn. Stat. § 241.01, subd. 3a.

On this basis, the Court finds that Richards has alleged sufficient facts to support

an ADA claim against Roy in his official capacity for injunctive relief.  See 281 Care

Comm., 766 F.3d at 797 ("We determined that the attorney general's connection to the

enforcement of § 21113.06 was three-fold: (1) the attorney general 'may, upon request

of the county attorney assigned to a case, become involved in a criminal prosecution of

section 21113.06,' (2) 'the attorney general is responsible for defending the decisions of

the OAH—including decisions pursuant to section 21113.06—if they are challenged in

civil court,' and (3) 'the attorney general appears to have the ability to file a civil

complaint under section 211B.06.' This connection, we held, was sufficient to make the

attorney general amenable to suit under the Ex parte Young exception to Eleventh

Amendment immunity.") (citations omitted);[33] <u>Reprod. Health Servs.</u>, 428 F.3d at 1145 ("At this stage of the proceedings, we agree with the district court that this statutory authority creates a sufficient connection with the enforcement of [Mo. Rev. Stat] § 188.039 to make the Attorney General a potentially proper party for injunctive relief, in which case he would be within the scope of the Ex parte Young exception to Eleventh Amendment immunity."); <u>see also</u> <u>Kitchen v. Herbert</u>, 755 F.3d 1193, 1201 (10th Cir.2014) ("An officer need not have a special connection to the allegedly unconstitutional statute; rather, he need only have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.") (quotation omitted).  However, any claim against Roy for damages is meritless.  Pursuant to <u>Ex parte Young</u>, the only relief he can assert against Roy in his official capacity is for injunctive relief.

As for Richards' claim against the State of Minnesota, under the Eleventh Amendment, nonconsenting states may not be sued in federal court.  However, "[a]s broad as the immunity that the states have is, it is not unlimited.  Congress, may abrogate the states' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority."  <u>Board of Trs. of</u>

---

[33]      <u>281 Care Comm.</u> was decided on a motion for summary judgment.  Based on the facts developed at the district court level via affidavit submitted by the attorney general in connection with the motion, the Eighth Circuit ultimately dismissed her from the action, concluding that she was immune from suit under the Eleventh Amendment based on her testimony that appellant was not subject to or threatened with any enforcement proceeding by her.  <u>281 Care Comm.</u>, 766 F.3d at 796-97.  Ultimately, Roy may provide sworn testimony that despite the duties of the Commissioner of Corrections set forth in Minn. Stat. § 241.01, subd. 3a, he plays no role in insuring that the state prisons comply with the requirements of the ADA.  However, at this juncture, Richards has stated sufficient facts to resist a motion to dismiss on grounds that he cannot make out an <u>Ex parte Young</u> showing against Roy.

the Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001). "Congress, in passing the ADA, 'unequivocally expressed' its intent to abrogate Eleventh Amendment immunity." Alsbrook, 184 F.3d at 1006 (quoting Coolbaugh v. Louisiana, 136 F.3d 430, 433 (5th Cir.), cert. denied, 525 U.S. 819 (1998)); see also 42 U.S.C. § 12202 (2000) ("A State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in Federal or State court ... for a violation of this chapter."); Klingler v. Dir., Dep't of Revenue, State of Mo., 455 F.3d 888, 893 (8th Cir. 2006) ("There is no question that, in enacting the ADA and authorizing its attendant regulations, Congress intended to abrogate state sovereign immunity.") (citations omitted).

Further, the [Supreme] Court has recognized that § 5 of the fourteenth amendment allows Congress to abrogate sovereign immunity to enforce that amendment's provisions." Klingler, 455 F.3d at 893. In short, there is "no doubt that Congress can abrogate sovereign immunity for conduct that actually violates the fourteenth amendment." Lors v. Dean, 746 F.3d 857, 864 (8th Cir. 2014) (quoting Klingler, 455 F.3d at 891) (citing United States v. Georgia, 546 U.S. 151, 158-59 (2006)). "The relevant question . . . is whether that abrogation is consistent with the scope of the § 5 power." Klingler, 455 F.3d at 893.

