UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


LEONARD J. RICHARDS,                                    CIVIL NO. 13-3029 (JRT/JSM)

       Plaintiff,

v.                                                                 <u>REPORT AND RECOMMENDATION</u>

MARK BRANDT DAYTON,
*Governor of the State of Minnesota,*
*in his individual and official capacities;*
LORI R. SWANSON,
*its Attorney General;*
STATE OF MINNESOTA;
DONALD MARK RITCHIE,
*Minnesota Secretary of State*
*(the "Secretary") in his individual*
*and official capacities also known*
*as Mark Ritchie;*
BRAD ANDERSON,
*Election Administrator of the Secretary,*
*in his individual and official capacities;*
BERT BLACK,
*Data Practices Compliance Officer of*
*the Secretary, in his individual and*
*official capacities;*
THOMAS A. ROY,
*Minnesota Commissioner of Corrections,*
*in his individual and official capacities*
*also known as Tom Roy;* and
THOMAS EDWARD NELSON,
*in his individual capacity as Plaintiff's*
*co-candidate for Governor or Lieutenant*
*Governor of the State of Minnesota in*
*election year 2014*;

       Defendants.


JANIE S. MAYERON, United States Magistrate Judge

       The above matter came before the Court upon Plaintiff's Motion for Temporary

Restraining Order and for Preliminary Injunction ("Pl.'s Mot.") [Docket No. 45].   The

matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I.  FACTUAL BACKGROUND

Plaintiff Leonard J. Richards ("Richards") is an inmate at the Minnesota Correctional Facility in Stillwater, Minnesota ("MCF-Stillwater").  Richards has brought a prisoner civil rights action against the State of Minnesota and various state officers in their individual and official capacities, pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and § 504 of the Rehabilitation Act ("RA"), along with pendent claims based on the Minnesota Constitution.  The full scope of Richards' complaints are set forth in the First Amended Complaint ("FAC"), filed on April 10, 2014, and involve a myriad of claims.  [Docket Nos. 28, 29].  These claims and the facts that bear on them are summarized in detail in the Report and Recommendation bearing on defendants' Motion to Dismiss [Docket No. 31], issued by this Court contemporaneously with the instant decision.  [Docket No. 110].  Consequently, the Court only refers to the claims and factual background that are germane to the instant motion, along with additional facts presented by Richards and defendants in connection with the motion.

In 2010, Richards attempted to run as a write-in candidate for Governor of Minnesota while he was imprisoned at the Minnesota Correctional Facility in Faribault, Minnesota ("MCF-Faribault").  FAC, ¶ 60.  Richards also claimed that he sought to run for United States Senate while he was imprisoned at MCF-Faribault.  Id., ¶ 55.

In connection with his candidacy, Richards mailed a copy of his "political tract," entitled "MARK BRANDT DAYTON," to an employee of MCF-Faribault.  Id., ¶ 62.  In

response, Faribault prison officials devised a campaign of retaliation against Richards. Id., ¶¶ 59, 70.

On December 31, 2013, Richards sent a letter to defendants Donald Mark Ritchie, Secretary of State for the State of Minnesota, and Brad Anderson, Election Administrator to Ritchie, seeking information regarding the requirements for running for Governor and Lieutenant Governor of Minnesota.  Id., ¶ 12.  Ritchie and Anderson did not respond to the letter, "thereby leaving [Richards] (A) uncertain of his fundamental constitutional rights to ballot access in the year 2014 (an in subsequent election years) for the offices of Governor and Lieutenant Governor, and (B) in imminent danger of losing the opportunity to exercise his fundamental constitutional rights to political expression and association in the year 2014 by means of an on-ballot candidacy for either of those offices."  Id.

On January 11, 2014, Richards sent a letter to defendant Bert Black, Data Practices Compliance Officer to Ritchie, requesting a copy of the American Fund Constitution,[1] which Anderson had retained in the files of the Minnesota Secretary of State.  Id., ¶ 41.  In his letter, Richards enclosed a check for $1.00.  Id. (attaching January 11, 2014 Letter from Leonard Richards to Bert Black [Docket No. 28-1]).  Black never responded to the letter.  FAC, ¶ 41.  Anderson, on the other hand, sent a letter to Richards stating that $1.00 was being returned to him.  Id., ¶ 42.  Richards has not yet received his $1.00.  Id.

In the First Amended Complaint, Richards alleged that in violation of Minn. Stat. §§ 204B and 202A; the Minnesota Constitution; and the First, Fifth, Eighth, and

---

[1]    The American Fund is a political party formed by Richards in 2013.  See Docket No. 16-1 (Declaration of Leonard Richards), pp. 10, 11.