In Georgia, the inmate claimed that the conditions of his incarceration violated not only the ADA, but also his rights under the Eighth Amendment to be free from cruel and unusual punishment (a right made applicable to the states by the due process clause of the Fourteenth Amendment). See Klingler, 455 F.3d at 891. The Eleventh Circuit had held that while the Eleventh Amendment did not bar Title II claims against

state officials in their official capacity for prospective injunctive relief, it did bar Title II claims for damages by an inmate against state officials in their official capacities.[34]   The Supreme Court reversed, holding that "insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."  546 U.S. at 159; see also Roblero-Barrios, 2008 WL 4838726, at *6 (concluding that based on Georgia, "Title II validly abrogates sovereign immunity when the conduct alleged actually violates the Fourteenth Amendment") (citing Georgia, 546 U.S. at 159).

The Supreme Court then remanded the case "to determine . . .  on a *claim-by-claim basis*, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid."  Klinger, 455 F.3d at 891-92 (quoting Georgia, 546 U.S. at 159) (emphasis added in Klinger).

Accordingly, in order to determine whether the State's right to assert Eleventh Amendment immunity has been abrogated, this Court must first consider whether

---

[34]    See Goodman v. Ray, File No. 02010168, at 21-23 (11th Cir., Sept. 16, 2004) (relying on Eleventh Circuit's decision issued two days earlier, Miller v. King, holding that the Eleventh Amendment did not bar ADA suits under Title II for prospective relief against state officials in their official capacities.  384 F.3d at 1264).  The Supreme Court did not address this holding because the Eleventh Circuit's decision that the Eleventh Amendment did not bar claims for injunctive relief was not raised on appeal to the Court.  As noted by Justice Stevens in his concurring opinion, "the state defendants have correctly chosen not to challenge the Eleventh Circuit's holding that Title II is constitutional insofar as it authorizes prospective injunctive relief against the State. See Brief for Respondents 6; see also Miller v. King, 384 F.3d 1248, 1264 (C.A.11 2004))".

Richards has alleged conduct by the State that gives rise to a cause of action based on the ADA.

"To state a prima facie claim under the ADA, a plaintiff must show: 1) he is a person with a disability as defined by statute; 2) he is otherwise qualified for the benefit in question; and 3) he was excluded from the benefit due to discrimination based upon disability." Randolph v. Rodgers, 170 F.3d 850, 858 (8th Cir. 1999) (citations omitted); see also Folkerts v. City of Waverly, Iowa, 707 F.3d 975, 983 (8th Cir. 2013) ("For a prima facie Title II ADA violation, a qualified individual with a disability must be excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or be otherwise discriminated against by the entity, by reason of the individual's disability.") (citing Layton v. Elder, 143 F.3d 469 (8th Cir. 1998)).

In addition, "Title II regulations require reasonable modifications in policies when necessary to avoid discrimination on the basis of disability unless doing so would fundamentally alter the nature of the service, or would create undue financial and administrative burdens . . . ." Davis v. Francis Howell Sch. Dist., 138 F.3d 754, 756-57 (8th Cir. 1998) (internal citations omitted); 28 C.F.R. § 35.130(b)(7).

"[R]ecreational activities, medical services, and educational and vocational programs at state prisons are benefits within the meaning of Title II, and qualified individual[s] with a disability are entitled to meaningful access to such benefits." Mason v. Corr. Med. Servs., Inc., 559 F.3d 880, 886 (8th Cir. 2009) (internal citations and quotation marks omitted).

In the First Amended Complaint, Richards alleged that he suffers from celiac disease, which prevents him from consuming foods or using products containing gluten.

Consequently, Richards is not able to eat meals or maintain his teeth without special dietary and dental accommodations by the DOC.  Richards further alleged that the State consistently failed to meet his needs.  It refused to provide him with gluten free products; it refused to make gluten free products available for him to buy at the canteen; it refused to perform an upper gastrointestinal endoscopy with biopsy and genetic testing.  FAC, ¶¶ 78, 88-93, 98-125, 150, 151, 153, 156-61, 163-65, 168, 170.  Richards has pleaded facts which, if established, demonstrate that (1) he is a person with a disability; (2) he was denied the benefits of services he would otherwise be entitled to; and (3) he was excluded from these services because of his disability.  Therefore, Richards has stated a prima facie case under Title II and defendants have not argued otherwise.