Fourteenth Amendments to the United States Constitution, defendants Mark Dayton, Ritchie, Anderson, Black, and the State of Minnesota denied Richards the right to run for Governor or Lieutenant Governor of Minnesota by failing to provide notary services for prisoners at all times, (FAC, ¶ 32) ("Sometimes a Notary Public is available to Plaintiff, and sometimes a Notary Public is not available to Plaintiff"), and by:

- Imposing illegal qualifications for ballot access—namely, that a candidate (1) provide a contact telephone number, email address, website URL, and "campaign contact" address; (2) submit an affidavit for registering on-ballot candidacy, which affirms that he is an eligible voter, and that he attended his political party's caucus; (3) specify a district from which he seeks election; (4) state the name of his political party or principle in three words or less; (5) and pay a filing fee; and

- Failing to answer Richards' letter to Ritchie and Anderson, which sought information concerning requirements for on-ballot candidacy.

FAC, ¶¶ 11-13, 17-29, 31-41, 43-55, 130-38, 143-45.

Additionally, Richards alleged that in violation of Article I of the United States Constitution, as well as the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, Dayton, Ritchie, Anderson, and the State of Minnesota denied Richards the right to run for President, Vice President, United States Senator, and United States Representative by requiring that candidates: (1) pay a filing fee to register on-ballot candidacy; (2) submit an affidavit to register on-ballot candidacy; and (3) disclose more ballot-qualifying information than required by Article I of the United States Constitution.  FAC, ¶¶ 55, 139-145.

Subsequent to the service and filing of the First Amended Complaint, on May 20, 2014, Richards mailed a "Notice of Candidacy" to the Office of the Secretary of State ("OSS"), which included Richards' name, office sought, political party, and legal address.  See Plaintiff's Deprivations and Notice of Candidacy Declaration (May 20,

2014), p. 5 [Docket No. 48].  Richards declared that he was running for the office of U.S.

Representative for the Sixth District of Minnesota; he will be an inhabitant of Minnesota

when elected; he is at least 25 years old; and he has been a citizen of the United States

for not less than seven years.  Id.

On May 28, 2014, Richards received the following letter from Black:

Dear Mr. Richards,

Thank you for your submission dated May 20, 2014, and received in this office on May 27, 2014.  In that submission you provided a document titled "Notice of Candidacy" to which you also referred in the accompanying document entitled "Plaintiff's Deprivations and Notice of Candidacy Declaration."

Your Notice of Candidacy is being returned to you.  You are not filed as a candidate for any office in this state at this time.

To file for office in Minnesota as a major party candidate in a partisan election, the law requires that a candidate must file an Affidavit of Candidacy form and either pay a filing fee as designated by statute, or provide a petition in lieu of the filing fee. See *Minnesota Statutes,* section 204B.03 and 204B.06 to 204B.11.

A blank Affidavit of Candidacy form is enclosed for your convenience. The form must be signed in the presence of a notary or other person authorized to administer oaths under section 358.10, as required by [Minn. Stat. §] 204B.09, subdivision 1, clause (b).

Affidavit of Bert Black ("Black Aff."), ¶ 6, Ex. A, p.1, 3 [Docket No. 67].  Black also sent

to Richards the OSS's "2014 Guide for Candidates."  Id.  According to Black, Richards'

"Notice of Candidacy" did not include a filing fee or a nominating petition in lieu of a

filing fee.  Id., ¶ 5; Ex. A, pp. 4-5.  As of July 9, 2014, the OSS had not received

Richards' notarized Affidavit of Candidacy, filing fee, or nominating petition.  Id., ¶ 7.

5

Richards filed the present motion for injunctive relief on May 27, 2014. The focus of the motion is Richards' attempt to run as an on-ballot candidate for U.S. Representative for the Sixth Congressional District. By this motion, Richards sought a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Ritchie, Anderson, Black, (collectively, the "OSS Defendants") and the State of Minnesota:

> (1) to place Richards' name of the 2014 Primary Election ballot for the Democratic-Farmer-Labor party nomination for U.S. Representative, Sixth District; (2) to place Richards' name on the ballot for that office in the 2014 General Election if Plaintiff prevails in the Primary Election; and (3) to accept Plaintiff's <u>Notice of Candidacy</u> dated May 20, 2014, as full and final compliance—without any filing fee or anything else—with all <u>lawful</u> requirements for the placing of Plaintiff's name on the ballot for the said Federal legislative office.

Pl.'s Mot., p. 1 (emphasis in original).

Richards also sought a temporary restraining order requiring Ritchie "to arrange in all respects to place [his] name on the 2014 ballot for U.S. Representative, Sixth District, as a Democratic-Farmer-Labor party candidate for the said Federal legislative office." <u>Id.</u>, pp. 1-2.

Subsequent to filing the motion, Richards attempted unsuccessfully to get the Affidavit of Candidacy sent to him by Black notarized. On May 30, 2014, Richards went to the office Lt. Gloria Andreachi, a notary public at MCF-Stillwater. Richards Declaration C, ¶ 3 [Docket No. 85]. Lt. Andreachi declined to notarize Richards' Affidavit of Candidacy, citing DOC policy. <u>Id.</u> Lt. Andreachi then handed Richards a copy of the DOC's notary policy (Division Directive 106.025) and escorted him back to his cellblock. <u>Id.</u>