The next step under the Georgia framework is to determine to what extent this alleged conduct violated the Fourteenth Amendment.  Richards has alleged that this conduct constitutes a violation of the Eighth Amendment.  FAC, ¶¶ 156-170.  "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed the Eighth Amendment."[35] Estelle v. Gamble, 429 U.S. 97, 104 (1976) (citation omitted). "'A prison official exhibits deliberate indifference when the official actually 'knows of and disregards' a prisoner's serious medical needs.'" Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996) (quoting Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995)).  Here, Richards has alleged that officials at MCF-Stillwater knew of his celiac disease yet failed to provide necessary medical

---

[35] The Due Process Clause of the Fourteenth Amendment incorporates the Eighth Amendment's guarantee against cruel and unusual punishment.  Long, 86 F.3d at 765 (citing Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463 (1947)).

diagnosis and treatment.[36]  Thus, Richards has sufficiently pled a violation of the Eighth (and Fourteenth) Amendment, and defendants have not argued to the contrary.

As to the final step of the <u>Georgia</u> analysis—determining to what extent this alleged conduct violated Title II but did not violate the Fourteenth Amendment—even if the conduct alleged by Richards did not rise to the level of a violation under the Eighth Amendment, neither the defendants nor Richards have addressed this issue in connection with the instant motion.  As such, the Court has no basis from which to analyze whether this third prong has been met.

Richards has satisfied the minimum pleading requirements with respect to his ADA claims against the State, and the Court will not recommend dismissal of those claims at this time.

In summary, this Court concludes that Richards can assert a claim for injunctive relief and damages against the State and for injunctive relief against Roy in his official capacity for violations of the ADA, but that his claims against Dayton in his official capacity should be dismissed as he has failed to allege any facts to establish any connection or involvement by Dayton to the alleged violations of the ADA.[37]

---

[36]    At this early stage in the case, the medical seriousness of Richards' celiac disease has not been established.  "Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are questions of fact."  <u>Schaub v. VonWald</u>, 638 F.3d 905, 915 (8th Cir. 2011) (citation omitted).  As such, the Court offers no opinion on whether the alleged deprivation of medical services rises to the level of an Eighth Amendment violation.

[37]    In his opposition brief, Richards also contended that as his ADA claims constitute continuing violations of the Constitution, he can assert ADA damage claims against the State and State Defendants in their official capacities, in addition to damage claims under § 1983.  Pl.'s Mem., pp. 6-7.  Richards is mistaken.

> It is well recognized that a plaintiff may use section 1983 to enforce not only rights contained in the Constitution, but also

## 2.    RA Claims

Like their response to Richards' ADA claim, in their supporting memorandum, defendants did not specifically address his RA claim, but instead generally asserted that as to all claims that the State of Minnesota is completely immune from suit based on the Eleventh Amendment, and any claims against Dayton and Roy in their official capacities failed under Ex parte Young because neither had any connection or involvement with the conduct at issue such that they could be enjoined from engaging in such conduct in the future.

Section 504 of the RA provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be

---

> rights that are defined by federal statutes.  An exception to this general rule exists when a comprehensive remedial scheme evidences a congressional intent to foreclose resort to section 1983 for remedy of statutory violations. Courts should presume that Congress intended that the enforcement mechanism provided in the statute be exclusive.

Alsbrook, 184 F.3d at 1011 (internal citations omitted).  Because Title II of the ADA and § 504 of the RA incorporate comprehensive remedial schemes, "Congress did not intend violations of those statutes to be also cognizable under § 1983." Id.; Battle v. Minnesota Dep't of Corr., 40 F. App'x 308, 309 (8th Cir. 2002) ("We agree with the District Court that Battle's disability-based discrimination claims were either not cognizable under § 1983 or fail on their merits. As to his ADA and RA claims, his sole recourse was under the ADA and RA themselves . . . .") (citation omitted); Pona v. Cecil Whittaker's, Inc., 155 F.3d 1034, 1038 (8th Cir. 1998) (Morris Sheppard Arnold, J., concurring) ("[W]e must be mindful of the principle that if the statutory right that a plaintiff seeks to vindicate comes outfitted with its own comprehensive remedial apparatus, a § 1983 action based on a violation of that statutory right will not lie."). Accordingly, Richards may not assert § 1983 claims for injunctive relief or damages against the State Defendants in their official or individual capacities based on his ADA claims.

> subjected to discrimination under any program or activity
> receiving Federal financial assistance . . . .