"For the 2014 election, there [were] a number of timelines and deadlines connected with filing for office and the production and distribution of ballots for both absentee voting and voting at the polling place in the primary election." Affidavit of Gary Poser ("Poser Aff."), ¶ 3 [Docket No. 68]. Pursuant to Minn. Stat. § 204B.09, subd. 1, Affidavits of Candidacy must be submitted to the OSS between 84 and 70 days before the state primary. Id., ¶ 4. Minnesota's primary election is held on the second Tuesday in August. Id. Accordingly, candidates were required to file for office between May 20, 2014 and June 3, 2014, at 5:00 p.m. Id. The OSS certified candidates for state and federal office on June 6, 2014. Id., ¶ 6. Once the OSS certified the candidates, county auditors immediately proceeded to finalize the layout of the ballots. Id., ¶¶ 5, 6. Absentee ballots were sent out on Friday, June 27, 2014, to comply with Minn. Stat. §203B.081, which requires they be sent at least 46 days before the state primary election, and pursuant to the Military and Overseas Voter Empowerment Act, Pub. L. No. 111-84, 123 Stat. 2190, §§ 575-589 (2009), which requires that absentee ballots be sent to military and overseas voters at least 45 days before the federal election. Id., ¶¶ 8, 9.

Under Minnesota law, a candidate for federal office must meet certain requirements to appear on the ballot. First, a candidate must submit a notarized Affidavit of Candidacy. Minn. Stat. § 204B.06, subd. 1(1); 204B.09, subd. 1(b). Second, the candidate must either pay a filing fee or submit a nominating petition in lieu of the fee. Minn. Stat. § 204B.11. The nominating petition must include a certain number of signatures from eligible voters. Id. The number of signatures required

depends on the office sought.  For U.S. Representative, the petition must include 1,000 signatures.  Minn. Stat. § 204B.11, subd. 2(b).

In his supporting memorandum, Richards argued that as a result of these statutory provisions, he faces irreparable harm because he has lost the opportunity to participate as an on-ballot candidate for U.S. Representative in the 2014 election, and the deprivation of his constitutional right to run for office continues.  Plaintiff's Memorandum in Support of Motion for Temporary Restraining Order [T.R.O.] and for Preliminary Injunction ("Pl.'s Mem."), p. 5 [Docket No. 47].  Richards contended that, as a matter of law, no state can bar a prisoner from the congressional ballot. Id., pp. 5-6. In addition, Richards maintained that he is likely to succeed on the merits of his suit because these provisions clearly violate Article I of the United States Constitution by imposing additional "qualifications" to run for federal congressional office (a filing fee or petition in lieu of a filing fee, and a notarized affidavit) – beyond the three qualifications required by the Constitution (age, citizenship and residency). Id., pp. 6-7.  Richards further claimed that his loss of opportunity to run for U.S. Representative outweighs the hardship the State of Minnesota will suffer by having to obey the Constitution, and therefore, the balance of hardships favors granting his motion. Id., pp. 7-8.  Richards urged that granting his motion will serve the public interest because it is always in the public interest for the government to obey the law. Id., p. 8.

Defendants responded that Richards' motion should be denied as moot because all absentee ballots for the 2014 general election have already been sent to voters pursuant to federal and state law that require that absentee ballots be sent to certain military and overseas voters, along with those persons who request them in advance of

8

the state primary election, by dates that have already passed.   State Defendants'
Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order and
Preliminary Injunction ("Defs.' Mem."), pp. 6-7 [Docket No. 65].   Consequently, because
the Court can no longer grant effective relief to Richards, his motion is moot.   Id., p. 7
(citng McFarlin v. Newport Special Sch. Dist., 980 F.2d 1208, 1210 (8th Cir. 1992).

Defendants also argued that Minnesota's ballot-access requirements (i.e. filing a
notarized Affidavit of Candidacy and paying a filing fee or submitting a petition of 1,000
signatures in lieu of a filing fee) are constitutional, and therefore, Richards is not likely to
prevail on the merits of his claims against the OSS Defendants.   Id., pp. 8-14.
Moreover, because he cannot succeed on his ballot-access claims, he is not at risk of
suffering any legally cognizable harm.   Id., p. 14.   Defendants further asserted that the
balance of harms clearly favors them, as granting Richards' motion would force
elections officials to revise ballots at the last minute before the August 12 primary
election, and the public interest cuts strongly against granting the instant motion
because voters should not have to pay for the "needless emergency procedures"
required to add Richards' name to the ballot.   Id., pp. 14-15.

As for Richards' claim that the Minnesota Department of Corrections' ("DOC")
declined to provide him with free notary services to notarize his Affidavit of Candidacy,
defendants maintained he was free to arrange his own notary services, and in any
event, because he failed to file a grievance under the DOC grievance system, this claim
is barred under the Prisoner Litigation Reform Act ("PLRA") for failure to exhaust
administrative remedies.   Id., p. 12 n. 5 (citing Affidavit of Mary McComb, ¶¶ 4, 5
[Docket No. 66).

In reply, Richards responded to defendants' argument that his motion was moot by indicating that he can and intends to run in 2016, 2018, and beyond for federal elective office, and for Minnesota Governor or Lieutenant Governor in 2018 and all succeeding election years.[2] Id., pp. 7, 9. Further, even though he cannot appear on the primary election ballot in 2014, the Court can order his appearance on the 2014 general election ballot and on both the primary and general election ballots in 2016 and 2018. Id., pp. 8, 10-11.