29 U.S.C. § 794(a).   Remedies under the RA include both damages and injunctive relief.  Randolph, 253 F.3d at 349 (citing 42 U.S.C. § 2000d–7(a)(2); Gorman, 152 F.3d at 911 ("Plaintiffs who prevail on Rehabilitation Act claims are entitled to the full spectrum of legal and equitable remedies needed to redress their injuries."); Rodgers v. Magnet Cove Pub. Sch., 34 F.3d 642, 645 (8th Cir.1994) ("[M]oney damages are available under § 504.").)

"To prevail on a claim under § 504, a plaintiff must demonstrate that: (1) he is a qualified individual with a disability; (2) he was denied the benefits of a program or activity of a public entity which receives federal funds, and (3) he was discriminated against based on his disability."  Gorman, 152 F.3d at 911 (citations and footnote omitted).  "[Title II] of [t]he ADA and § 504 of the Rehabilitation Act are similar in substance and, with the exception of the Rehabilitation Act's federal funding requirement, cases interpreting either are applicable and interchangeable for analytical purposes."  Folkerts, 707 F.3d at 983 (citations and internal quotation marks omitted).

As with the ADA, the RA prohibits discrimination by "public entities," and not individuals.  Accordingly, Richards' RA claims against Dayton and Roy in their individual capacities should be dismissed.  See Dinkins v. Corr. Med. Servs., 743 F.3d 633, 634 (8th Cir. 2014) ("This court affirms the dismissal of the individual-capacity claims against Lange and Logan.  They cannot be sued in their individual capacities under the ADA or the RA.") (citations omitted).

With respect to the RA claims against the State, as previously discussed, "Eleventh Amendment immunity . . . is not absolute. The Supreme Court has

recognized, among other exceptions, that a state may waive its sovereign immunity by consenting to suit." Doe v. Nebraska, 345 F.3d 593, 597 (8th Cir. 2003) (citing Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670, (1999)). "A state may waive its immunity . . . by voluntarily participating in federal spending programs where Congress expressed a clear intent to condition receipt of federal funds on a state's consent to waive its sovereign immunity." Id. (citing Atasacadero State Hosp. v. Scanlon, 473 U.S. 234, 238 n. 1, (1985) ("A state may effectuate a waiver of its constitutional immunity by ... waiving its immunity to suit in the context of a particular federal program.")).

"Under the Rehabilitation Act, states that accept federal funds are required by statute to waive their Eleventh Amendment immunity to § 504 claims. 42 U.S.C. § 2000d–7 ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act ... or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance."). Doe, 345 F.3d at 598. However, "this waiver of sovereign immunity is limited and applies only to the individual agency that receives the federal funds, i.e., a state can avoid waiver by 'accepting federal funds for some departments and declining them for others.'" Id. (quoting Jim C. v. United States, 235 F.3d 1079, 1081 (8th Cir.2000) (en banc), cert. denied, 533 U.S. 949, (2001)). "[This] waiver . . .  cover[s] all activities of the [Agency], and not merely those activities specifically supported by Section 504 funds." Jim C., 235 F.3d at 1082.

In his response to defendants Motion to Dismiss, Richards maintained that the State of Minnesota had waived its Eleventh Amendment immunity by accepting federal

funds for Minnesota's drug treatment program.  Pl.'s Mem., p. 7 (citing <u>Arlt v. Mo. Dep't of Corr.</u>, 229 F. Supp. 2d 938, 942 (E.D. Mo. 2002)).

Richards' RA claims against the State fail for two reasons.  First, Richards never alleged in his First Amended Complaint that the State had accepted federal funds for Minnesota's drug treatment program.   While the Court may consider materials embraced by the complaint in deciding a motion to dismiss, <u>Wickner</u>, 2010 WL 610913, at *5, this does not include facts alleged for the first time in a responsive memorandum.

Second, in order to make out a waiver of the Eleventh Amendment based on acceptance of federal funds, Richards must allege <u>facts</u> to support a claim that the DOC has received federal funds to operate.  No such facts were supplied by Richards in his responsive memorandum, much less in the First Amended Complaint.

Accordingly, Richards' RA claims against the State of Minnesota should be dismissed without prejudice.

Similarly, like his claims against Roy in connection with his claims under the ADA, while Richards has alleged sufficient involvement by Roy in his official capacity in connection with the conduct giving rise to his RA claims, this official capacity claim against Roy must be dismissed because he has failed to allege that the DOC, the agency which Roy heads, received any federal funding.