Additionally, Richards asserted that since filing his motion, personnel at MCF-Stillwater have placed unconstitutional impediments on his right to seek federal office, as evidenced by their refusal to provide him free notary services to execute the Affidavit of Candidacy. Id., pp. 11-14.

With respect to defendants' assertion that he had failed to exhaust administrative remedies under the PLRA, Richards responded that the DOC expressly bars grievances where, as here, a different administrative procedure applies. Id., p. 15. That procedure, known as "policy revision," is a "lengthy and cumbersome multi-step method for attempting to change a DOC policy." Id. (citing Declaration of Maurice L Ward, Ex. 1 (Revision Review Form)).

Richards concluded by affirming that he meets all the qualifications to run for U.S. Representative and he is able to pay the $300 filing fee; the only barrier preventing him from running for U.S. Representative was the requirement that his Affidavit of Candidacy be notarized. Id., pp. 13, 16-17; Richards Declaration C, ¶ 4 [Docket No. 85]..

---

[2]     Richards also noted that there is no limit on the number of offices a candidate can seek by write-in votes. Pl.'s Reply, p. 9.

## II.    LEGAL STANDARD

"When evaluating whether to issue a preliminary injunction,[3] a district court should consider four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest."    Roudachevski v. All-American Care Centers, Inc., 648 F.3d 701, 705 (8th Cir. 2011) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).    "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." West Pub. Co. v. Mead Data Cent., Inc., 799 F.2d 1219, 1222 (8th Cir. 1986), cert. denied, 479 U.S. 1070 (1987) (citation omitted).    Such injunctive relief is an extraordinary remedy and the movant has the burden of establishing the propriety of an injunction. See Roudachevski, 648 F.3d at 705 (citing Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003)).    The burden is especially heavy where, as in this case, the moving party seeks not to maintain the status quo, but to obtain relief similar to that which it could obtain after a trial on the merits. See Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 486 (8th Cir. 1993) (citation omitted).

---

[3]    Courts in the Eighth Circuit apply the same standards to a request for a preliminary injunction and temporary restraining order. See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project, 877 F.2d 707, 708 (8th Cir.1989) (affirming the district court's application of the Dataphase factors to a motion for a temporary restraining order); Jackson v. Nat'l Football League, 802 F. Supp. 226, 229 (D. Minn. 1992) (concluding that the Dataphase factors apply to requests for temporary restraining orders and preliminary injunctions) (citations omitted).

## II.      DISCUSSION

### A.      Is this Motion Moot?

As an initial matter, the Court must determine whether Richards' motion should be dismissed as moot.

"'In order to invoke the jurisdiction of the federal courts, the parties must demonstrate an actual, ongoing case or controversy within the meaning of Article III of the Constitution.'" Republican Party of Minn., Third Cong. Dist. v. Klobuchar, 381 F.3d 785, 789-90 (8th Cir. 2004) (quoting Iron Cloud v. Sullivan, 984 F.2d 241, 242 (8th Cir. 1993)); see also Ringo v. Lombardi, 677 F.3d 793, 796 (8th Cir. 2012) ("The exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy.") (quoting Preiser v. Newkirk, 422 U.S. 395, 401 (1975)).   "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Ringo v. Lombardi, 677 F.3d 793, 796 (8th Cir. 2012) (quoting Preiser, 422 U.S. at 401); Gilbert v. Nix, 990 F.3d 1044, 1046 (8th Cir. 1993) (same).

"'When, during the course of litigation, the issues presented in a case lose their life because of the passage of time or change in circumstances ... and a federal court can no longer grant effective relief, the case is considered moot' and cannot be heard by a court." Life Investors Ins. Co. of Am. v. Fed. City Region, Inc., 687 F.3d 1117, 1121 (8th Cir. 2012) (quoting Ali v. Cangemi, 419 F.3d 722, 723 (8th Cir. 2005)); see also Ringo, 677 F.3d at 796 ("When a case . . . no longer presents an actual, ongoing case or controversy, the case is moot and the federal court no longer has jurisdiction to hear it.") (quoting Neighborhood Transp. Network, Inc. v. Pena, 42 F.3d 1169, 1172 (8th Cir. 1994).

"A narrow exception to the mootness doctrine exists when a dispute is capable of repetition yet evades review." Klobuchar, 381 F.3d at 790 (citing Webster Groves Sch. Dist. v. Pulitzer Publ'g. Co., 898 F.2d 1371, 1373–74 (8th Cir.1990)). "In order to fall within this exception (1) there must be a reasonable expectation that the same complaining party would be subjected to the same action again (the 'capable of repetition' prong); and (2) the action must be in duration too short to be fully litigated prior to cessation or expiration (the 'evading review' prong)." Neighborhood Transp. Network, Inc., 42 F.3d at 1172 (footnote omitted) (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)); Klobuchar, 381 F.3d at 790 ("A dispute is capable of repetition yet evades review when the challenged action is too short in duration for timely review and a reasonable expectation exists that the complaining party will be subject to the same action again.") (citation omitted).