As for Richards' RA claims against Dayton in his official capacity, the same reasoning this Court applied with respect to Richards' ADA claim against Dayton applies here.  Richards has alleged no facts from which this Court could conclude that Dayton had anything to do with Richards' denial of proper dental, dietary and medical care and that he could in the future.

For all of these reasons, the Court recommends granting defendants' Motion to Dismiss with respect to Richards' RA claims against the State, and against Dayton and Roy in their individual and official capacities.

## IV.    CONCLUSION

In summary, based on a thorough examination of Richards' 89-page, 258-paragraph First Amended Complaint, the Court reaches the following conclusions.

Thomas Edward Nelson should be dismissed as a defendant because Richards has not sought any relief with respect to him.

All claims based on violations of the Minnesota Constitution must be dismissed against all defendants because there is no private cause of action to remedy such violations.

All claims brought under 42 U.S.C. § 1983 against the State of Minnesota should be dismissed because the Eleventh Amendment bars suits against nonconsenting states, regardless of the relief sought.

All § 1983 claims for damages against the State Defendants in their official capacities should be dismissed because they are barred by the Eleventh Amendment.

All § 1983 claims against Dayton in both his individual and official capacities, including claims for injunctive relief, should be dismissed, as Dayton was not personally involved in any of the alleged violations, nor was he responsible for enforcing any allegedly unconstitutional conduct against Richards.

All § 1983 claims against the OSS Defendants (Ritchie, Anderson, and Black) in their official and individual capacities, including claims for injunctive relief, should be dismissed.  Richards has failed to demonstrate an ongoing violation of law by the OSS

Defendants that may be enjoined under Ex parte Young to avoid the application of Eleventh Amendment immunity enjoyed by these defendants. Further, Richards' claims against the OSS defendants regarding state and federal ballot access fail on the merits.

With the exception of Roy's involvement in Richards' parole hearing and Richards' medical and dental care, all § 1983 claims against Roy in both his individual and official capacities, including claims for injunctive relief, should be dismissed, as Roy was not personally involved in any of the alleged violations, nor was he responsible for enforcing any allegedly unconstitutional conduct against Richards. Richards' parole claim against Roy in his official and individual capacity fails as a matter of law, and Richards cannot assert a § 1983 claim against Roy in his official capacity based on the denial of medical and dental services because he has asserted this claim against Roy under the ADA based on the same alleged violations. Because the ADA incorporates a comprehensive remedial scheme, Congress did not intend for claimants to use § 1983 to vindicate rights guaranteed by Title II. Therefore, these remaining claims against Roy in his official and individual capacities should be dismissed.

Richards' claims under the ADA and RA are not cognizable against Dayton and Roy in their individual capacities because those statutes provide a cause of action against public entities, and not individuals. Therefore, these claims should be dismissed.

All ADA and RA claims against Dayton in his official capacity must be dismissed because Dayton was not involved in the alleged denial of medical and dental services.

To the extent Richards is seeking damages under the ADA and RA against Roy in his official capacity, his claims cannot proceed.  Under Ex parte Young, a claimant may sue a state officer in his official capacity for injunctive relief only.

Any remaining RA claims by Richards against the State of Minnesota and Roy should be dismissed because Richards has not pled facts demonstrating that the DOC accepted federal funds.

Richards has stated a viable claim under the ADA against the State of Minnesota for damages and injunctive relief, and against Roy in his official capacity for injunctive relief.

Having determined that all but Richards' ADA claims against the State and Roy should be dismissed, the Court must determine whether dismissal as to the remaining claims should be with or without prejudice.

As a general rule, when an action is dismissed for lack of subject matter jurisdiction, it is dismissed without prejudice, because the dismissal is not on the merits. See O'Grady v. Marathon Cnty. Child Support Agency, Civ. No. 05-2418 (JNE/JJG), 2006 WL 1715473 at *1 (D. Minn., June 19, 2006) (citing Frederiksen v. City of Lockport, 384 F.3d 437, 438-39 (7th Cir. 2004)).   "A jurisdictional disposition is conclusive on the jurisdictional question: the plaintiff cannot re-file in federal court. But it is without prejudice on the merits, which are open to review in state court to the extent the state's law of preclusion permits."  Id. (quoting Frederiksen, 384 F.3d at 438); cf. Brereton v. Bountiful City Corp., 434 F.3d 1213, 1218 (10th Cir. 2006) ("[D]ismissals for lack of jurisdiction should be without prejudice because the court, having determined that it lacks jurisdiction over the action, is incapable of reaching a disposition on the

merits of the underlying claims."); Cnty. of Mille Lacs v. Benjamin, 361 F.3d 460, 464 (8th Cir.2004) ("A district court is generally barred from dismissing a case with prejudice if it concludes subject matter jurisdiction is absent.")).