In this case, to the extent Richards is seeking to be added to the 2014 ballot, his motion is clearly moot, as the 2014 election has come and gone. Consequently, the issue is whether the present controversy falls under the "capable of repetition, yet evading review" exception.

As to the first prong of this exception, the Court finds that it cannot reasonably expect that the only impediment Richards has identified that prevents him from running for U.S. Representative – notarization of an Affidavit of Candidacy – will repeat itself. The next election for U.S. Representative (or Senator) is not until 2016, and the next election for Governor and Lieutenant Governor of Minnesota is not until 2018. Therefore, this Court has no factual basis from which it could reasonably conclude that the DOC's current notarization policy (which limits free notary services to court-related

documents)[4] will remain in place until that time.  The DOC's current notary policy went into effect on November 2, 2010.  See McComb Aff., Ex. A (DOC Division Directive 106.025).  And, in fact, Richards admitted that "[i]n both 1992 and 1994, . . . the State, acting through its Oak Park Heights prison, notarized Plaintiff's Affidavit of Candidacy forms, without the slightest difficulty."  Memorandum of Plaintiff in Opposition to the State Defendants' Motion to Dismiss, p. 26 [Docket No. 73].  Consequently, Richards was able to run as an on-ballot candidate for United States Representative in 1992, and for United States Senator in 1994.  FAC, ¶ 4(a); see also Pl.'s Mem., p. 6 ("In 1992, for instance, Plaintiff received more than 14,500 votes for Congress (8th District) during his immurement at Oak Park Heights . . . ."); Pl.'s Reply, p. 8 ("In fact, Plaintiff has run for Congress many times, and some of those candidacies have been on-ballot while imprisoned.  For instance, Plaintiff ran for U.S. Representative, 8th District, in 1992 while immured at the Oak Park Heights state prison.").

Further, even if the DOC does not alter its present notary policy before the next election, the Court cannot reasonably expect that Richards will be unable to obtain alternative notary services.  Richards contended that, in mid-July, 2014, the prison law librarian told him that one prisoner had paid $200 to have a notary come to MCF-Shakopee.  Richards Declaration A, ¶ 5 [Docket No. 75].  Even if this statement were

---

[4]    See McComb Aff., Ex. A (DOC Division Directive 106.025), p.1 ("POLICY:  Each warden will ensure notary services are available at no charge as necessary to provide offender access to the courts in actions relating to their criminal convictions or to seek redress of complaints concerning the conditions of their confinement.  Facilities may develop instructions to implement this policy."); p. 2 ("Notaries public will not notarize non-legal documents, including but not limited to: blank pieces of paper; pictures or photos; personal artwork, literature, songs, or drawings; personal correspondence (even if addressed to government officials), grievances, or other non-legal documents.") (emphasis added).

admissible evidence (which it is not), as opposed to double hearsay (which it is), this fee is well beyond the fee permitted by law for notary services. 2014 Minnesota Laws 301 § Minn. Stat. § 357.17 (2014) ("The maximum fees to be charged and collected by a notary public shall be as follows: . . . (4) for any affidavit or paper for which provision is not made herein, $5 per folio, and $1 per folio for copies[.]"). Thus, Richards' broad assertion that alternative notary services are prohibitively expensive and will be a barrier to his candidacy is speculative at best.

In sum, because there is no reasonable expectation that any Affidavit of Candidacy submitted in the next congressional election will be rejected, the instant controversy is not "capable of repetition. Therefore, the Court agrees with defendants that his motion for injunctive relief is moot and should be denied on that basis. However, even if the motion were not moot, as discussed below, the Court finds that Richards' claims fail on the merits.

### B.    Likelihood of Success on the Merits

In the Report and Recommendation issued by this Court on defendants' motion to dismiss, the Court has already determined that their motion should be granted with respect to Richards' state and federal ballot claims. Nevertheless, for completeness of this decision on Richards' motion for a TRO and preliminary injunction, the Court addresses the merits of his federal ballot claims here, as well.

### 1.    Failure to Provide Information

Richards claimed that Ritchie and Anderson failed to respond to his letter dated December 30, 2013, in which Richards made several objections to the State's requirements for on-ballot candidacy, thereby leaving him uncertain of his fundamental

constitutional rights to ballot access and in imminent danger of being excluded from the 2014 ballot. FAC, ¶¶ 12, 17. Richards contended that Ritchie and Anderson, by their refusal to answer his letter, violated the First, Fifth, and Fourteenth Amendments to the United States Constitution.

This claim fails as a matter of law. Richards has cited no authority for the proposition that a state agency has a constitutional duty to respond to a citizen's demand for information or action, or that the failure to do so constitutes a denial of his fundamental right to run for office. To the contrary, "[t]here is no discernible basis for a constitutional duty to disclose, or for standards governing disclosure of or access to [government] information. Houchins v. KQED, Inc., 438 U.S. 1, 14 (1978); id. at 16 (Stewart, J., concurring) ("The First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government . . . ."); see also In re Boston Herald, Inc., 321 F.3d 174, 180 (1st Cir. 2003) ("Both the constitutional and the common law rights of access have applied only to judicial documents.") (citation omitted).