Thus, to the extent that this Court has determined that Richards' § 1983 claims against the State or the State Defendants in their official capacities should be dismissed based on Eleventh Amendment immunity, it will recommend that the claims be dismissed without prejudice.  Likewise, to the extent that the Court has determined that Richards' § 1983 claims against any of the State Defendants in their individual capacities should be dismissed based on Eleventh Amendment immunity, it will recommend that the claims be dismissed without prejudice.

However, to the extent that the Court addressed the merits of any of Richards' claims against the State, or against the State Defendants in either their official or individual capacities, and concluded that those claims failed as a matter of law, it will recommend those claims be dismissed with prejudice.

Finally, to the extent that the Court believes that Richards should be given the opportunity to amend his complaint to overcome the pleading deficiencies that lead the Court to find that certain claims against the State or State Defendants in their official or individual capacities failed, it will give Richards the opportunity to do so.

## V.    RECOMMENDATION

Applying the above parameters and for all of the reasons stated in this decision, IT IS HEREBY RECOMMENDED that the State Defendants' Motion to Dismiss [Docket No. 31] be GRANTED in part and DENIED in part as follows:

1.    All claims against Thomas Edward Nelson be DISMISSED WITHOUT PREJUDICE.

2.    All claims asserted against any defendant alleging a violation of the Minnesota Constitution be DISMISSED WITH PREJUDICE.

3.    All claims under 42 U.S.C. § 1983 asserted against the State of Minnesota for damages or injunctive relief be DISMISSED WITHOUT PREJUDICE.

4.    All claims under 42 U.S.C. § 1983 asserted against Mark Brandt Dayton in his individual and official capacities for damages or injunctive relief be DISMISSED WITHOUT PREJUDICE.

5.    All state and federal ballot-access claims asserted under 42 U.S.C. § 1983 against Donald Mark Ritchie, Brad Anderson, and Bert Black in their official and individual capacities for damages or injunctive relief, including any claims that they failed to provide plaintiff with notarization services at MCF-Stillwater in connection with his attempt to file an Affidavit of Candidacy for U.S. Representative for the 2014 election, be DISMISSED WITH PREJUDICE.

6.    All claims under 42 U.S.C. § 1983 asserted against Thomas A. Roy in his individual and official capacities for damages or injunctive relief be DISMISSED WITHOUT PREJUDICE, except for the parole claims asserted against Thomas A. Roy and the claim that Thomas A. Roy failed to provide adequate medical and dental care, which claims for damages or injunctive relief should be DISMISSED WITH PREJUDICE.

7.    All claims under the Americans with Disability Act and the Rehabilitation Act asserted against Mark Brandt Dayton and Thomas A. Roy in their individual capacities for damages or injunctive relief be DISMISSED WITH PREJUDICE.

8.    All claims under the Americans with Disabilities Act and the Rehabilitation Act asserted against Mark Brandt Dayton in his official capacity for injunctive relief be DISMISSED WITHOUT PREJUDICE.

9.    All claims seeking dismissal under the Americans with Disability Act asserted against the State of Minnesota for damages or injunctive relief and against Thomas A. Roy in his official capacity for injunctive relief be DENIED.

10.   All claims under the Rehabilitation Act against the State of Minnesota for damages or injunctive relief and against Thomas A. Roy in his official capacity be DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER RECOMMENDED that as to those claims this Court has

recommended be dismissed without prejudice in paragraphs 4, 6, 8, and 10 above, that

plaintiff be given the opportunity to amend his complaint, consistent with the requirements of Rule 8 of the Federal Rules of Civil Procedure, to assert facts to support his claims against Mark Brandt Dayton, Thomas A. Roy, the State of Minnesota or other state officials.  Such amendment must be served and filed within 21 days after the District Court issues its order acting on this Report and Recommendation.


Dated: January 30, 2015


*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


**NOTICE**

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 13, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.