Accordingly, the Court concludes that Richards is not likely to succeed on the merits of this claim.

### 2. Filing Fee, Nominating Petition, and Affidavit of Candidacy Requirements

Richards contended that Minn. Stat. §§ 204B.06 and 204B.11 impose unconstitutional restrictions on his fundamental right to appear as a candidate for United States Representative.

At the outset, the Court finds that Richards does not have standing to challenge § 204B.11, which requires that candidates pay a filing fee or submit a nominating petition in lieu of the fee.

"'[T]he question of standing is whether the litigant is entitled to have the [federal] court decide the merits of the dispute or of particular issues.'" Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 933 (8th Cir. 2012) (alteration in original) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). "'[I]f a plaintiff lacks standing, the district court has no subject matter jurisdiction.'" Young Am. Corp. v. Affiliated Computer Servs. (ACS), Inc., 424 F.3d 840, 843 (8th Cir. 2005) (citing Faibisch v. Univ. of Minn., 304 F.3d 797, 801 (8th Cir. 2002)). "'To show standing under Article III of the U.S. Constitution, a plaintiff must demonstrate (1) injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) the likelihood that a favorable decision by the court will redress the alleged injury.'" Iowa League of Cities v. E.P.A., 711 F.3d 844, 869 (8th Cir. 2013) (citation omitted).

"For purposes of standing, a plaintiff's injury must consist of 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" Young Am. Corp., 424 F.3d at 843 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

Here, although Richards suffered an "injury in fact" because he was unable to register his on-ballot candidacy, there was no causal connection between that injury and the requirements set forth in Minn. Stat. § 204B.11. Richards admitted in his reply memorandum that the American Fund, a political party, was "stand[ing] by with immediately withdrawable bank funds sufficient for Plaintiff to pay the nonrefundable

$300 filing fee." Pl.'s Reply, p. 13 (footnote omitted); Richards Declaration C, ¶ 4 [Docket No. 85]; see also Pl.'s Reply, p. 16 (stating he "overcame for 2014 the filing-fee hurdle through the funding provided to him by the American Fund to pay the State-required $300 to the Secretary of State."). Thus, the only reason Richards was unable to register his candidacy was the DOC's alleged refusal to notarize his Affidavit of Candidacy, as required by § 204B.06. Although Richards may object to the filing fee and nominating petition requirement as a matter of principle, that is not sufficient to create standing under Article III. For that reason, Richards is not likely to succeed on the merits of this claim.

With respect to Minn. Stat. § 204B.06, which requires candidates to submit a notarized Affidavit of Candidacy, the Court finds that this claim was not properly pled in the First Amended Complaint. The first time Richards alleged that the notarization requirement was unconstitutional was in his memorandum in response to defendants' Motion to Dismiss. Memorandum of Plaintiff in Opposition to the State Defendants' Motion to Dismiss, p. 20 [Docket No. 73]. Indeed, the requirement that Affidavits of Candidacy be signed in the presence of a notary public does not appear in Minn. Stat. § 204B.06. Rather, that provision is found in Minn. Stat. § 204B.09(b), which was not referenced in the First Amended Complaint.

At any rate, even if the Court were to allow Richards to amend his complaint to include a challenge to the notarization requirement, the claim fails as a matter of law.

Article I, § 4, cl. 1 of the United States Constitution provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law

18

make or alter such Regulations, except as to the Places of [choosing] Senators."  This provision is also known as the "Elections Clause."

"[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  Storer v. Brown, 415 U.S. 724, 730 (1974).  Accordingly, "[t]he Elections Clause gives States authority 'to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.'"  U.S. Term Limits Inc. v. Thornton, 514 U.S. 779, 834 (1995) (quoting Smiley v. Holm, 285 U.S. 355, 366 (1932)).  "States are thus entitled to adopt 'generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself.'"  Id. (citing Anderson v. Celebrezze, 460 U.S. 780, 788 n. 9 (1983)).

"For a ballot access restriction to be found unconstitutional, a challenger first must establish that the law imposes a substantial burden."  Libertarian Party of N. Dakota v. Jaeger, 659 F.3d 687, 694 (8th Cir. 2011) (citation omitted); see also Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) ("When deciding whether a state election law violates First and Fourteenth Amendment associational rights, we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary.") (citation and internal quotation marks omitted).

"Regulations that impose severe burdens on associational rights must be narrowly tailored to serve a compelling state interest."  Clingman v. Beaver, 544 U.S.

581, 586 (2005) (citation omitted).   "[W]hen regulations impose lesser burdens, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'"   Id. at 586-87 (citation omitted).   However, "[a]n undue burden, which essentially removes all realistic chance for a minor party or independent candidate to ever access the general election ballot, cannot be justified by any state interest, regardless of how compelling the interest may be."   Jaeger, 659 F.3d at 694 (citations omitted).   "[T]he crux of this analysis is to determine whether the challenged statute 'freezes the status quo' of a two-party system, or whether '[i]t affords minority political parties a real and essentially equal opportunity for ballot qualification.'"   Id. (quoting Am. Party of Tex. v. White, 415 U.S. 767, 787-88 (1974).

"[T]he rule fashioned by the [Supreme] Court to pass on constitutional challenges to specific provisions of election laws provides no litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause."   Storer, 415 U.S. at 730.   As such, a "[d]ecision in this context, as in others, is very much a matter of degree, very much a matter of consider(ing) the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification."   Id. (internal citations and quotation marks omitted).

Federal courts have upheld notarization requirements in the absence of some evidence that the statute at issue is unusually burdensome.

In Am. Party of Texas v. White, 415 U.S. 767 (1974), several minority political parties objected to a Texas statute requiring that all signatures evidencing support for a political party be notarized.   These signatures were necessary for unaffiliated or

minority-party candidates to appear on the ballot. See id. at 772-775. The Court upheld the statute, noting that the plaintiffs "ma[de] little or no effort to demonstrate its impracticability or that it is unusually burdensome." Id. at 787; see also Fishman v. Schaffer, 429 U.S. 1325, 1328-29 (1976) (Marshall, J., in chambers) ("[A] requirement more burdensome than Connecticut's that all signatures be notarized at the time they are collected is not unconstitutional, at least absent more proof of impracticability or unusual burdensomeness than was before the Court.") (citing Am. Party of Texas, 415 U.S. at 787). The Court also agreed with the district court's finding that there was "no alternative if the State was to be able to enforce its laws to prevent voters from crossing over or from voting twice for the same office." Id.

In Am. Constitutional Law Found., Inc. v. Meyer, 120 F.3d 1092 (10th Cir. 1997), aff'd sub nom. Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182 (1999), a Colorado statute required circulators of ballot-initiative petitions to "sign affidavits averring that the signatures [they] collected [were] valid." Id. at 1099 (citation omitted). The court found that "[t]here is little, if anything, in the record to support plaintiffs' claim that the affidavit requirement significantly burdens political expression by decreasing the pool of available circulators. Hence exacting scrutiny is not required." Id. (footnote omitted).

On the other hand, in Perez-Guzman v. Gracia, 346 F.3d 229 (1st Cir. 2003), the First Circuit upheld a district court order striking down a Puerto Rico law, which required that new political parties collect over 100,000 separately notarized petitions. In Puerto Rico, only attorneys could serve as notaries, and thus there were fewer than 8,000 notaries in the entire commonwealth. Id. at 230, 232 (citation omitted). The court noted

that "the lawyer-notarization requirement greatly hampered [plaintiff's] efforts to gather signatures because, in addition to convincing voters that a new political party was needed, he also had to convince them to repair to an attorney's office." Id. at 239. In addition, the court found that the cost of notarizing 100,000 petitions would be at least $1,500,000. Id. at 240. Thus, the court concluded that "Puerto Rico's lawyer-notarization requirement imposes a severe burden on [plaintiff's] rights." Id. at 243.

Minnesota's notarization requirement is significantly less onerous than those in the above cases. First, unlike in Am. Party of Texas, Minnesota requires all candidates to provide a notarized Affidavit of Candidacy, regardless of party affiliation or office sought. In that respect, candidates of well-established parties have no advantage over unaffiliated or new-party candidates. Second, Minnesota only requires notarization of the Affidavit of Candidacy. It does not require that signatures appearing on a nominating petition be notarized. Thus, unlike in Texas, a single notary stamp will suffice. Finally, unlike in Perez-Guzman, notaries in Minnesota do not have to be licensed attorneys. Therefore, as a practical matter, notary services are considerably more accessible (and presumably less expensive) than in Puerto Rico.

In short, Minnesota's notarization requirement "'in no way freezes the status quo, but implicitly recognizes the potential fluidity of American political life.'" Am. Party of Texas, 415 U.S. at 787 (quoting Jenness v. Fortson, 403 U.S. 431, 439 (1971)). Accordingly, the Court finds that Minn. Stat. § 204B.09(b) does not impose a severe burden on the right to ballot access.

Because the notarization requirement is not a "severe burden," Minnesota need only have a rational, nondiscriminatory interest in requiring that Affidavits of Candidacy

be notarized. "States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364-65 (1997) (citations omitted). Minnesota's notarization requirement rationally furthers these interests by preventing frivolous or fraudulent candidacies and ensuring that candidates are committed to the electoral process.

Accordingly, the requirement of a notarized Affidavit of Candidacy, as set forth in Minn. Stat. § 204B.09(b), is a reasonable and constitutional restriction on the right to ballot access. The Court concludes that Richards is unlikely to succeed on the merits of this claim.

### 3. Denial of Notary Services

Finally, Richards contended that the OSS Defendants denied him notary services; and instead proposed the "ridiculously and ruinously unreasonable 'alternative'" that he locate and pay a notary to come to the prison to notarize his affidavit. Pl.'s Reply, p. 12.

The fundamental problem with Richards' claim is two-fold. First, as this Court determined in the Report and Recommendation addressing defendants' motion to dismiss, any claim by Richards against the State of Minnesota for injunctive relief (and damages) is barred by the Eleventh Amendment. Second, to the extent that he seeks to obtain injunctive relief against state officials in their official capacity for the DOC's notary policy, Richards has named the wrong defendants. Ritchie, Anderson, and Black are employees of the OSS. They are not responsible for promulgating or enforcing DOC policy, and Richards has alleged no facts indicating that they were in any way

involved in the denial of notary services to him.  Thus, even if Richards was precluded from submitting an Affidavit of Candidacy because he could not get it notarized, the persons responsible for this result are not the OSS defendants but those persons responsible for administering the DOC's rules with respect to the availability of a prison notary.  See E.E.O.C. v. State of Ill., 69 F.3d 167, 170 (7th Cir. 1995) ("'A person aggrieved by the application of a legal rule does not sue the rule *maker*-Congress, the President, the United States, a state, a state's legislature, the judge who announced the principle of common law. He sues the person whose acts hurt him.'" (quoting Quinones v. City of Evanston, 58 F.3d 275, 277 (7th Cir.1995) (emphasis in original)).

In conclusion, neither Ritchie, Anderson, nor Black have any connection with the conduct Richards seeks to remedy with respect to the provision or denial of notary services, and therefore, Richards' motion cannot be granted against them based on this claim.  For all of these reasons, this Court concludes that this claim is not likely succeed on the merits against the OSS Defendants or the State of Minnesota.

### C.  The Remaining *Dataphase* Factors

Having concluded that Richards' federal ballot claims have no merit, the Court need not address the balance of the Dataphase factors.

"In deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant." Laclede Gas Co. v. St. Charles Cnty., Mo., 713 F.3d 413, 419-20 (8th Cir. 2013) (internal quotation marks omitted) (quoting Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp., 59 F.3d 80, 83 (8th Cir. 1995); S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist., 696 F.3d 771, 776 (8th Cir. 2012) (same) (citation omitted); MacDonald v. Hopps, Civ. No. 03-6445 (MJD/JGL), 2004 WL 114940, at *2

(D. Minn. Jan. 13, 2004) (same) (citing <u>S & M Constructors Inc., v. Foley Co.</u>, 959 F.2d 97, 98 (8th Cir. 1992); <u>see</u> <u>also</u> <u>Cedar-Riverside People's Ctr. v. Minn. Dep't of Human Servs.</u>, Civ. No. 09-768 (DSD/SRN), 2009 WL 1955440, at *3 (D. Minn. July 6, 2009) ("While not overriding the other *Dataphase* factors, the likelihood of success on the merits is a preeminent consideration."); <u>Bremer Bank, Nat. Ass'n v. John Hancock Life Ins. Co.</u>, Civ. No. 06-1534 (ADM/JSM), 2006 WL 1205604, at *2 (D. Minn. May 2, 2006) ("Although *Dataphase* lists this as the final factor for consideration, likelihood of success on the merits is often the most significant of the four factors considered by courts in determining whether to issue a temporary restraining order.") (citation omitted).

"To that end, 'the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied.'" <u>Barrett v. Claycomb</u>, 705 F.3d 315, 320 (8th Cir. 2013) (citing <u>CDI Energy Servs., Inc. v. W. River Pumps, Inc.</u>, 567 F.3d 398, 402 (8th Cir. 2009).  Indeed, "[i]f a party's likelihood of succeeding on the merits is sufficiently low, a court may deny a preliminary injunction even if the other three factors—irreparable harm, balance of harms, and the public interest—weigh in the party's favor."  <u>Honeywell Int'l Inc. v. Stacey</u>, Civ. No. 13-3056 (PJS/JJK), 2013 WL 9851104, at *5 (D. Minn. Dec. 11, 2013) (citations omitted).

Since, as explained above, Richards' claims cannot succeed on the merits, there is no threat of irreparable harm for which Richards has any legally cognizable interest in preventing, no balancing of harms to be performed, and no public interest to be served

in granting his motion.   Accordingly, the remaining <u>Dataphase</u> factors weigh against

granting Richards' motion.[5]

## III.   RECOMMENDATION

For the reasons set forth above, it is hereby RECOMMENDED that:

Plaintiff's Motion for Temporary Restraining Order and for Preliminary Injunction

[Docket No. 45] be **DENIED**.


Dated:        January 30, 2015


                                                    *s/ Janie S. Mayeron*
                                                    JANIE S. MAYERON
                                                    United States Magistrate Judge

---

[5]       Defendants contended that Richards' motion is barred under the PLRA for failure to exhaust administrative remedies.   Under the PLRA, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."   42 U.S.C. § 1997e(a).

In this motion, however, Richards is not requesting that the DOC provide notary services or alter its notary policies.   As such, Richards is not raising a challenge to "prison conditions," and therefore, the PLRA is not applicable.   Of course, if Richards does decide to pursue a claim against DOC officials in the event they refuse to notarize his Affidavit of Candidacy, then he will have to determine whether he must first grieve any denial of that request through the grievance process provided by the DOC before commencing suit on this claim.

**NOTICE**

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 13, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.   A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.